

**ALEXANDER HOOD** (*pro hac vice forthcoming*)
**DERMOT LYNCH** (*pro hac vice forthcoming*)
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org
      dermot@towardsjustice.org
*Attorneys for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ABEL CÁNTARO CASTILLO, and those similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>WESTERN RANGE ASSOCIATION, MELCHOR GRAGIRENA; and EL TEJON SHEEP COMPANY,<br><br>      Defendants. | Civil Case No.<br><br>**COMPLAINT**<br><br>3:16-cv-00237 |

1        Plaintiff Abel Cántaro Castillo was paid a shockingly low wage of as little as one or two

2  dollars an hour for his work as a shepherd in California and Nevada. This is well below the

3  minimum wage of $8.25 per hour that Mr. Cántaro should have been paid under Nevada law and

4  the minimum of $7.25 per hour he should have been paid pursuant to the Fair Labor Standards

5  Act (FLSA).



1       Mr. Cántaro is not alone in suffering either of these violations for the hundreds of hours

2  of work he has sometimes provided to the ranching industry in a single week. This is because his

3  employers—Defendants here—have a policy of paying all shepherds they employ a low *monthly*

4  wage that has the effect of creating illegally low *hourly* rates of pay, in light of the actual number

5  of hours shepherds are working.

6       This illegal monthly-pay policy manifests in two ways at issue in this case. First,

7  Defendant Western Range Association (WRA) has a policy of setting the wages of all Nevada

8  shepherds, including Mr. Cántaro, at a rate of as little as $800 per month, despite the fact that this

9  translates to an effective wage rate of between one and two dollars an hour—much less than the

10  Nevada minimum of $8.25 per hour. Defendants El Tejon Sheep Company and Melchor

11  Gragirena adhered to the same illegal monthly wage policy in acting as Mr. Cántaro's joint

12  employers.

13       Second, in addition to violating Nevada state law, Defendants violated FLSA by paying

14  Mr. Cántaro and all other shepherds at Defendant Gragirena's ranch less than the FLSA

15  minimum wage of $7.25 per hour. To be sure, FLSA contains a narrowly-construed exception

16  from its minimum wage protections for those principally engaged in herding work at locations so

17  remote and isolated that it would be difficult for an employer to calculate the number of hours

18  worked. But the exception cannot apply here because work at El Tejon was not principally

19  remote: for the majority of the time Mr. Cántaro and all other shepherds worked at El Tejon, they

20  were performing farming or other non-herding work just off well-trafficked highways and on

21  cultivated farmland—often under the direct supervision Defendant Gragirena or his foreman.

22  Given the type of work El Tejon shepherds were performing—and the locations where the work

1    was performed—the FLSA exception cannot apply and Mr. Cántaro is entitled to the hourly

2    FLSA minimum wage for the entirety of time he was working as a shepherd.

3          Mr. Cántaro on his own behalf and those similarly situated seeks damages including the

4    difference between the right hourly wages Defendants should have paid, and what he was

5    actually paid under Defendants' illegal monthly wage policies, statutory and/or liquidated

6    damages, and attorneys' fees.

7                   **JURISDICTION AND VENUE**

8    1.      This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 for the claim

9    brought under the Fair Labor Standards Act and has supplemental jurisdiction over the state-law

10    claims under 28 U.S.C. § 1367.

11    2.      In addition and in the alternative, this Court has jurisdiction over the principal class-

12    action state-law claim against WRA pursuant to 28 U.S.C. § 1332(d) because the matter in

13    controversy for that claim exceeds the sum or value of $5 million, exclusive of interest and costs,

14    and at least one member of the plaintiff class is a citizen of a state different from any defendant.

15    In particular, as described in greater detail below, at least 170 members of the class Mr. Cántaro

16    seeks to represent were underpaid at least two thousand dollars per month for—at the least—a

17    period of over three years, for a total of over $12 million in unpaid wages.

18    3.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the

19    events giving rise to Plaintiff's and the classes' claims to unpaid wages occurred while they were

20    working as shepherd in or near Elko, Nevada.

1                                              **PARTIES**

2      4.        Plaintiff Abel Cántaro is a former shepherd. He worked as a shepherd in California and

3      Nevada from around October 2007 until around June 2014.

4      5.        Defendant El Tejon Sheep Co. ("El Tejon") is a California corporation with its principal

5      place of business at 5616 Hooper Way, Bakersfield, CA 93308 and is registered to do business in

6      Nevada as a foreign corporation. Defendant El Tejon transacts business in Nevada by, among

7      other things, employing shepherds such as Mr. Cántaro, who spend part of the year grazing sheep

8      on land outside of cities such as Elko, Nevada.

9      6.        Defendant Melchor Gragirena resides in California and is the owner of El Tejon.

10     Defendant Gragirena transacts business in Nevada by, among other things, employing shepherds

11     who spend part of the year grazing sheep on land outside of cities such as Elko, Nevada.

12     7.        Defendant Western Range Association is a California non-profit corporation with its

13     principal place of business at 161 Fifth Avenue South, Suite 100, Twin Falls, Idaho 83301. WRA

14     transacts business in Nevada by, among other things, recruiting and employing foreign

15     shepherds, such as Mr. Cántaro, who work in Nevada.

16                                    **STATEMENT OF FACTS**

17                                        **Mr. Cántaro's Work**

18     8.        In 2007, a representative of Defendant WRA in Peru first recruited Mr. Cántaro to be a

19     shepherd in the United States while Mr. Cántaro was living near Huancayo, Peru.

20     9.        The WRA representative made Mr. Cántaro sign a document in which WRA established

21     many of the conditions under which Mr. Cántaro would work in the United States.

4

10.     The WRA representative directed how Mr. Cántaro should obtain a visa to work in the United States and required Mr. Cántaro to take a number of trips from Huancayo to Lima, Peru, to comply with the policies WRA had established for hiring foreign shepherds to work in the United States. These policies included a WRA-ordered medical exam that was a condition of employment, a WRA-ordered review of Mr. Cántaro's criminal records, and a WRA-directed interview to determine if Mr. Cántaro had the skills necessary to work as a shepherd.

11.     In the United States, Mr. Cántaro worked with one particular WRA ranch, Defendant El Tejon Sheep Company, which is owned by Defendant Gragirena.

12.     Subject to confirmation through discovery, when Mr. Cántaro arrived at El Tejon ranch, Mr. Cántaro signed another document prepared by Defendant WRA that set additional terms of employment with which Mr. Cántaro had to comply. One such requirement was that Mr. Cantaro work at any ranch managed by Defendant WRA and that he agree to be transferred to another WRA ranch at any time—regardless of whether it was his preference to stay on the ranch to which he was originally assigned and regardless of whether the individual WRA ranch on which he worked agreed to the transfer.

13.     All or almost all shepherds employed by Defendant WRA are subject to the same employment policies as those described above because all or almost all WRA shepherds sign the same or substantially similar employment contracts as a condition of working for Defendant WRA. Although to be confirmed through discovery, Plaintiff believes the terms of all WRA employment contracts at issue in this case are similar to those described in *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1063-71 (E.D. Wash. 2013), where another Court in this Circuit concluded that Defendant WRA was a joint employer of shepherds such as Mr. Cántaro.

1  14.     Mr. Cántaro worked for Defendants from 2007 until June 2014, generally returning to

2  Peru for short periods of time every three years but otherwise working as a U.S.-based shepherd.

3  15.     For all of Mr. Cántaro's time as a shepherd, he generally worked according to the

4  following schedule, to be confirmed with greater precision through discovery:

5      a.      **Veterinary Work:**

6  16.     From approximately mid-October until approximately early to mid-April, Mr. Cántaro

7  worked on well-cultivated farmland—normally alfalfa fields that were surrounded by temporary

8  electric and regular wire fences that Mr. Cántaro often helped to set up.

9  17.     The land was generally in suburban areas around Bakersfield, California, and normally

10  within walking distance of three- or four-lane highways. In fact, for some of this period, Mr.

11  Cantaro appears to have worked just beside the athletic fields at Independence High School, a

12  school of several thousand in the Kern County school district.

13  18.     All of these locations were easily accessible by Plaintiffs' employer. And all these work

14  locations appear to have been a short drive from Defendant Gragirena's home in suburban

15  Bakersfield.

16  19.     During a large portion of this time, Mr. Cántaro was effectively a full-time veterinarian as

17  he managed all aspects of the birthing of thousands of new lambs managed by Defendants. In

18  addition to the veterinary work, Mr. Cántaro repaired and constructed other structures (such as

19  fencing and corrals) at El Tejon ranch.

20  20.     It would have been easy for Defendants to calculate the number of hours Mr. Cántaro

21  worked because he was laboring in such accessible places, often under Defendants' direct

22  supervision or the supervision of foremen employed by Defendants.

1      a.      **Lamb Fattening Work:**

2      21.      From approximately mid-April until approximately early or mid-June, after being

3      transported to Elko, Nevada, Mr. Cántaro maintained his herd alone on public lands near Elko.

4      22.      During this time, he tried to fatten up the lambs in his charge in preparation for their sale.

5      a.      **Sale of Lambs:**

6      23.      For an approximately a two-week period in early or mid-June, Mr. Cántaro would

7      assemble corrals and manage his herd close to the corrals in preparation for the sale of the lambs.

8      24.      During this time, he was under the direct supervision of Defendant Gragirena or a

9      foreman employed by Defendants.

10     25.      It would not have been difficult to calculate the number of hours that Mr. Cántaro was

11     working during this period, in light of this direct supervision of his work.

12     a.      **Autumn Herding Work:**

13     26.      From approximately mid-June until late September or early October, Mr. Cántaro grazed

14     his herd alone on public lands near Elko, Nevada. .

15     27.      For a majority of his time working as a shepherd, Mr. Cántaro was not in isolated

16     mountain locations herding sheep but rather working on well-cultivated farmland and focused on

17     non-herding work (*e.g.*, birthing sheep or repairing ranch equipment, such as fences and posts on

18     the ranch).

19     28.      It would not have been difficult to calculate the number of hours Mr. Cántaro worked

20     during most of the year principally because he was working under the direct supervision of one

21     of his bosses.

1    29.    During all of his time as a shepherd, Mr. Cántaro almost never worked less than 70 hours

2    a week and was often engaged by Defendants to work 24 hours a day seven days a week.

3    30.    All or almost all of the other shepherds working with Mr. Cántaro worked according to

4    the same or similar schedule as the one described above. Mr. Cántaro knows this because he

5    would meet the other shepherds at various times during the year: for example, during the time he

6    was doing veterinary work and during the time when he was preparing the lambs for sale.

7    31.    Some of the shepherds in fact never left California to work in Nevada. These workers

8    spent most or all of their time on non-herding work, principally as ranch-hands working at the

9    headquarter ranch for Defendants.

10    32.    One of the shepherds employed by Defendants does not conduct any shepherding work—

11    rather, he works as a full-time foreman, supervising the work of the other shepherds and

12    providing them with supplies.

13    33.    Mr. Cántaro began his last work contract with Defendants in or around late October 2013,

14    after returning from an approximately three-month stay in Peru. Upon arrival, he again

15    performed his veterinary work from October 2013 until around early April 2014.

16    34.    Defendants then transported Mr. Cántaro to public lands near Elko, Nevada, in April

17    2014.

18    35.    During this time, Mr. Cántaro developed a severe infection in a tooth that required

19    immediate medical attention.

20    36.    As a result, Mr. Cántaro repeatedly requested that Defendant Gragirena or his foreman

21    provide him with access to medical attention, but neither complied with the request.

1    37.    In or about June 2014, Mr. Cántaro feared that if he did not obtain medical attention

2    immediately, he could be seriously injured or worse. He was also concerned that he would

3    shortly be required by Defendant Gragirena to travel to a more isolated region where medical

4    attention would be even more difficult to obtain. He therefore left Mr. Gragirena's employ and

5    sought medical attention for his worsening condition.

6    38.    Mr. Cántaro was not paid any wages for approximately the last ten days of his work with

7    Defendants.

8        **The H-2A Visa Program for Shepherds and Defendants' Monthly Wage Policy**

9    39.    Most shepherds, including Mr. Cántaro, work in the United States under the H-2A

10    program, which is administered by the Departments of Labor and Homeland Security. The H-2A

11    program takes its name from the statutory provision, 8 U.S.C. § 1101(a)(15)(H)(ii)(a), which

12    describes the visa category for nonimmigrant foreign workers who come to the United States to

13    perform agricultural work on a temporary or seasonal basis.

14    40.    DOL has implemented special rules regulating H-2A workers in the sheepherding

15    industry. As part of these special rules, DOL, among other things, sets a wage floor below which

16    it will not approve H-2A visa applications for shepherds.

17    41.    As relevant here, the DOL-established wage floor for shepherds is as follows:

18

| Wage Floor | State | Dates |
|---|---|---|
| $800 per month | Nevada | Until November 16, 2015 |
| $1206.31 per month | Nevada | November 16, 2015-Present |
| $1422.55 per month | California | Until June 30, 2014 |
| $1600.34 per month | California | July 1, 2014-January 1, 2016 |
| $1777.98 per month | California | January 1, 2016-Present |

42.     The Nevada state minimum wage controls in the event that it is higher than the DOL set minimum because there is no preemption.

43.     This is enshrined in the DOL regulations. A higher state minimum wage law necessarily supersedes a lower wage floor set by DOL: by regulation, H-2A employers must agree to pay H-2A workers at least the DOL wage floor (called the Adverse Effect Wage Rate (AEWR)), the prevailing wage, the federal or state minimum wage or the agreed-upon collective bargaining rate—whichever is highest. See 20 C.F.R. § 655.120.

44.     As noted above, the problem here is that Defendant WRA has a policy of only paying the minimum monthly wage established by DOL, regardless of whether there is a higher wage is required under state or federal law because of the number of hours the shepherds are actually working or the type of work they are performing.

45.     Defendant WRA's monthly minimum wage policy only varies based on the state in which a ranch is located. For example, if the ranch on which a shepherd works is located in California (as is the case with Mr. Cántaro), the wage Defendants pay is the DOL wage-floor for California. On the other hand, if the ranch is located in Nevada, Defendant WRA has a policy of paying the Nevada wage floor, which has been as low as $800 per month.

46.     The existence of this policy is evident from a review of the Department of Labor's Fiscal Year 2014 and 2015 "Disclosure Data," which is a data set that provides information across a

1    number of fields about each H-2A Visa Application submitted to the Department of Labor by

2    Defendants.

3    47.    The data for Fiscal Years 2014 and 2015 cover the period from October 1, 2013 to

4    September 30, 2015. This is the most recent and comprehensive data set on H-2A certifications.

5    48.    The Disclosure Data is accessible by clicking on the "Disclosure Data" tab available at

6    http://www.foreignlaborcert.doleta.gov/performancedata.cfm. To access the FY 2014 or 2015

7    data, download a Microsoft Xcel file available for H-2A workers for Fiscal Year 2014 or 2015

8    under this tab.

9    49.    The 2014 and 2015 Data reveal that if one filters out all job references for jobs other than

10   "sheepherder" or a similar job title, the minimum wage offered to all shepherds in Nevada is

11   uniformly $800 per month.[1] The wage offered to all California shepherds is uniformly the wage

12   floor set by DOL for that state for the relevant period of time (*i.e.*, $1422.55, $1600.34, or

13   $1777.98 per month).

14   50.    Plaintiff Cántaro was offered approximately the wage floor established by DOL.

15   51.    Further, subject to discovery from Defendants, Plaintiff estimates that he was paid

16   approximately $1422.55 per month—or slightly more than this sum—for every month that he

---

[1] At times, DOL has erroneously reported the correct offered wage. This error is evident based on a review of the underlying H-2A applications associated with each record contained in the Disclosure Data. One can view this underlying data by matching the ETA case number included with each record in the disclosure data and reviewing the individual H-2A applications associated with these numbers. These H-2A records are viewable at https://icert.doleta.gov/, where one can perform a search by ETA case number. A review of numerous individual H-2A Applications at this website confirms that Defendants have a policy of uniformly paying the same monthly minimum wage to shepherds.

1   worked as a shepherd for Defendants. (Plaintiff will have to determine the exact amount he was

2   paid through discovery as his employment records are in the possession of Defendants.)

3   52.     Finally, in addition to Defendant WRA adhering to this policy for all the shepherds it has

4   employed in Nevada, Defendants El Tejon and Gragirena have adhered to this same policy for all

5   shepherds employed at Defendant Gragirena's ranch who worked in Nevada.

6                                    **Nevada Minimum Wage**

7   53.     As noted above, Plaintiff worked in Nevada for Defendants from approximately early to

8   mid-April until October.

9   54.     Plaintiff was paid an illegally low wage for his work in Nevada. Even though he was paid

10   approximately $1422.55 per month (or slightly more than this sum), he should have been paid

11   much more than this amount based on the number of hours he worked.

12   55.     The Nevada minimum wage is established in Section 16 of the Nevada Constitution. This

13   is an hourly minimum wage that applies regardless of the industry in which the employee is

14   working. *See Thomas v. Nevada Yellow Cab Corp.*, 327 P. 3d 518 (Nev. 2014).

15   56.     At present, the hourly minimum wage for all employees in Nevada is $7.25 per hour for

16   workers who are covered by an employer's medical insurance and $8.25 per hour for workers

17   who do not have insurance coverage.

18   57.     Plaintiff was not covered by his employers' medical insurance. Further, upon information

19   and belief, no foreign shepherds employed by Defendants have been covered by Defendants'

20   medical insurance.

21   58.     All foreign shepherds, including Mr. Cántaro, are accordingly entitled to an hourly wage

22   of at least $8.25 per hour.

1    59.    To be paid only $1422.55 per month, Mr. Cántaro could have worked just under 40 hours

2    per week. But Mr. Cántaro worked many more hours than this every week: he never worked less

3    than 70 hours a week and was often engaged by Defendants to work 24 hours a day seven days a

4    week. Beyond the time he was engaged to wait by the employer (namely, by being ready to

5    respond to a problem with his flock late at night), he often was actively working in excess of 100

6    hours per week.

7    60.    Mr. Cántaro's work was hardly irregular for a shepherd. Most Nevada shepherds work

8    roughly the same number of hours and according to the same schedule as Mr. Cántaro.

9    61.    All shepherds are accordingly always working in excess of 40 hours of work per week

10   and are being underpaid for the hourly minimum value of their labor as established in the Nevada

11   Constitution.

12                                    **Fair Labor Standards Act**

13   62.    Beyond being entitled to the hourly minimum wage for his work in Nevada, Plaintiff is

14   entitled to the hourly minimum wage guaranteed under FLSA for his work in both California and

15   Nevada.

16   63.    Defendants are covered by FLSA because, upon information and belief, they are

17   enterprises with an excess of $500,000 in annual revenues.

18   64.    Plaintiff is also covered by FLSA because his work regularly involves him in commerce

19   between States or the production of goods for commerce: namely, the sheep that are transported

20   between states such as Nevada and California.

1    65.    Defendants are Plaintiff's employers, given the control over work and authority to hire

2    and fire they exerted over Plaintiff, and their control over the terms of Plaintiff's employment

3    conditions, as detailed above.

4    66.    Plaintiff is entitled to the minimum wage accorded under FLSA.

5    67.    Further, because his work was generally not remote and generally focused on non-

6    herding work, Mr. Cántaro does not fit within the "range production of livestock" exception to

7    the FLSA minimum wage. *See* 29 U.S.C. § 213(a)(6)(E).

8    68.    This range exception is designed for work that is in isolated and mountainous locales

9    where the terrain is rugged, the forage is naturally growing, and the inaccessibility of the work

10   site makes it difficult for an employer to calculate the exact number of hours worked. *See* 29

11   C.F.R. § 780.323, *et seq.*

12   69.    A majority of Mr. Cántaro's work—especially in his last period of work from October

13   2013 until June 2014—does not fit within what is contemplated by the exception. Rather, for a

14   majority of his time as a shepherd, Mr. Cántaro: (1) was working on land under the direct

15   supervision of one of his employers, and those employers could easily have calculated the time

16   he was working; (2) was working generally on cultivated alfalfa fields in suburban Bakersfield;

17   and (3) was working not far from his employer—indeed, much of the time he was working in the

18   same city as his employer's ranch and his home.

19   70.    Accordingly, even though Mr. Cántaro performed some work that might fit within the

20   FLSA exception, most of his work does not fall within what is required for the exception to

21   apply and he is entitled to the FLSA minimum wage given that the majority of his work falls

22   outside the exception.

1       **RULE 23 CLASS ALLEGATIONS**

2       **Nevada Wage Class**

3       71.     Plaintiff Cántaro asserts Count I against Defendant WRA as a Class Action pursuant to

4       Federal Rule of Civil Procedure 23.

5       72.     He brings this claim on behalf of the "NV Minimum Wage Class," which, pending any

6       modifications necessitated by discovery, is defined as follows:

7                       ALL PERSONS WHOM WRA EMPLOYED AS SHEPHERDS
8                       IN NEVADA DURING THE RELEVANT STATUTE OF
9                       LIMITATIONS.

10      73.     The members of the putative class are so numerous that joinder of all potential class

11      members is impracticable. Plaintiff Cántaro does not know the exact size of the class since that

12      information is within the control of WRA. However, according to publicly available data from

13      the Department of Labor (namely, the aforementioned "Disclosure Data"), Defendant WRA

14      employed approximately 180 shepherds in Nevada in fiscal years 2014 and 2015. Plaintiff has no

15      reason to believe that WRA employed a substantially different number of shepherds in Nevada in

16      any of the other years within the relevant statute of limitations.

17      74.     There are questions of law or fact common to the classes that predominate over any

18      individual issues that might exist—namely, whether the WRA failed to pay Nevada shepherds at

19      least Nevada minimum wage by instead adhering to their policy of paying the monthly wage

20      floor established by DOL.

21      75.     The class claims asserted by Mr. Cántaro are typical of the claims of all of the potential

22      Class Members because all potential Class Members allege they were paid less than the Nevada

23      minimum wage by Defendants.

76.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

77.    Mr. Cántaro will fairly and adequately protect and represent the interests of the class.

78.    Mr. Cántaro also suffered from the same illegally low wage as the class.

79.    Mr. Cántaro is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

80.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendant WRA.

81.    Mr. Cántaro is unaware of any members of the putative class who are interested in presenting their claims in a separate action, though he is aware of a separate class action based on Nevada law against another employer of shepherds: Mountain Plains Agricultural Service. *See Llacua et al v. Western Range Association et al.*, 1:15-cv-01889-REB-CBS (D. Colo. 2015). This other case contains no Nevada-based wage claims against Defendants named here.

82.    Mr. Cántaro is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

83.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada and shepherds operate exclusively in the western United States.

1    84.    This class action will not be difficult to manage due to the uniformity of claims among

2    the Class Members and the susceptibility of the claims to class litigation and the use of

3    representative testimony and representative documentary evidence.

4    85.    The contours of the class will be easily defined by reference to Defendants' records and

5    government records.

6                                    **El Tejon Wage Class**

7    86.    Plaintiff Cántaro asserts Count II against Defendants Gragirena and El Tejon as a Class

8    Action pursuant to Federal Rule of Civil Procedure 23.

9    87.    Pending any modifications necessitated by discovery, Plaintiff defines the "El Tejon NV

10   Minimum Wage Sub-Class" as follows:

11              ALL PERSONS WHOM DEFENDANTS EL TEJON AND
12              GRAGIRENA EMPLOYED AS SHEPHERDS IN NEVADA
13              DURING THE RELEVANT STATUTE OF LIMITATIONS.

14   88.    The members of the putative class are so numerous that joinder of all potential class

15   members is impracticable. Plaintiff Cántaro does not know the exact size of the class since that

16   information is within the control of the Defendants. However, according to publicly available

17   data from the Department of Labor (namely, the aforementioned "Disclosure Data"), Defendants

18   El Tejon and Gragirena employed an average of nine shepherds per year for a total of at least

19   around thirty shepherds for the relevant statute of limitations.

20   89.    There are questions of law or fact common to the class that predominate over any

21   individual issues that might exist—namely, whether Defendants El Tejon and Gragirena failed to

22   pay Nevada shepherds at least Nevada minimum wage by instead adhering to their policy of

23   paying the monthly wage floor established by DOL.

1    90.     The class claims asserted by Mr. Cántaro are typical of the claims of all of the potential

2    Class Members because all potential Class Members allege they were paid less than the Nevada

3    minimum wage by Defendants El Tejon and Gragirena. A class action is superior to other

4    available methods for the fair and efficient adjudication of this controversy because numerous

5    identical lawsuits alleging similar or identical causes of action would not serve the interests of

6    judicial economy.

7    91.     Mr. Cántaro will fairly and adequately protect and represent the interests of the class.

8    92.     Mr. Cántaro also suffered from the same illegally low wage as the class.

9    93.     Mr. Cántaro is represented by counsel experienced in litigation on behalf of low-wage

10    workers and in class actions.

11    94.     The prosecution of separate actions by the individual potential Class Members would

12    create a risk of inconsistent or varying adjudications with respect to individual potential Class

13    Members that would establish incompatible standards of conduct for Defendant WRA.

14    95.     Mr. Cántaro is unaware of any members of the putative class who are interested in

15    presenting their claims in a separate action, though he is aware of a separate class action based

16    on Nevada law against another employer of shepherds: Mountain Plains Agricultural Service.

17    *See Llacua et al v. Western Range Association et al.*, 1:15-cv-01889-REB-CBS (D. Colo. 2015).

18    This other case contains no FLSA or Nevada-based wage claims against Defendants named here.

19    96.     Mr. Cántaro is unaware of any pending litigation commenced by members of the class

20    concerning the instant controversies.

1    97.    It is desirable to concentrate this litigation in this forum because many of the Defendants

2    and Plaintiffs are located in, or do business in, Nevada and shepherds operate exclusively in the

3    western United States.

4    98.    This class action will not be difficult to manage due to the uniformity of claims among

5    the Class Members and the susceptibility of the claims to class litigation and the use of

6    representative testimony and representative documentary evidence.

7    99.    The contours of the class will be easily defined by reference to Defendants' records and

8    government records.

9                    **29 U.S.C. § 216(B) COLLECTIVE ACTION ALLEGATIONS**

10   100.    Mr. Cántaro brings his FLSA claim as a collective action pursuant to 29 U.S.C. § 216(b)

11   on behalf of himself and all other similarly situated current and former employees of Defendants.

12   101.    Pending any modifications necessitated by discovery, Mr. Cántaro preliminarily defines

13   the "216(b) Class" as follows:

14                    ALL CURRENT AND FORMER EMPLOYEES OF THE
15                    DEFENDANTS WHO WORKED ON DEFENDANT EL TEJON
16                    RANCH AND/OR FOR DEFENDANT GRAGIRENA AS
17                    SHEPHERDS.

18   102.    All potential FLSA Class Members are similarly situated because, among other things,

19   they were all employees of these Defendants and, upon information and belief, all suffered from

20   the same policies of these Defendants, including the failure to pay at least the minimum hourly

21   wage required under FLSA.

22              **I. FIRST COUNT: SECTION 16 OF THE NEVADA CONSTITUTION**

23              **(Plaintiff Cántaro and the NV Minimum Wage Class Against Defendant WRA)**

19

1   103.   As noted above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of

2   the NV Minimum Wage Class pursuant to Fed. R. Civ. P. 23.

3   104.   WRA employed Plaintiff Cántaro and the NV Minimum Wage Class in Nevada during

4   the relevant statute of limitations and paid him less than the Nevada minimum wage—Plaintiff

5   Cántaro was usually paid only $1422 per month or $2-3 per hour of work. Many fellow WRA

6   employees were paid even less—as little as $800 per month—for the same number of hours of

7   work.

8   105.   As a result, the Plaintiffs are entitled to the difference between the wages paid and the

9   Nevada minimum wage and attorneys' fees pursuant to Nev. Const. art. 15, § 16.

10   106.   Although not necessary to obtain fees under the Nevada Constitution, Plaintiff Cántaro

11   sent a written demand for wages at least five days prior to bringing this claim and is entitled to

12   attorney's fees if he prevails in this action.

13   ## II. SECOND COUNT: SECTION 16 OF THE NEVADA CONSTITUTION

14   **(Plaintiff Cántaro and the El Tejon Minimum Wage Class Against Defendants El Tejon**
15   **and Gragirena)**

16   107.   As noted above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of

17   the El Tejon Minimum Wage Class pursuant to Fed. R. Civ. P. 23.

18   108.   Defendants El Tejon and Gragirena employed Plaintiff Cántaro and the NV Minimum

19   Wage Class in Nevada during the relevant statute of limitations and paid him less than the

20   Nevada minimum wage—Plaintiff Cántaro was usually paid only $1422 per month or $2-3 per

21   hour of work at some times.

22   109.   As a result, the Plaintiffs are entitled to the difference between the wages paid and the

23   Nevada minimum wage and attorneys' fees pursuant to Nev. Const. art. 15, § 16.

1    110.    Although not necessary to obtain fees under the Nevada Constitution, Plaintiff Cántaro

2    sent a written demand for wages at least five days prior to bringing this claim and is entitled to

3    attorney's fees if he prevails in this action.

4    **III. <u>THIRD COUNT: FAIR LABOR STANDARDS ACT</u>**

5    **(Plaintiff Cántaro Against All Defendants)**

6    111.    As noted above, Mr. Cántaro asserts this count on his own behalf and on behalf of all

7    other similarly situated employees pursuant to 29 U.S.C. § 216(b).

8    112.    Mr. Cántaro and those similarly situated were engaged in the production of goods for

9    commerce pursuant to 29 U.S.C. § 203(b) and 29 U.S.C. § 206(a) because they assisted in raising

10    sheep that moved, or could reasonably be expected to move, in interstate commerce.

11    113.    Mr. Cántaro and all others similarly situated were "employees" as that term is defined by

12    29 U.S.C § 203 (e) because each entered into an employment contract with Defendants, and each

13    Defendant had the ability to exert significant control over Mr. Cantaro and all other Defendants,

14    including by directing him to work in different states and on different WRA ranches, controlling

15    the terms and conditions of his employment, and having the authority to hire and fire him.

16    114.    Defendants "employed" Mr. Cántaro and all others similarly situated as that term is

17    defined by 29 U.S.C. § 203(g) because each was suffered or permitted to work by the

18    Defendants.

19    115.    Defendant Gragirena and WRA employed Plaintiff and the similarly situated members of

20    the § 216(b) Class pursuant to FLSA 29 U.S.C. § 203(d) because they acted directly or indirectly

21    in the interest of El Tejon in relation to Mr. Cántaro and the members of the 216(b) Class by,

22    among other things, controlling when, where, and how they worked; maintaining their

1    employment records; setting the terms of their employment; and having the power to hire and

2    fire them.

3    116.    Defendants violated FLSA when they failed to pay Mr. Cántaro and all others similarly

4    situated at least minimum wage for some of the hours they worked. 29 U.S.C. § 206.

5    117.    Defendants' violations of FLSA were willful under 29 U.S.C. § 255(a) because they

6    knew or should have known that Mr. Cántaro and all others similarly situated were entitled to

7    minimum wage under FLSA, and/or, upon information and belief, they failed to make adequate

8    inquiry regarding whether the Plaintiff and others similarly situated were covered by FLSA.

9    118.    Mr. Cántaro and all others similarly situated are entitled to recover unpaid minimum

10   wages, liquidated damages, attorneys' fees, costs, and post-judgment interest. 29 U.S.C. §§ 206;

11   216(b).

12                        **PLAINTIFFS DEMAND A JURY TRIAL**

13                              **PRAYER FOR RELIEF**

14   119.    Plaintiff respectfully requests that judgment be entered in his favor and in favor of those

15           similarly situated and that this Court:

16           a.    Declare Defendants in violation of each of the counts set forth above;

17           b.    Certify and maintain this action as a class action, with Plaintiff Cántaro as

18                 designated class representative and with his counsel appointed as class counsel;

19           c.    Award damages for Defendants' failure to pay the Nevada minimum wage;

20           d.    Award damages for Defendants' failure to pay the minimum wage under FLSA

21                 and award liquidated damages pursuant to 29 U.S.C. §216(b);

1     e.     Award pre-judgment, post-judgment, and statutory interest, as permitted by

2           law;

3     f.     Award attorneys' fees;

4     g.     Award costs;

5     h.     Order equitable relief, including a judicial determination of the rights and

6           responsibilities of the parties;

7     i.     Certify the FLSA claims against Defendants to proceed as a collective action

8           under 29 U.S.C § 216(b), and provide that appropriate notice of this suit and

9           the opportunity to opt into it be provided to all potential members of the

10          216(b) Class

11     j.     Award such other and further relief as the Court may deem just and proper.

12

Respectfully submitted,

s/Alexander Hood_____
Alexander Hood
Attorney and Director of Litigation
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

s/Dermot Lynch_____
Dermot Lynch
Attorney and Skadden Fellow
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289

Email: dermot@towardsjustice.org

*Attorneys for the Plaintiffs*