MARK R. THIERMAN, Nev. Bar No. 8285
JOSHUA D. BUCK, Nev. Bar No. 12187
LEAH L. JONES, Nev. Bar No. 13161
Thierman Buck LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027
Email: mark@thiermanbuck.com
josh@thiermanbuck.com
leah@thiermanbuck.com

ALEXANDER HOOD (*pro hac vice*)
DERMOT LYNCH (*pro hac vice*)
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org
dermot@towardsjustice.org

CHRISTINE E. WEBBER (*pro hac vice*)
BRIAN CORMAN (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Suite 500
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
Email: cwebber@cohenmilstein.com
bcorman@cohenmilstein.com

*Attorneys for the Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

ABEL CANTARO CASTILLO;
ALCIDES INGA RAMOS, and those
similarly situated,

        Plaintiffs,

v.

WESTERN RANGE ASSOCIATION;
MELCHOR GRAGIRENA;
EL TEJON SHEEP COMPANY;
MOUNTAIN PLAINS AGRICULTURAL
SERVICE; ESTILL RANCHES, LLC;
and JOHN ESTILL,

        Defendants.

Civil Case No. 3:16-cv-00237-MMD-VPC

**FIRST AMENDED COMPLAINT**

### INTRODUCTION

1.      Plaintiffs Abel Cántaro Castillo and Alcides Inga Ramos were paid a shockingly low wage of as little as one or two dollars an hour for their work as shepherds in Nevada.  This is well below the minimum wage of $8.25 per hour that these men should have been paid under Nevada law and the $8.25 minimum hourly wage required by the nonimmigrant temporary visa program under which he was employed.

2.      These Plaintiffs are not alone in suffering either of these violations for the many hours of work he provided to the ranching industry in a single week.  This is because their employers—Defendants here—have a policy of paying all shepherds they employ a low *monthly* salary that has the effect of creating illegally low *hourly* rates of pay, in light of the actual number of hours shepherds engage in compensable work.

3.      This illegal pay policy principally manifests in two ways at issue in this case.  First, Defendants Western Range Association (WRA) and Mountain Plains Agricultural Service (MPAS) each have  policies of setting the wages of all Nevada shepherds, including Plaintiffs, at a rate of as little as $800 per month, despite the fact that this translates to an effective wage rate of between one and two dollars an hour—much less than the Nevada minimum of $8.25 per hour.  Defendants El Tejon Sheep Company and Melchor Gragirena adopted and implemented this same illegal pay policy in acting as Mr. Cántaro's joint employers.  And Defendants Estill Ranches, and John Estill adopted and implemented this same illegal policy in acting as Mr. Inga Ramos's joint employers.

4.      Second, Defendants violated the terms of employment contracts required of employers who are granted permission to employ workers under what is commonly referred to as the "H-2A" visa program.  This program, authorized by 8 U.S.C.§ 1101(a)(15)(H)(ii)(a) and the implementing regulations promulgated at 20 C.F.R. Part 655 Subpart B, requires that Nevada ranchers employing H-2A workers pay those workers and any U.S. workers similarly employed at least $8.25 per hour (Nevada's minimum wage).  Defendants violated this contractual obligation by choosing to pay a significantly lower hourly rate.

5.      Plaintiffs, on their own behalf and those similarly situated, seek damages including

2

2172539.4

the difference between the lawful hourly wages Defendants should have paid and what they were actually paid under Defendants' illegal pay policies.  Plaintiffs also seek statutory and/or liquidated damages and attorneys' fees.

### JURISDICTION AND VENUE

6.    This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 for the claims brought under the contracts, which require the Court to resolve significant and serious questions of federal law under 8 U.S.C. § 1101(a)(15)(H)(ii)(a) and the regulations promulgated by the Department of Labor at 20 C.F.R. Part 655 Subpart B.  It has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

7.    In addition and in the alternative, this Court has jurisdiction over the principal class-action state-law claims against WRA pursuant to 28 U.S.C. § 1332(d) because the matter in controversy for those claims exceeds the sum or value of $5 million, exclusive of interest and costs, and at least one member of the plaintiff class is a citizen of a foreign state or a state different from any defendant.  In particular, as described in greater detail below, at least 100 members of the class Mr. Cántaro seeks to represent were underpaid at least two thousand dollars per month for—at the least—a period of over six years, for a total of over $10 million in unpaid wages.[1]  Further, as described in greater detail below, approximately 27 of the class Mr. Inga Ramos seeks to represent were underpaid at least two thousand dollars per month for—at the least—a period of over six years, for a total of over $2 million in unpaid wages.[2]

8.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiffs' and the classes' claims to unpaid wages occurred while they were working as shepherds in Nevada.

---

[1] While there were an average of approximately 100 shepherds employed each year, given that many shepherds did not work all six years, many more individuals are members of the class.

[2] While there were an average of approximately 27 shepherds employed each year, given that many shepherds did not work all six years, many more individuals are members of the class.

3

**PARTIES**

9.     Plaintiff Abel Cántaro is a former shepherd.  He worked as a shepherd in California and Nevada from around October 2007 until around June 2014.

10.     Plaintiff Alcides Inga Ramos is a former shepherd. He worked as a shepherd in Nevada from around April 2012 until around February 2013.

11.     Defendant El Tejon Sheep Co.  ("El Tejon") is a California corporation with its principal place of business at 5616 Hooper Way, Bakersfield, CA 93308, and is registered to do business in Nevada as a foreign corporation.  Defendant El Tejon transacts business in Nevada by, among other things, employing shepherds such as Mr. Cántaro, who spend a substantial portion of the year grazing sheep on land outside of cities such as Elko, Nevada.

12.     Defendant Melchor Gragirena resides in California and is the owner of El Tejon. Defendant Gragirena transacts business in Nevada by, among other things, employing shepherds who spend a substantial part of the year grazing sheep on land in Nevada.

13.     Defendant Western Range Association ("WRA") is a California non-profit corporation with its principal place of business at 161 Fifth Avenue South, Suite 100, Twin Falls, Idaho 83301.  WRA transacts business in Nevada by, among other things, recruiting and employing foreign shepherds, such as Mr. Cántaro, who work in Nevada.

14.     Together, Defendants El Tejon, Mejchor Gragirena, and WRA will be referred to as "WRA Defendants."

15.     Defendant Mountain Plains Agricultural Service ("MPAS") is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601. The MPAS transacts business in Nevada by, among other things, recruiting and employing foreign shepherds, such as Mr. Inga Ramos, who work in Nevada.

16.     Defendant Estill Ranches, LLC, ("Estill Ranches") is a Nevada Limited Liability Company with its principal place of business in Gerlach, Nevada.

17.     Defendant John Estill is an owner or operator of Estill Ranches, LLC. He also employed Mr. Inga.

18.     Together, Defendants Estill Ranches and John Estill will be referred to as the "Estill

4

Ranch Defendants."

19.     Together, Defendants MPAS, Estill Ranches, and John Estill will be referred to as "MPAS Defendants."

## STATEMENT OF FACTS

### The H-2A Program and the Obligations of H-2A Employers

20.     This is a case about the H-2A temporary agricultural worker program, which is administered jointly by the Departments of Labor ("USDOL") and Homeland Security.  H-2A workers come to the United States on temporary agricultural visas, commonly referred to as H-2A visas.

21.     An agricultural employer in the United States may only employ H-2A workers if the USDOL certifies that: (1) there are insufficient workers available in the United States to perform the work, and (2) the employment of the nonimmigrant temporary aliens will not adversely affect the wages and working conditions of United States workers similarly employed.

22.     Agricultural employers or agricultural associations seeking the admission of H-2A workers must first file a temporary labor certification application with the USDOL.  20 C.F.R. § 655.130.  This application must include a job offer, commonly referred to as a "clearance order" or "job order," that complies with applicable regulations.  20 C.F.R. § 655.121(a)(1).  These regulations establish the minimum benefits, wages, and working conditions that the employer must offer to the employee in order to avoid adversely affecting similarly-situated United States workers.  20 C.F.R. §§ 655.120(a)(2), 655.122, 655.135, and 655.210.

23.     In almost all material respects, both groups of Defendants use identically worded job orders when they seek to employ H-2A shepherds.  Examples of such job orders are attached as Exhibits A and C.

24.     The H-2A program regulations also specify that H-2A employers must agree to pay their workers the higher of the Adverse Effect Wage Rate (AEWR), the prevailing wage for the work in the geographic area where the work is to be performed, the federal minimum wage, the state minimum wage, the agreed-upon collectively bargained wage rate, or a wage set by judicial order.

5

Accordingly, if—as is the case here—an hourly minimum wage requirement established by state law requires the payment of a higher wage than a monthly AEWR (in light, for example, of the number of hours that the worker has labored), the H-2A regulations require that the state minimum wage be paid.

25.     The H-2A program regulations require that each foreign worker receive a copy of an employment contract no later than the time that the worker applies for a visa to enter the United States under the H-2A program.  U.S. workers employed by WRA or its member ranches, or by MPAS or its member ranches, must be provided the contract no later than the first day of work.  In the absence of a contract containing all the required terms and conditions of employment, the job order required by the USDOL will be deemed to be the required employment contract or will supplement the contract provided by the employer.  That job order includes the promise to comply with governing law, including the Nevada law setting the minimum wage.

26.     In the contracts they enter into with all H-2A shepherds, including with Plaintiffs. and other Class Members, all Defendants explicitly agree to comply with all H-2A program regulations—including the H-2A program's requirement that an employer pay the state minimum wage if that is higher than the AEWR.

27.     A requirement to comply with the H-2A rules is a term of the employment agreement WRA Defendants enter into with all H-2A shepherds.  For example, a sample of a form contract, which is similar to the one Plaintiff Cántaro likely entered into with the WRA Defendants, is attached as Exhibit B.  As this contract states, the H-2A shepherd's employer "agrees to comply with all applicable laws of the United States and the individual states, including but not limited to compliance with all immigration laws."  Ex. B at 1.  Further, in the job orders for H-2A shepherds, such as the one included as Exhibit A, WRA Defendants agree "to abide by the regulations at 20 C.F.R. [§] 655.135."  Ex. A at 7.  In turn, 20 C.F.R. § 655.135(e) requires that during the period of employment covered by the H-2A certification, "the employer must comply with all applicable Federal, State and local laws and regulations . . . ."

28.     MPAS Defendants make a similar commitment in job orders, which "serve as the

6

work contract for workers employed by Mountain Plains Agricultural Service members." Ex. C at 5, and which accordingly require employers to pay a state minimum wage if that wage is higher than a wage set by DOL.

### Plaintiff Cántaro's Employment as an H-2A Shepherd

29.    In 2007, a representative of Defendant WRA in Peru first recruited Mr. Cántaro to be a shepherd in the United States while Mr. Cántaro was living near Huancayo, Peru.

30.    The WRA representative made Mr. Cántaro sign a document in which WRA established many of the conditions under which Mr. Cántaro would work in the United States.

31.    The WRA representative directed how Mr. Cántaro should obtain an H-2A visa to work in the United States and required Mr. Cántaro to take a number of trips from Huancayo to Lima, Peru, to comply with the policies WRA had established for hiring foreign shepherds to work in the United States.  These policies included a WRA-ordered medical exam that was a condition of employment, a WRA-ordered review of Mr. Cántaro's criminal records, and a WRA-directed interview to determine if Mr. Cántaro had the skills necessary to work as a shepherd.

32.    In the United States, Mr. Cántaro was employed by one particular WRA ranch, Defendant El Tejon Sheep Company, which is owned and managed by Defendant Gragirena.

33.    Subject to confirmation through discovery, when Mr. Cántaro arrived at El Tejon ranch, Mr. Cántaro signed another contract, similar to the one included as Exhibit B, which was prepared by Defendant WRA and set additional terms of employment with which Mr. Cántaro had to comply. One such requirement was that Mr. Cántaro work at any ranch managed by Defendant WRA and that he agree to be transferred to another WRA ranch at any time—regardless of whether it was his preference to stay on the ranch to which he was originally assigned and regardless of whether the individual WRA ranch on which he worked agreed to the transfer.

34.    Defendant El Tejon was also a party to this WRA-prepared contract. Upon information and belief, based on it being the policy of WRA, Defendant El Tejon signed a contract similar to the one attached here as Exhibit B.  That contract identifies Defendant El Tejon as Mr. Cántaro's employer and obligated Defendant El Tejon to comply with a number of contractual

provisions, such as paying Mr. Cantaro's wages, keeping records of his employment and wages, and providing him with tools and equipment to perform his work. *See* Ex. B.

35.    All shepherds employed by Defendant WRA are subject to the same employment policies as those described above because all WRA shepherds sign the same or substantially similar employment contracts as a condition of working for Defendant WRA.  *See* Ex. B.  The terms of WRA employment contracts are described in *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1063-71 (E.D. Wash. 2013), where another court in this Circuit concluded that Defendant WRA was a joint employer of shepherds such as Mr. Cántaro.

36.    The WRA self-declares in the certifications required by the H-2A program and provided to the USDOL that it is a joint employer, along with its member ranches, for purposes of the employment of H-2A shepherds and United States workers similarly employed. *See* Ex. A at 1.

37.    Defendants El Tejon and Gragirena also entered into employment agreements with Plaintiff Cántaro.

38.    Defendant Gragirena employed Mr. Cántaro by establishing a reasonable degree of oversight over Mr. Cántaro's work.  For example, for a substantial portion of each year, Defendant Gragirena would often observe and direct how Mr. Cántaro would perform specific tasks as a shepherd, indicating, for example, which sheep Mr. Cántaro should focus on birthing or directing Mr. Cántaro to perform a specific task, such as to repair a fence to prevent sheep from escaping from a specific area or to work with a specific pregnant ewe that Defendant Gragirena predicted would have a complicated pregnancy or would have trouble producing milk.

39.    Defendant Gragirena would also instruct H-2A shepherds, including Mr. Cántaro, how to perform certain tasks at his ranch, and would then have the shepherd repeat the tasks he had performed.  Defendant Gragirena would observe the H-2A shepherds performing these tasks until they had performed them to his satisfaction

40.    Defendant Gragirena also gave Mr. Cántaro detailed instructions to be followed throughout the course of a workweek.  For example, Defendant Gragirena would tell Mr. Cántaro to graze his sheep on one specific plot of land for a specific period of time and then asked that Mr.

8

Cántaro move to a specific different plot of land.  Similarly, Defendant Gragirena would communicate by phone with Mr. Cántaro and ask him to make sure to move his sheep to a specific meeting point in the mountains near Elko on a specific day, in preparation for the sale of the lambs.

41.     On other occasions, Defendant Gragirena used an intermediary—normally Defendant Gragirena's foreman—to direct that Mr. Cántaro perform specific tasks, such as to move sheep from one location to another in the mountains near Elko, Nevada.

42.     Defendant Gragirena would also bring Mr. Cántaro his checks on the pay days or have an intermediary perform this same function.

43.     Mr. Cántaro worked for the WRA Defendants from 2007 until June 2014, generally returning to Peru for short periods of time every three years but otherwise working as a U.S.-based shepherd.

44.     For all of Mr. Cántaro's time as a shepherd, he generally worked from approximately mid-October until approximately early to mid-April near Bakersfield, California, assisting with lambing and other work as assigned.  Then, from approximately mid-April until approximately late September or early October, Mr. Cántaro grazed his herd alone on public lands near Elko, Nevada.

45.     This case only concerns the time Mr. Cántaro, or others similarly situated, worked in Nevada.

46.     The WRA H-2A job orders specified that the work hours were 24 hours a day and seven days per week; the work hours are among the terms and conditions of employment that must be contained in the contract and job order and disclosed to any shepherd employed by the WRA or its member ranches, including Defendants El Tejon Sheep Company and Defendant Gragirena.

47.     Under the terms of the H-2A program, the employer must pay for the work offered in the job order or employment contract, in this instance 24 hours of work, seven days per week.

48.     During all of his time as a shepherd in Nevada, Mr. Cántaro almost never declined work and was often engaged by the WRA Defendants to be on duty in his workplace 24 hours a day, seven days a week.

49.     During every week of his employment by the WRA Defendants, including for

9

2172539.4

example, the time period of June 1-30, 2013, Mr. Cántaro worked well over 40 hours per week, and on duty in his workplace 24 hours per day, seven days per week pursuant to the terms of the job order and Defendants' requirement that he remain near the flock and guard them from predators. Thus, during each week in the month of June 2013, Mr. Cántaro worked 168 hours, but he was paid only approximately $1422.55 for that entire month.[3]  This monthly wage amounts to $331.93 per week, which works out to only $1.98 per hour.

50.    All or almost all of the other shepherds working with Mr. Cántaro worked according to the same or similar schedule as the one described above.  Mr. Cántaro knows this because he would meet the other shepherds at various times during the year: for example, during the time he was assisting with lambing and during the time when he was preparing the lambs for sale.

51.    Mr. Cántaro began his last work contract with the WRA Defendants in or around late October 2013, after returning from an approximately three-month stay in Peru.  Upon arrival, he again performed his work near Bakersfield, CA from October 2013 until around early April 2014.

52.    The WRA Defendants then transported Mr. Cántaro to public lands near Elko, Nevada, in April 2014.

53.    During this time, Mr. Cántaro developed a severe infection in a tooth that required immediate medical attention.

54.    As a result, Mr. Cántaro repeatedly requested that Defendant Gragirena or his foreman provide him with access to medical attention, but neither complied with the request.

55.    This medical condition was exacerbated by the poor conditions in which Mr. Cántaro was living, where he had insufficient access to water, adequate shelter, and a balanced diet.

56.    By failing to provide medical attention or adequate living conditions, the WRA Defendants violated numerous laws, including the H-2A regulations designed to protect H-2A workers.  The WRA Defendants accordingly breached the employment agreements they entered into

---

[3] As noted above, he might have been paid a little more than this sum, and Plaintiffs will confirm this through discovery.

with Mr. Cántaro.

57.     In or about June 2014, Mr. Cántaro feared that if he did not obtain medical attention immediately, he could be seriously injured or worse.  He was also concerned that he would shortly be required by Defendant Gragirena to travel to a more isolated region in the mountains near Elko, where medical attention would be even more difficult to obtain.  He therefore left Mr. Gragirena's employ and sought medical attention for his worsening condition.

58.     Mr. Cántaro was not paid any wages for approximately the last ten days of his work with the WRA Defendants.

### Plaintiff Inga Ramos's Employment as an H-2A Shepherd

59.     In the first few months of 2012, a representative of Defendant MPAS in Peru first recruited Mr. Inga to be a shepherd in the United States while Mr. Inga was living near Huancayo, Peru.

60.     The MPAS representative made Mr. Inga sign a form contract in which MPAS established many of the conditions under which Mr. Inga would work in the United States, including his monthly salary, the location of his work, and certain requirements he had to meet to continue working as a shepherd for MPAS.

61.     The MPAS representative directed how Mr. Inga should obtain an H-2A visa to work in the United States and required Mr. Inga to take a number of trips from near Huancayo, Peru, to Lima, Peru, to comply with the policies MPAS had established for hiring foreign shepherds to work in the United States.  These policies included visiting a DHL office on various days to send documents to or receive documents from the United States embassy. They also included instructions on how and when Mr. Inga would travel to the United States and types of documents or other items he would need at various stages of the visa-acquisition and travel process.

62.     In the United States, Mr. Inga was employed by one particular MPAS ranch, Defendant Estill Ranches, LLC ("Estill Ranches"), which is owned and managed by Defendant John Estill.

63.     Subject to confirmation through discovery, when Mr. Inga arrived at Estill Ranches,

11

Mr. Inga signed another contract, which was prepared by Defendant MPAS, which set additional terms of employment with which Mr. Inga had to comply.

64.     Upon information and belief, Defendant Estill Ranches was also a party to this MPAS-prepared contract.

65.     All or almost all shepherds employed by Defendant MPAS are subject to the same employment policies as those described above because all or almost all MPAS shepherds sign the same or substantially similar employment contracts as a condition of working for Defendant MPAS.

66.     MPAS also self-declared in the certifications required by the H-2A program and provided to the USDOL that it was a shepherd employer, along with its member ranches, for purposes of the employment of H-2A shepherds and United States workers similarly employed. For example, in one job order from the relevant period when Mr. Inga worked on Estill Ranches, which is attached as Exhibit C, the Executive Director of MPAS signed the "employer's certification" that the MPAS-prepared job order for Estill Ranches complied with the requirements of the H-2A visa program. *See* Ex. C at 2.

67.     MPAS also prepared a uniform attachment for all of its NV H-2A job orders establishing terms of employment for all H-2A shepherds it recruited to work in Nevada. *See* Ex. C at 3-6.

68.     Defendants Estill Ranches and John Estill also employed Mr. Inga.

69.     Defendant John Estill employed Mr. Inga by establishing a reasonable degree of oversight over Mr. Inga's work.  For example, for a substantial portion of each year, Defendant John Estill would observe and direct how Mr. Inga would perform specific tasks as a shepherd, indicating, for example, which sheep Mr. Inga should focus on moving around the range or directing Mr. Inga to perform a specific task, such as to repair a fence.

70.     On other occasions and because he did not speak fluent Spanish and Mr. Inga did not speak English, Defendant John Estill used an agent—normally one of his foremen—to direct that Mr. Inga perform specific tasks, such as to move sheep from one location to another.

71.     Defendant John Estill would also bring Mr. Inga his checks on pay days or have an

2172539.4

agent perform this same function on their behalf.

72.     Mr. Inga worked for the MPAS Defendants from April 2012 until February 2013. He believes he worked all of this time in or near Gerlach, Nevada.

73.     The MPAS H-2A job orders specified that the work hours were 24 hours a day and seven days per week; the work hours are among the terms and conditions of employment that must be contained in the contract and job order and disclosed to any shepherd employed by MPAS or its member ranches, including Defendants Estill Ranches and John Estill.

74.     Under the terms of the H-2A program, the employer must pay for the work offered in the job order or employment contract, in this instance 24 hours of work, seven days per week. *See* Ex. C at 3.

75.     During all of his time as a shepherd, Mr. Inga almost never declined work and was often engaged by Defendants to be on duty in his workplace 24 hours a day, seven days a week.

76.     During every week of his employment by Defendants, including for example, the time period of January 1-31, 2013, Mr. Inga worked well over 40 hours per week, and was on duty in his workplace 24 hours per day, seven days per week pursuant to the terms of the job order and the MPAS Defendants' requirement that he remain near the flock and guard them from predators. Thus, during each week in the month of June 2013, Mr. Inga worked 168 hours, but he was paid only approximately $800 for that entire month. This monthly wage amounts to $184.76 per week, which works out to only $1.09 per hour.

77.     All or almost all of the other shepherds working with Mr. Inga worked according to the same or similar schedule as the one described above.  Mr. Inga knows this because he would meet the other shepherds at various times during the year: for example, back at the ranches just before or after the ranches' lambing season.

78.     Mr. Inga was also living in dangerous and unsanitary conditions when he was working for the MPAS Defendants. He had insufficient access to water, adequate shelter, and a balanced diet.  In particular, Mr. Inga lived in a camper with insufficient heating and no place to store any perishable items.  The camper was also insufficiently insulated and had holes through

13

which rodents and wind would pass.  The MPAS Defendants also provided Mr. Inga with insufficient food: he often mainly ate potatoes and sometimes had to share his food with his sheep dogs, as they had insufficient food themselves.

79.     By failing to provide adequate living conditions, the MPAS Defendants violated numerous laws, including the H-2A regulations designed to protect H-2A workers.  The MPAS Defendants accordingly breached the employment agreements they entered into with Mr. Inga.

80.     In or around February 2013, Mr. Inga had had enough of the bad conditions. In part because of the bad conditions and the poor pay, Mr. Inga ended his employment relationship with the MPAS Defendants.

81.     Mr. Inga was not paid any wages for approximately the last 15 days of his work with the MPAS Defendants.

**The H-2A Visa Program for Shepherds and Defendants' Wage Policies**

82.     As described above, most shepherds, including Plaintiffs, work in the United States under the H-2A program, which is administered by the USDOL and the Department of Homeland Security.

83.     The USDOL has implemented special rules regulating H-2A workers in the sheepherding industry.  As part of these special rules, the USDOL, among other things, sets a wage floor which must be paid to the workers admitted under the labor certification, or it will not approve H-2A visa applications.

84.     As relevant here, the USDOL-established wage floor for shepherds requires the payment of the *highest* of (i) the Adverse Effect Wage Rate (AEWR) determined for every state where the work will be performed; (ii) the federal minimum wage; (iii) the state minimum wage for the state where the work is performed; or, (iv) an agreed-upon collectively bargained wage.  All employers under the H-2A program are required to both promise to pay and to actually pay the higher of the above specified pay rates.  *See* 20 C.F.R. § 655.120 and 655.210.

85.     The Nevada state minimum wage for the work performed by the shepherds in Nevada is $8.25.

14

2172539.4

86.     Under the terms of the H-2A program and the contract provisions applicable to the shepherds, a higher state minimum wage law necessarily supersedes any lower wage floor specified by the USDOL.

87.     As noted above, Defendants WRA and MPAS each have a policy and practice of only paying the AEWR established by the USDOL, regardless of whether a higher wage is required under state law, the H-2A program, or federal law.

88.     Defendants El Tejon and Mr. Gragirena adopted and implemented this same policy and practice of paying per month, based on the AEWR established by the USDOL, albeit paying the California AEWR even for the months that Plaintiffs worked in Nevada, rather than paying the higher hourly wage required by state law.

89.     Defendants Estill Ranches and John Estill adopted and implemented this same policy and practice of paying per month, based on the monthly AEWR established by the USDOL.

90.     In light of this policy, the wage offered and normally paid by the WRA Defendants varies only based on the state in which a ranch is located.  For example, if the ranch on which a shepherd works is based in California (as is the case with Mr. Cántaro in some instances), the wage Defendants pay is the AEWR for California.  On the other hand, if the ranch is located in Nevada, Defendant WRA has a policy of paying the Nevada AEWR, which has been as low as $800 per month.

91.     The MPAS Defendants adhere to the same policy. The wage offered to all H-2A shepherds in Nevada is the monthly minimum of as low as $800 per month.

92.     The existence of these policies is evident from a review of the USDOL's Fiscal Year 2014 and 2015 "Disclosure Data," which is a data set that provides information about each H-2A Visa Application submitted to the USDOL by Defendants.

93.     The data for Fiscal Years 2014 and 2015 cover the period from October 1, 2013 to September 30, 2015.  This is the most recent and comprehensive data available on H-2A certifications.

94.     The Disclosure Data is accessible by clicking on the "Disclosure Data" tab available

15

at http://www.foreignlaborcert.doleta.gov/performancedata.cfm.  To access the Fiscal Year 2014 or 2015 data, download a Microsoft Excel file available for H-2A workers for Fiscal Year 2014 or 2015 under this tab.

95.     The 2014 and 2015 data reveal that the minimum wage offered to all WRA shepherds and all MPAS shepherds in Nevada is uniformly $800 per month.[4]  The wage offered to all California WRA shepherds is uniformly the AEWR set by the USDOL for that state for the relevant period of time (*i.e.*, $1422.55, $1600.34, or $1777.98 per month).

96.     Mr. Cántaro was offered approximately the AEWR established by the USDOL for California.

97.     Mr. Cántaro was paid approximately $1422.55 per month—or slightly more than this sum—for every month that he worked as a shepherd for the WRA Defendants.  (Plaintiff will have to determine the exact amount he was paid through discovery as his employment records are in the possession of the WRA Defendants.)

98.     Mr. Inga was offered approximately the AEWR established by the USDOL for Nevada.

99.     Mr. Inga was paid approximately $800 per month—or slightly more than this sum—for every month that he worked as a shepherd for the MPAS Defendants.  (Mr. Inga will have to determine the exact amount he was paid through discovery as his employment records are in the possession of the MPAS Defendants.)

100.     Finally, in addition to Defendants MPAS and WRA adhering to the policy described

---

[4] At times, DOL has erroneously reported the offered wage for shepherds in Nevada, by noting in the Disclosure Data that a shepherd is being paid a higher wage than $800 per month (for example, sometimes Nevada shepherds are erroneously reported as earning a lower wage of $750 per month, which until recently was the wage earned by shepherds ).  This error is evident based on a review of the underlying H-2A applications associated with each record contained in the Disclosure Data.  One can view this underlying data by matching the ETA case number included with each record in the disclosure data and reviewing the individual H-2A applications associated with these numbers. These H-2A records are viewable at https://icert.doleta.gov/, where one can perform a search by ETA case number.  A review of numerous individual H-2A Applications at this website confirms that Defendants have a policy of uniformly paying the same monthly minimum wage to shepherds.

in ¶¶ 87-91 for all the shepherds each has employed in Nevada, Defendants El Tejon and Gragirena have adopted and implemented this same policy for all shepherds employed by Defendant Gragirena's ranch who worked in Nevada, paying them the California AWER both for months when they worked in California and for months when they worked in Nevada, where state law mandated higher pay.  Finally, Defendants Estill Ranches and John Estill adopted and implemented this same policy for all shepherds employed at Estill Ranch in Nevada.

## NEVADA MINIMUM WAGE

101.    As noted above, Plaintiffs worked in Nevada for Defendants.

102.    Plaintiffs were paid illegally low wages for their work in Nevada.  Even though Mr. Cantaro was paid approximately $1422.55 per month (or slightly more than this sum), he should have been paid much more than this amount based on the number of compensable hours he worked. Even though Mr. Inga was paid approximately $800 per month, he should have been paid much more than this amount based on the number of compensable hours worked.

103.    The Nevada minimum wage is established in Section 16 of the Nevada Constitution. This is an hourly minimum wage that applies regardless of the industry in which the employee is working.  *See Thomas v.  Nevada Yellow Cab Corp.*, 327 P.3d 518 (Nev. 2014).

104.    At present, the hourly minimum wage for all employees in Nevada is $7.25 per hour for workers who are covered by an employer's medical insurance and $8.25 per hour for workers who do not have insurance coverage.

105.    Upon information and belief, foreign shepherds, including Plaintiffs, employed by either the WRA or MPAS Defendants have not been covered by medical insurance meeting the requirements of Section 16 of the Nevada Constitution.

106.    All foreign shepherds, including Plaintiffs, are accordingly entitled to an hourly wage of at least $8.25 per hour for each hour of work completed in Nevada.

107.    In order for the wage of $1422.55 per month to be a lawful payment, Mr. Cántaro would have had to have worked under 40 hours per week and, in order for $800 per month to be a lawful payment, Mr. Inga would have had to have worked well under 40 hours in a week.  But both

Plaintiffs worked much more than 40 hours a week: they were engaged by the WRA Defendants and the MPAS Defendants respectively to work 24 hours a day, seven days per week under the terms of the job orders.

108.    Plaintiffs' work was standard operating procedure for a shepherd.  Nevada shepherds were engaged to work 24 hours a day, seven days per week.

109.    All shepherds are accordingly always working in excess of 40 hours per week and are being underpaid for the hourly minimum value of their labor as established in the Nevada Constitution.

### **RULE 23 CLASS ALLEGATIONS**
### **WRA Nevada Classes**

110.    Plaintiff Cántaro asserts Counts I, III, IV, V and IX against Defendant WRA as a Class Action pursuant to Federal Rule of Civil Procedure 23.

111.    He brings these claims on behalf of the "WRA Nevada Class," which, pending any modifications necessitated by discovery, is defined as follows:

> All persons whom WRA employed as shepherds through the H-2A program, who worked in Nevada during the applicable statute of limitations.

112.    Plaintiff Cántaro defines the "WRA Former Employee Sub-Class" as follows:

> All persons whom WRA employed as shepherds through the H-2A program, who worked in Nevada during the applicable statute of limitations and who are no longer employed by the WRA.

113.    The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Cántaro does not know the exact size of the classes since that information is within the control of WRA.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendant WRA employed an average of more than 100 shepherds in Nevada in each year from 2010 through 2016.

114.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including, (a) whether the WRA was obligated to pay shepherds working in Nevada at least Nevada minimum wage instead of paying the monthly wage established

18

by the USDOL; (b) whether WRA fulfilled its obligation to pay the Nevada minimum wage; (c) whether any health insurance was offered by WRA to putative Class Members which qualified for the lower, $7.25/hour minimum wage; (d) whether WRA was a joint employer of the H-2A shepherds; (e) whether the WRA paid plaintiff for all compensable hours; and (f) whether the WRA paid all wages when due following termination of employment of shepherds in Nevada.

115.    The claims asserted by Mr. Cántaro are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the applicable Nevada minimum wage by Defendants, that WRA was their joint employer, and that they worked 168 hours per week (24 hours/day, seven days/week).

116.    Mr. Cántaro also suffered from the same illegally low wage as the class.

117.    Mr. Cántaro will fairly and adequately protect and represent the interests of the class.

118.    Mr. Cántaro is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions who will adequately represent the class.

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

120.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendant WRA.

121.    Mr. Cántaro is unaware of any members of the putative class who are interested in presenting their claims in a separate action, though he is aware of a separate class action based on Nevada law against another employer of shepherds: Mountain Plains Agricultural Service.  *See Llacua et al v.  Western Range Association et al.*, 1:15-cv-01889-REB-CBS (D.  Colo.  2015). This other case contains no Nevada-based wage claims against WRA.

122.    Mr. Cántaro is unaware of any pending litigation commenced by members of the

19

Class concerning the instant controversies.

123.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

124.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

125.    The contours of the classes will be easily defined by reference to Defendants' records and government records.

<u>**El Tejon Classes**</u>

126.    Plaintiff Cántaro asserts Counts II, VI, VII, VIII, and X  as a Class Action pursuant to Federal Rule of Civil Procedure 23.

127.    In particular, he asserts Counts II and X against Defendants Gragirena and El Tejon, and he asserts Counts VI-VIII against only Defendant El Tejon.

128.    Pending any modifications necessitated by discovery, Plaintiff defines the "El Tejon Class" as follows:

> All persons whom Defendants El Tejon and Gragirena employed through the H2A program as shepherds during the applicable statute of limitations.

129.    Pending any modifications necessitated by discovery, Plaintiff defines the "El Tejon Former Employee Sub-Class" as follows:

> All persons whom Defendants El Tejon and Gragirena employed through the H2A program as shepherds during the applicable statute of limitations who are no longer employed by Defendants El Tejon and Gragirena.

130.    The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Cántaro does not know the exact size of the classes, since that information is within the control of the Defendants.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendants El Tejon and Gragirena employed an average of eight shepherds per year for a total of at least 54 shepherds during

2172539.4

the statutory period, if new shepherds came each year, and likely at least thirty 30 shepherds if some returned repeatedly to El Tejon.

131.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including (a) whether Defendants El Tejon and Gragierena were obligated to pay Nevada shepherds at least the Nevada minimum wage instead a of paying the monthly wage floor established by the USDOL; (b) whether Defendants El Tejon and Gragierena fulfilled their obligation to pay the Nevada minimum wage; (c) whether any health insurance was offered by Defendants El Tejon and Gragierena to putative Class Members which qualified for the lower, $7.25/hour minimum wage; (d) whether Defendants El Tejon and Gragierena were joint employers, with WRA, of the H-2A shepherds; (e) whether Defendants El Tejon and Gragierena paid plaintiffs for all compensable hours; and (f) whether Defendants El Tejon and Gargierena are jointly and severally liable for WRA's violations.

132.    The claims asserted by Mr. Cántaro are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the Nevada minimum wage by Defendants El Tejon and Gragirena.

133.    Mr. Cántaro also suffered from the same illegally low wage as the class.

134.    Mr. Cántaro will fairly and adequately protect and represent the interests of the class.

135.    Mr. Cántaro is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

136.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

137.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants El Tejon and

21

Gragirena.

138.    Mr. Cántaro is unaware of any members of the putative class who are interested in presenting their claims in a separate action, though he is aware of a separate class action based on Nevada law against another employer of shepherds: Mountain Plains Agricultural Service.  *See Llacua et al v.  Western Range Association et al.*, 1:15-cv-01889-REB-CBS (D. Colo. 2015).  This other case contains no Nevada-based wage claims against the WRA or El Tejon Defendants.

139.    Mr. Cántaro is unaware of any pending litigation commenced by members of the class concerning the instant controversies.

140.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

141.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

142.    The contours of the class will be easily defined by reference to Defendants' records and government records.

**MPAS Nevada Classes**

143.    Plaintiff Inga asserts Counts XI to XV against Defendant MPAS as a Class Action pursuant to Federal Rule of Civil Procedure 23.

144.    He brings these claims on behalf of the "MPAS Nevada Class," which, pending any modifications necessitated by discovery, is defined as follows:

> All persons whom MPAS employed as shepherds through the H-2A program, who worked in Nevada at any time during the applicable statute of limitations.[5]

---

[5] Plaintiffs assert that the statute of limitations is tolled for this class on its Nevada minimum wage claim based on *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and the Nevada minimum wage claim brought against MPAS in *Llacua et al v. Western Range Association et al.*, No. 15-cv-01889-REB-CBS (D. Colo. 2015).

145.   Plaintiff Inga defines the "MPAS Former Employee Sub-Class" as follows:

> All persons whom MPAS employed as shepherds through the H-2A program, who worked in Nevada during the applicable statute of limitations and who are no longer employed by the MPAS.

146.   The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Inga does not know the exact size of the classes since that information is within the control of MPAS.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendant MPAS employed an average of more than 27 shepherds in Nevada in each year from 2011 through 2016.

147.   There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including, (a) whether the MPAS was obligated to pay shepherds working in Nevada at least Nevada minimum wage instead of paying the monthly wage established by the USDOL; (b) whether MPAS fulfilled its obligation to pay the Nevada minimum wage; (c) whether any health insurance was offered by MPAS to putative Class Members which qualified for the lower, $7.25/hour minimum wage; (d) whether MPAS was a joint employer of the H-2A shepherds; (e) whether the MPAS paid plaintiff for all compensable hours; and (f) whether the MPAS paid all wages when due following termination of employment of shepherds in Nevada.

148.   The claims asserted by Mr. Inga are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the applicable Nevada minimum wage by Defendants, that MPAS was their joint employer, and that they worked 168 hours per week (24 hours/day, seven days/week).

149.   Mr. Inga also suffered from the same illegally low wage as the class.

150.   Mr. Inga will fairly and adequately protect and represent the interests of the class.

151.   Mr. Inga is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions who will adequately represent the class.

152.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the

2172539.4

putative Class Members lack the resources and language ability to locate and retain competent counsel.

153.   The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendant MPAS.

154.   Mr. Inga is aware of a separate class action based on Nevada law against Mountain Plains Agricultural Service.  *See Llacua et al v.  Western Range Association et al.*, 1:15-cv-01889-REB-CBS (D.  Colo.  2015).  Mr. Inga's understanding is that the Nevada minimum wage claim in that case is likely to soon be dismissed.

155.   Mr. Inga is unaware of any other pending litigation commenced by members of the Class concerning the instant controversies.

156.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

157.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

158.   The contours of the class will be easily defined by reference to Defendants' records and government records.

**Estill Ranches Classes**

159.   Plaintiff Inga also asserts Counts XVI to XX as a Class Action pursuant to Federal Rule of Civil Procedure 23.

160.   In particular, he asserts Counts XVI to XX against Defendant Estill Ranches. He asserts Counts XVI and XX against all the Estill Defendants.

161.   Pending any modifications necessitated by discovery, Plaintiff defines the "Estill Ranches Class" as follows:

> All persons whom Defendants Estill Ranches and John Estill employed through the H2A program as shepherds in Nevada at any time during the applicable statute of limitations.

162.     Pending any modifications necessitated by discovery, Plaintiff defines the "Estill Ranches Former Employee Sub-Class" as follows:

> All persons whom Defendants Estill Ranches and John Estill employed through the H2A program as shepherds in Nevada at any time during the applicable statute of limitations and who are no longer employed by Defendants Estill Ranches and John Estill.

163.     The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Inga does not know the exact size of the classes, since that information is within the control of the Defendants.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendants Estill Ranches employed an average of eleven shepherds per year (through a combination of MPAS and WRA), for a total of over 70 shepherds during the statutory period, if new shepherds came each year, and likely at least 30 shepherds if some returned repeatedly to Estill Ranches during the applicable statute of limitations.

164.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including (a) whether the Estill Ranch Defendants were obligated to pay Nevada shepherds at least the Nevada minimum wage instead a of paying the monthly wage floor established by the USDOL; (b) whether the Estill Ranch Defendants fulfilled their obligation to pay the Nevada minimum wage; (c) whether any health insurance was offered by the Estill Ranch Defendants to putative Class Members which qualified for the lower, $7.25/hour minimum wage; (d) whether the Estill Ranch Defendants were joint employers, with MPAS, of the H-2A shepherds; (e) whether the Estill Ranch Defendants paid plaintiffs for all compensable hours; and (f) whether the Estill Ranch Defendants are jointly and severally liable for MPAS's violations.

165.     The claims asserted by Mr. Inga are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the Nevada minimum wage by Defendants Estill Ranches and John Estill.

166.     Mr. Inga also suffered from the same illegally low wage as the class.

167.     Mr. Inga will fairly and adequately protect and represent the interests of the class.

25

168.     Mr. Inga is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

169.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

170.     The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants Estill Ranches and John Estill.

171.     Mr. Inga is unaware of any members of the putative class who are interested in presenting these claims in a separate action, though—as noted above—he is aware of a separate class action based on Nevada law against MPAS.  *See Llacua et al v.  Western Range Association et al.*, 1:15-cv-01889-REB-CBS (D.  Colo.  2015).

172.     Mr. Inga is unaware of any pending litigation commenced by members of the class concerning the instant controversies.

173.     It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

174.     This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

175.     The contours of the class will be easily defined by reference to Defendants' records and government records.

## <u>COUNT ONE</u>

**Failure to Pay Minimum Wages in Violation of the Nevada Constitution**

26

2172539.4

**(On Behalf of Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)**

176.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.  As noted above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of the WRA Nevada Class pursuant to Fed. R. Civ. P. 23.

177.    WRA employed Plaintiff Cántaro and other members of the WRA Nevada Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

178.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage, and attorneys' fees, pursuant to Nev.  Const.  art.  15, § 16, for the relevant time period alleged herein.

179.    Although not necessary to obtain fees under the Nevada Constitution, Plaintiff Cántaro sent a written demand for wages at least five days prior to bringing this claim and is entitled to attorneys' fees and costs if he prevails in this action.

<u>COUNT TWO</u>

**Failure to Pay Minimum Wages in Violation of the Nevada Constitution**

**(On Behalf of Plaintiff Cántaro and the El Tejon Class Against Defendants El Tejon and Gragirena)**

180.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.  As noted above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of the El Tejon Class pursuant to Fed. R. Civ. P. 23.

181.    Defendants El Tejon and Gragirena employed Plaintiff Cántaro and members of the El Tejon Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

182.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage and attorneys' fees pursuant to Nev.  Const.  art.  15, § 16, for the for the relevant time period alleged herein.

183.    Although not necessary to obtain fees under the Nevada Constitution, Plaintiff Cántaro sent a written demand for wages at least five days prior to bringing this claim and is entitled

2172539.4

to attorneys' fees and costs if he prevails in this action.

## COUNT THREE

### Breach of Contract of Quasi-Contract

### (Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)

184.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

185.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

186.    Plaintiff and the WRA Nevada Class entered into contracts with the WRA that explicitly incorporated the requirements of 20 C.F.R. §§ 655.122 and 655.210 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiff and members of the WRA Nevada Class entered into contracts with WRA, which were drafted by WRA, and which included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

187.    These contracts provide that each worker employed by WRA will be paid the higher of the monthly AEWR, the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof.  WRA failed to pay the required wage when they failed to pay the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state law, the above cited regulations, and the employment contract.

188.    As a result of the breach of contract, the Plaintiff and the WRA Nevada Class suffered damages for the relevant time period alleged herein.

## COUNT FOUR

### Promissory Estoppel

### (Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)

189.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully

28

re-written herein.

190.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

191.    In the alternative to a contract claim, Plaintiff Cántaro and the WRA Nevada Class are entitled to relief in promissory estoppel.  The WRA promised the Plaintiff and members of the Nevada Class that it would adhere to 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

192.    Plaintiff Cántaro and the WRA Nevada Class relied on this promise to their detriment by traveling to WRA member ranches to work as shepherds, where the WRA and its members illegally failed to pay wages as promised by WRA.  Plaintiff Cántaro and the WRA Nevada Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein.

## COUNT FIVE

### Unjust Enrichment and Quantum Meruit

### (Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)

193.    Plaintiff Cántaro incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

194.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

195.    In the alternative to a contract claim, Plaintiff Cántaro and the WRA Nevada Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on the WRA when the Plaintiff and the WRA Nevada Class performed work as specified by the WRA for which the WRA failed to pay the required compensation in violation of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

196.    That benefit was appreciated by the WRA as it had the advantage of the Plaintiff's and Class Members' labor without paying for that labor as required; it is unjust for the WRA to be permitted to benefit from the illegally obtained labor; and WRA engaged in unfair competition with other Nevada businesses that abide by Nevada's wage and hour laws.

29

197.     Plaintiff Cántaro and the WRA Nevada Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210, and those wages were not paid according to that expectation.

198.     As a result, Plaintiff Cántaro and the WRA Nevada Class are entitled to the full value of the services provided, and the WRA should be disgorged of the illegally withheld wages for the relevant time period alleged herein.

## COUNT SIX

### Breach of Contract or Quasi Contract

### (Plaintiff Cántaro and the El Tejon Class Against Defendant El Tejon)

199.     Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

200.     As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

201.     Plaintiff and the El Tejon Class entered into contracts with Defendant El Tejon that explicitly incorporated the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiff and the El Tejon Class entered into contracts with Defendant El Tejon that included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

202.     These contracts provide that each worker employed by Defendant El Tejon will be paid the higher of the monthly AEWR (adverse effect wage rate), the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof.  Defendant El Tejon failed to pay the required wage when it failed to pay the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state law and of the above cited regulations.

203.     As a result of the breach of contract, the Plaintiff and the El Tejon Class suffered

30

2172539.4

damages for the relevant time period alleged herein.

## COUNT SEVEN

### Promissory Estoppel

### (Plaintiff Cántaro and the El Tejon Class Against Defendant El Tejon)

204.   Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

205.   As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

206.   In the alternative to a contract claim, Plaintiff Cántaro and the El Tejon Class are entitled to relief in promissory estoppel.  Defendant El Tejon promised Plaintiff Cántaro and the El Tejon Class that it would adhere to 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

207.   Plaintiff Cántaro and the El Tejon Class relied on this promise to their detriment by traveling to the ranch operated by Defendant El Tejon to work as shepherds, where Defendant El Tejon illegally failed to pay wages as promised by Defendant El Tejon.  Plaintiff Cántaro and the El Tejon Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein.

## COUNT EIGHT

### Unjust Enrichment and Quantum Meruit

### (Plaintiff Cántaro and the El Tejon Class Against Defendant El Tejon)

208.   Plaintiff Cántaro incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

209.   As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

210.   In the alternative to a contract claim, Plaintiff Cántaro and the El Tejon Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on Defendant El Tejon when the Plaintiff and the El Tejon Class performed work as specified by Defendant El Tejon for which Defendant El Tejon failed to pay the required compensation in violation of 20 C.F.R. §

31

2172539.4

655.122 and 20 C.F.R. § 655.210.

211.    That benefit was appreciated by Defendant El Tejon as it had the advantage of the Plaintiff's and Class Members' labor without paying for that labor as required; it is unjust for the Defendant El Tejon to be permitted to benefit from the illegally obtained labor; and Defendant El Tejon engaged in unfair competition with other Nevada businesses that abide by Nevada's wage and hour laws.

212.    Plaintiff Cántaro and the El Tejon Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 and those wages were not.

213.    As a result, Plaintiff Cántaro and the El Tejon Class are entitled to the full value of the services provided and Defendant El Tejon should be disgorged of the illegally withheld wages for the relevant time period alleged herein.

## COUNT NINE

### Failure to Pay Separated Employees Wages When Due

### (On Behalf of Plaintiff Cántaro and the WRA Former Employee Sub-Class Against Defendant WRA)

214.    Plaintiff Cántaro incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

215.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

216.    Mr. Cántaro and many other members of the WRA Former Employee Sub-Class are no longer employed by WRA, whether due to resignation or termination.

217.    N.R.S.  § 608.140 provides that an employee has a private right of action for unpaid wages.

218.    N.R.S.  § 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

219.    N.R.S.  § 608.040(1)(a-b), in relevant part, impose a penalty on an employer who

32

2172539.4

fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

220.    N.R.S.  § 608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

221.    By failing to pay Plaintiff and all members of the WRA Former Employee Sub-Class for all hours worked in violation of state law, Defendant WRA has failed to timely remit all wages due and owing to Plaintiff and all members of the Sub-Class.

222.    Despite demand, Defendant willfully refuses and continues to refuse to pay Plaintiff and all WRA Former Employee Sub-Class Members who are former employees their full wages due and owing to them.

223.    Wherefore, Plaintiff demands thirty (30) days wages under N.R.S.  608.140 and 608.040, and an additional thirty (30) days wages under N.R.S.  608.140 and 608.050, for all members of the WRA Former Employee Sub-Class, together with attorneys' fees, costs, and interest as provided by law.

## COUNT TEN

### Failure to Pay Separated Employees Wages When Due

**(On Behalf of Plaintiff Cántaro and the El Tejon Former Employee Class Against Defendant El Tejon and Gragirena)**

224.    Plaintiff Cántaro incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

225.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

33

2172539.4

226.    Mr. Cántaro and many other Class Members are no longer employed by El Tejon and Gragirena, whether due to resignation or termination.

227.    N.R.S. 608.140 provides that an employee has a private right of action for unpaid wages.

228.    N.R.S. 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

229.    N.R.S. 608.040(1)(a-b), in relevant part, imposes a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

230.    N.R.S. 608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

231.    By failing to pay Plaintiff and all members of the El Tejon Class who are former employees for all hours worked in violation of state law, Defendants El Tejon and Gragirena have failed to timely remit all wages due and owing to Plaintiff and all members of the El Tejon Class who are former employees.

232.    Despite demand, Defendants willfully refuse and continue to refuse to pay Plaintiff and all El Tejon Class Members who are former employees their full wages due and owing to them.

233.    Wherefore, Plaintiff demands thirty (30) days wages under N.R.S. 608.140 and 608.040, and an additional thirty (30) days wages under N.R.S. 608.140 and 608.050, for all members of the El Tejon Class who are former employees, together with attorneys' fees, costs, and interest as provided by law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT ELEVEN

**Failure to Pay Minimum Wages in Violation of the Nevada Constitution**

**(On Behalf of Plaintiff Inga and the MPAS Nevada Class Against Defendant MPAS)**

234.     Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.  As noted above, Plaintiff Inga asserts this count on his own behalf and on behalf of the MPAS Nevada Class pursuant to Fed. R. Civ. P. 23.

235.     MPAS employed Plaintiff Inga and other members of the MPAS Nevada Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

236.     As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage, and attorneys' fees, pursuant to Nev.  Const.  art.  15, § 16, for the relevant time period alleged herein.

## COUNT TWELVE

**Promissory Estoppel**

**(Plaintiff Inga and the MPAS Nevada Class Against Defendant MPAS)**

237.     Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

238.     As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

239.     In the alternative to a contract claim, Plaintiff Inga and the MPAS Nevada Class are entitled to relief in promissory estoppel.  The MPAS promised the Plaintiff and members of the MPAS Nevada Class that it would adhere to 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

240.     Plaintiff Inga and the MPAS Nevada Class relied on this promise to their detriment by traveling to MPAS member ranches to work as shepherds, where the MPAS and its members illegally failed to pay wages as promised by MPAS.  Plaintiff Inga and the MPAS Nevada Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein.

## COUNT THIRTEEN

**Unjust Enrichment and Quantum Meruit**

**(Plaintiff Inga and the MPAS Nevada Class Against Defendant MPAS)**

241.    Plaintiff Inga incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

242.    As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

243.    In the alternative to a contract claim, Plaintiff Inga and the MPAS Nevada Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on the MPAS when the Plaintiff and the MPAS Nevada Class performed work as specified by the MPAS for which the MPAS failed to pay the required compensation in violation of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

244.    That benefit was appreciated by the MPAS as it had the advantage of the Plaintiff's and Class Members' labor without paying for that labor as required; it is unjust for the MPAS to be permitted to benefit from the illegally obtained labor; and MPAS engaged in unfair competition with other Nevada businesses that abide by Nevada's wage and hour laws.

245.    Plaintiff Inga and the MPAS Nevada Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210, and those wages were not paid according to that expectation.

246.    As a result, Plaintiff Inga and the MPAS Nevada Class are entitled to the full value of the services provided, and the MPAS should be disgorged of the illegally withheld wages for the relevant time period alleged herein.

## COUNT FOURTEEN
### Breach of Contract of Quasi-Contract

**(Plaintiff Inga and the MPAS Nevada Class Against Defendant MPAS)**

247.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

248.    As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of

36

all those similarly situated pursuant to Fed. R. Civ. P. 23.

249.     Plaintiff and the MPAS Nevada Class entered into contracts with the MPAS that explicitly incorporated the requirements of 20 C.F.R. §§ 655.122 and 655.210 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiff and members of the MPAS Nevada Class entered into contracts with MPAS, which were drafted by MPAS, and which included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

250.     These contracts provide that each worker employed by MPAS will be paid the higher of the monthly AEWR, the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof.  MPAS failed to pay the required wage when they failed to pay the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state law, the above cited regulations, and the employment contract.

251.     As a result of the breach of contract, the Plaintiff and the MPAS Nevada Class suffered damages for the relevant time period alleged herein.

## COUNT FIFTEEN
### Failure to Pay Separated Employees Wages When Due

**(On Behalf of Plaintiff Inga and the MPAS Former Employee Sub-Class Against Defendant MPAS)**

252.     Plaintiff Inga incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

253.     As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

254.     Mr. Inga and members of the MPAS Former Employee Sub- Class are no longer employed by MPAS, whether due to resignation or termination.

255.     N.R.S.  § 608.140 provides that an employee has a private right of action for unpaid wages.

2172539.4

256.    N.R.S. § 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

257.    N.R.S. § 608.040(1)(a-b), in relevant part, impose a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

258.    N.R.S. § 608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

259.    By failing to pay Plaintiff and all members of the MPAS Former Employee Sub-Class who are former employees for all hours worked in violation of state law, Defendant MPAS has failed to timely remit all wages due and owing to Plaintiff and all members of the Sub-Class.

260.    Wherefore, Plaintiff demands thirty (30) days wages under N.R.S. 608.140 and 608.040, and an additional thirty (30) days wages under N.R.S. 608.140 and 608.050, for all members of the MPAS Former Employee Sub-Class, together with attorneys' fees, costs, and interest as provided by law.

## COUNT SIXTEEN

### Failure to Pay Minimum Wages in Violation of the Nevada Constitution

### (On Behalf of Plaintiff Inga and the Estill Class Against Defendants Estill Ranches and John Estill)

261.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.  As noted above, Plaintiff Inga asserts this count on his own behalf and on behalf of the Estill Ranches Class pursuant to Fed. R. Civ. P. 23.

262.    Defendants Estill Ranches and John Estill employed Plaintiff Inga and members of

38

2172539.4

the Estill Ranches Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

263.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage and attorneys' fees pursuant to Nev.  Const.  art.  15, § 16, for the for the relevant time period alleged herein.

**COUNT SEVENTEEN**
**Breach of Contract or Quasi Contract**

**(Plaintiff Inga and the Estill Ranches Class Against Defendant Estill Ranches)**

264.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

265.    As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

266.    Plaintiff and the Estill Ranches Class entered into contracts with Defendant Estill Ranches that explicitly incorporated the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiff and the Estill Ranches Class entered into contracts with Defendant Estill Ranches that included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

267.    These contracts provide that each worker employed by Defendant Estill Ranches will be paid the higher of the monthly AEWR (adverse effect wage rate), the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof.  Defendant Estill Ranches failed to pay the required wage when it failed to pay the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state law and of the above cited regulations.

268.    As a result of the breach of contract, the Plaintiff and the Estill Ranches Class suffered damages for the relevant time period alleged herein.

39

**COUNT EIGHTEEN**
**Promissory Estoppel**

**(Plaintiff Inga and the Estill Ranches Class Against Defendant Estill Ranches)**

269.    Plaintiff incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

270.    As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

271.    In the alternative to a contract claim, Plaintiff Inga and the Estill Ranches Class are entitled to relief in promissory estoppel.  Defendant Estill Ranches promised Plaintiff Inga and the Estill Ranches Class that it would adhere to 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

272.    Plaintiff Inga and the Estill Ranches Class relied on this promise to their detriment by traveling to the ranch operated by Defendant Estill Ranches to work as shepherds, where Defendant Estill Ranches illegally failed to pay wages as promised by Defendant Estill Ranches.  Plaintiff Inga and the Estill Ranches Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein.

**COUNT NINETEEN**
**Unjust Enrichment and Quantum Meruit**

**(Plaintiff Inga and the Estill Ranchces Class Against Defendant Estill Ranches)**

273.    Plaintiff Inga incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

274.    As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

275.    In the alternative to a contract claim, Plaintiff Inga and the Estill Ranches Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on Defendant Estill Ranches when the Plaintiff and the Estill Ranches Class performed work as specified by Defendant Estill Ranches for which Defendant Estill Ranches failed to pay the required compensation in violation of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

2172539.4

276.   That benefit was appreciated by Defendant Estill Ranches as it had the advantage of the Plaintiff's and Class Members' labor without paying for that labor as required; it is unjust for the Defendant Estill Ranches to be permitted to benefit from the illegally obtained labor; and Defendant Estill Ranches engaged in unfair competition with other Nevada businesses that abide by Nevada's wage and hour laws.

277.   Plaintiff Inga and the Estill Ranches Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 and those wages were not.

278.   As a result, Plaintiff Inga and the Estill Ranches Class are entitled to the full value of the services provided and Defendant Estill Ranches should be disgorged of the illegally withheld wages for the relevant time period alleged herein.

## COUNT TWENTY

### Failure to Pay Separated Employees Wages When Due

### (On Behalf of Plaintiff Inga and the Estill Ranches Former Employee Sub-Class Against Defendants Estill Ranches and John Estill)

279.   Plaintiff Inga incorporates by reference paragraphs 1 to 175 of this Complaint as if fully re-written herein.

280.   As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

281.   Mr. Inga and many other Class Members are no longer employed by Estill Ranches and John Estill, whether due to resignation or termination.

282.   N.R.S.  608.140 provides that an employee has a private right of action for unpaid wages.

283.   N.R.S.  608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

284.   N.R.S.  608.040(1)(a-b), in relevant part, imposes a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee

41

2172539.4

who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

285.   N.R.S.  608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

286.   By failing to pay Plaintiff and all members of the Estill Ranches Former Employee Sub-Class for all hours worked in violation of state law, Defendants Estill Ranches and John Estill have failed to timely remit all wages due and owing to Plaintiff and all members of the Estill Ranches Former Employee Sub-Class.

287.   Wherefore, Plaintiff demands thirty (30) days wages under N.R.S.  608.140 and 608.040, and an additional thirty (30) days wages under N.R.S.  608.140 and 608.050, for all members of the Estill Ranches Former Employee Sub-Class, together with attorneys' fees, costs, and interest as provided by law.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully requests that judgment be entered in their favor and in favor of those similarly situated and that this Court:

1. Declare Defendants in violation of each of the counts set forth above;

2. Certify and maintain this action as a class action, with Plaintiff Cántaro as designated class representative for the WRA and El Tejon Classes, and with Plaintiff Inga as designated class representative for the MPAS and Estill Ranches Classes and with their counsel appointed as class counsel;

3. Award damages for Defendants' failure to pay the Nevada minimum wage, as required by contract, by state law, and the principles of unjust enrichment, quantum meruit, and promissory estoppel, and to pay wages in a timely fashion upon conclusion of employment;

42

4.  Award pre-judgment, post-judgment, and statutory interest, as permitted by law;

5.  Award attorneys' fees;

6.  Award costs;

7.  Order equitable relief, including a judicial determination of the rights and responsibilities of the parties;

8.  Award such other and further relief as the Court may deem just and proper; and

9.  Grant Plaintiffs a jury trial.


Dated: October 3, 2016                                         Respectfully submitted,

                                    /s/Alexander Hood
                                    Alexander Hood
                                    Attorney and Director of Litigation
                                    Towards Justice
                                    1535 High St., Suite 300
                                    Denver, CO 80218
                                    Tel.: 720-239-2606
                                    Fax: 303-957-2289
                                    Email: alex@towardsjustice.org

                                    /s/Dermot Lynch
                                    Dermot Lynch
                                    Attorney and Skadden Fellow
                                    Towards Justice
                                    1535 High St., Suite 300
                                    Denver, CO 80218
                                    Tel.: 720-239-2606
                                    Fax: 303-957-2289
                                    Email: dermot@towardsjustice.org

                                    /s/Christine E.  Webber
                                    Christine E.  Webber
                                    Brian Corman
                                    Cohen Milstein Sellers & Toll PLLC
                                    1100 New York Ave., NW, Suite 500
                                    Washington, DC  20005
                                    Tel: 202-408-4600
                                    Fax: 202-408-4699
                                    Email: cwebber@cohenmilstein.com

                                    /s/Joshua D.  Buck
                                    Joshua D.  Buck, Nev.  Bar No.  12187
                                    Thierman Buck LLP
                                    7287 Lakeside Drive
                                    Reno, Nevada 89511
                                    Tel.  (775) 284-1500

43

Fax.  (775) 703-5027
Email: josh@thiermanbuck.com

*Attorneys for the Plaintiffs*

2172539.4