MARK R. THIERMAN, Nev. Bar No. 8285
JOSHUA D. BUCK, Nev. Bar No. 12187
LEAH L. JONES, Nev. Bar No. 13161
Thierman Buck LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027
Email: mark@thiermanbuck.com
josh@thiermanbuck.com
leah@thiermanbuck.com

ALEXANDER HOOD (*pro hac vice*)
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

CHRISTINE E. WEBBER (*pro hac vice*)
BRIAN CORMAN (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Suite 500
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
Email: cwebber@cohenmilstein.com
bcorman@cohenmilstein.com

*Attorneys for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| ABEL CÁNTARO CASTILLO; ALCIDES INGA RAMOS, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WESTERN RANGE ASSOCIATION; MELCHOR GRAGIRENA; EL TEJON SHEEP COMPANY; MOUNTAIN PLAINS AGRICULTURAL SERVICE; ESTILL RANCHES, LLC; and JOHN ESTILL, <br><br> Defendants. | Civil Case No. 3:16-cv-00237-RCJ-VPC <br><br> **PLAINTIFFS' CONSOLIDATED** <br><br> **OPPOSITION TO MOTIONS TO** <br><br> **DISMISS** |

# TABLE OF CONTENTS

Page

BACKGROUND ............................................................................................................. 1

STANDARD OF REVIEW ............................................................................................ 3

ARGUMENT ................................................................................................................... 4

I.   THIS COURT HAS JURISDICTION OVER ALL CLAIMS ................................. 4

    A.   This Court Has Federal Question Jurisdiction Under § 1331 ...................... 4

    B.   This Court Has Supplemental Jurisdiction Over the Claims of Defendants
    Gragirena, El Tejon, Estill and Estill Ranches Under § 1367 ...................... 9

II.   GRAGIRENA AND ESTILL ARE INDIVIDUALLY LIABLE FOR STEALING
    PLAINTIFFS' WAGES .......................................................................................... 11

III.   DEFENDANTS MUST PAY THE NEVADA MINIMUM WAGE, NOT THE
    FEDERAL AEWR ................................................................................................... 13

IV.   PLAINTIFFS PROPERLY ALLEGE CONTRACT CLAIMS ............................. 15

    A.   WRA is Properly Alleged to Be a Party to Plaintiff Cántaro's Contract ..... 15

    B.   Plaintiffs Properly Allege Breach of Employment Contracts ....................... 17

V.   ALTERNATIVELY, DEFENDANTS ARE LIABLE IN EQUITY FOR STEALING
    PLAINTIFFS' WAGES .......................................................................................... 19

VI.   STATUTES OF LIMITATION CANNOT PROTECT DEFENDANTS FROM ALL
    LIABILITY ............................................................................................................. 22

CONCLUSION ............................................................................................................... 23

i

# TABLE OF AUTHORITIES

Page

CASES

*Allis–Chalmers Corp. v. Lueck,*
471 U.S. 202 (1985)...............................................................................8

*In re Amerco Derivative Litig.*
252 P.3d 681 (Nev. 2011)......................................................................23

*Arriaga v. Fla. Pac. Farms, L.L.C.,*
305 F.3d 1228 (11th Cir. 2002) ............................................................16

*Augustine v. United States,*
704 F.2d 1074 (9th Cir. 1983) ................................................................4

*Avila-Gonzalez v. Barajas,*
No. 2:04CV567-FTM-33DNF, 2006 WL 643297 (M.D. Fla. Mar. 2, 2006)...........6

*Becky Kariuki & Dixie Kaiuki v. Shac, LLC, et al.,*
No. 214CV1118JCMCWH, 2016 WL 6069927 (D. Nev. Oct. 13, 2016)....................12

*Becnel v. KPMG LLP,*
387 F.Supp.2d 984 (W.D. Ark. 2005).....................................................7

*Blanck v. Hager,*
360 F. Supp. 2d 1137 (D. Nev. 2005).....................................................3

*Boucher v. Shaw,*
124 Nev. 1164, 196 P.3d 959 (2008). Dkt. 55 ............................11, 12, 13

*Brewer v. Premier Golf Props.,*
86 Cal. Rptr. 3d 225 (Cal. Ct. App. 2008) ...........................................17

*Cal. ex rel. Lockyer v. Dynegy, Inc.,*
375 F.3d 831 (9th Cir.), *amended on denial of reh'g,* 387 F.3d 966 (9th Cir. 2004) ...................6

*Cheqer, Inc. v. Painters & Decorators Joint Comm., Inc.,*
98 Nev. 609, 655 P.2d 996 (1982) ........................................................21

*City of Chicago v. Comcast Cable Holdings, L.L.C.,*
384 F.3d 901 (7th Cir. 2004) .................................................................7

*Crockett & Myers, Ltd. v. Napier, Fitzgeralld & Kirby, LLP,*
440 F. Supp. 2d 1184 (D. Nev. 2006).....................................................20

*Custom Teleconnect, Inc. v. International Tele-Services, Inc.,*
254 F. Supp. 2d 1173 (D. Nev. 2003).....................................................20

*D'Amato v. Lillie,*
401 Fed. Appx. 291 (9th Cir. 2008) (unpublished)..............................20

*DFR Apparel Co. v. Triple Seven Promotional Products, Inc.,*
No. 2:11-cv-001406-APG, 2014 WL 4891230 (D. Nev. Sept. 30, 2014) .................20

# TABLE OF AUTHORITIES

Page

*Dunlap v. G&L Holding Grp., Inc.*,
381 F.3d 1285 (11th Cir. 2004) ....................................................................4, 7

*E. H. Boly & Son, Inc. v. Schneider*,
525 F.2d 20 (9th Cir. 1975) ...............................................................................21

*In re Enter. Rent-A-Car Wage & Hour Emp. Prac. Litig.*,
683 F.3d 462 (3d Cir. 2012)...............................................................................13

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) .............................................................................................9

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005) ..........................................................................................4, 7

*Gray v. Powers*,
673 F.3d 352 (5th Cir. 2012) ..............................................................................12

*Hale v. State of Ariz.*,
993 F.2d 1387 (9th Cir. 1993) .............................................................................12

*Harris v. Amgen, Inc.*,
573 F.3d 728 (9th Cir. 2009) ................................................................................3

*Kenny v. Trade Show Fabrications W., Inc.*,
No. 215CV410JCMVCF, 2016 WL 697110 (D. Nev. Feb. 18, 2016) ...............12

*KlaCaizner v. Countrywide Fin.*,
2015 WL 627927 (Nev. 2015)............................................................................23

*Leasepartners Corp., Inc. v. Robert L. Brooks Trust*,
113 Nev. 747, 942 P.2d 182 (1997) ...................................................................20

*Leighton v. City and County of Denver*,
14-cv-02812-PAB-NYW, 2015 WL 5532751 (D. Colo. Sep. 21, 2015)...........20

*Lindsay v. Gov't Emps. Ins. Co.*,
448 F.3d 416 (D.C. Cir. 2006) ...........................................................................10

*Lindy v. Lynn*,
501 F.2d 1367 (3d Cir. 1974)...............................................................................7

*Lopez v. Fish*,
No. 2:11-cv-113, 2012 WL 2126856 (E.D. Tenn. May 21, 2012) ....................17

*Love v. United States*,
915 F.2d 1242 (9th Cir. 1989) ..............................................................................3

*Martin v. Spring Break '83 Prods., L.L.C.*,
688 F.3d 247 (5th Cir. 2012) ..............................................................................12

*Mathews v. Diaz*,
426 U.S. 67 (1976)................................................................................................5

# TABLE OF AUTHORITIES

Page

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ....................................................................................1

*Mendoza v. United States*,
   481 F. Supp. 2d 650 (W.D. Tex. 2007), *aff'd sub nom. Mendoza v. Murphy*, 532
   F.3d 342 (5th Cir. 2008) ............................................................................................10

*Mitchell v. Bank of America, N.A.*,
   No. 6:09-cv-2131-Orl-31GJK, 2010 WL 3340486 (M.D. Fla. Aug. 25, 2010) ...........7

*Mitchell v. Osceola Farms Co.*,
   408 F. Supp. 2d 1275 (S.D. Fla. 2005) .........................................................................5

*Moore v. Dollar Tree Stores Inc.*,
   85 F. Supp. 3d 1176 (E.D. Cal. 2015) .........................................................................11

*Olson v. Bemis Co.*,
   800 F.3d 296 (7th Cir. 2015) .........................................................................................8

*Pac. Merch. Shipping Ass'n v. Aubry*,
   918 F.2d 1409 (9th Cir. 1990) .....................................................................................14

*Peabody Coal Co. v. Navajo Nation*,
   373 F.3d 945 (9th Cir. 2004) .........................................................................................4

*Perry v. Terrible Herbst, Inc.*,
   132 Nev. Adv. Op. 75 (Oct. 27, 2016) ........................................................................22

*Pink v. Busch*,
   100 Nev. 684, 691 P.2d 456 (1984) .............................................................................21

*Price v. Washington Mutual, N.A.*,
   No. CV 10-4875 AHM (SHX), 2010 WL 2792124 (C.D. Cal. July 14, 2010) .............8

*Rhodes v. Designer Distrib. Serv., LLC*,
   2012 WL 642434 (Nev. Sup. Ct., Feb. 24, 2012) ........................................................20

*Rivera v. Peri & Sons Farms, Inc.*,
   735 F.3d 892 (9th Cir. 2013) ...................................................................................2, 16

*Ruiz v. Fernandez*,
   949 F. Supp. 2d 1055 (E.D. Wash. 2013) ...............................................................15, 16

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ..................................................................................3, 4

*Sheridan Healthcorp, Inc. v. Aetna Health Inc.*,
   161 F. Supp. 3d 1238 (S.D. Fla. 2016) .........................................................................7

*Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   159 F.3d 1209 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch,
   Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016) ...............................6

# TABLE OF AUTHORITIES

Page

*Sudomir v. McMahon*,
   767 F.2d 1456 (9th Cir. 1985) ................................................................5

*Terry v. Sapphire Gentlemen's Club*,
   130 Nev. Adv. Op. 87, 336 P.3d 951 (2014), *reh'g denied* (Jan. 22, 2015)................12

*Thomas v. Nevada Yellow Cab Corp.*,
   327 P.3d 518 (2014), *reh'g denied* (Sept. 24, 2014)................14

*Tyus v. Wendy's of Las Vegas, Inc.*,
   No. 2:14-cv-00729-GMN-VCF, 2015 WL 5021644 (D. Nev. Aug. 21, 2015) ................17

*Valentini v. Shinseki*,
   860 F. Supp. 2d 1079 (C.D. Cal. 2012) ................................................7

*W. Reserve Oil & Gas Co. v. New*,
   765 F.2d 1428 (9th Cir. 1985) ................................................3

*Wang v. Chinese Daily News, Inc.*,
   623 F.3d 743 (9th Cir. 2010), *vacated on other grounds*, 132 S. Ct. 74 (2011)................10

*White v. Lee*,
   227 F.3d 1214 (9th Cir.2000) ................................................3

**STATUTES**

8 U.S.C. § 1101(a)(15)(H)(ii)(a) ................................................1

29 U.S.C. § 218(a) ................................................14

Nev. Const. Art. 15 § 16 ................................................19

Nev. Rev. Stat. Ann. § 11.190(1)(b) ................................................22

Nev. Rev. Stat. Ann. § 11.190(2)(c) ................................................23

Nev. Rev. Stat. Ann. Chapter 608................................................11, 22

**RULES AND REGULATIONS**

Fed. R. Civ. P. 8(a) ................................................3, 20

20 C.F.R. § 653.501 ................................................2, 13, 14, 18

20 C.F.R. § 655.0(a) ................................................1, 14

20 C.F.R. § 655.122 ................................................18

20 C.F.R. § 655.135 ................................................2, 14, 17, 18

20 C.F.R. §§ 655.200 *et seq.* ................................................18

20 C.F.R. § 655.210 ................................................2, 13, 14, 18, 19

v

# TABLE OF AUTHORITIES

Page

20 C.F.R. § 655.211 ...............................................................................................2, 13, 14

75 Fed. Reg. 6884 .................................................................................................................2

76 Fed. Reg. 47256 ..............................................................................................2, 13, 18, 19

80 Fed. Reg. 62958 ...............................................................................................................13

80 Fed. Reg. 62988 ...............................................................................................................13

Plaintiff Abel Cántaro Castillo ("Mr. Cántaro") alleges that Defendants Western Range Association ("WRA"), El Tejon Sheep Company ("El Tejon"), and Melchor Gragirena ("Gragirena") have cheated him and others similarly situated out of his hard-earned wages.  Plaintiff Alcides Inga Ramos ("Mr. Inga") asserts the same claims against Defendants Mountain Plains Agricultural Service ("MPAS"), Estill Ranches, and John Estill ("Estill").  Defendants did this by violating the Nevada Minimum Wage Amendment, the terms of Plaintiffs' employment contracts, and their duties under federal law to pay fair wages to Mr. Cántaro and Mr. Inga.  None of the arguments presented in Defendants' Motions to Dismiss, Dkts. 55, 66 and 74, should prevent this Court from fully considering Plaintiffs' claims.[1]

## BACKGROUND

The Immigration and Nationality Act ("INA") creates a program for issuing temporary nonimmigrant worker visas, known as H-2A visas, that allows employers to hire foreign workers when there are not enough qualified and available American workers to fill open jobs.  8 U.S.C. § 1101(a)(15)(H)(ii)(a).  The Department of Labor ("DOL") "is tasked with administering the visa program to protect the wages and working conditions of U.S. workers." *Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014).  To further this objective, the Secretary of Labor may approve an H-2A visa only if the temporary worker's employment does "not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id*. § 1188(a)(1)(A).

The DOL has adopted regulations setting minimum wages and working conditions for H-2A workers such that their employment does not adversely affect the wages and working conditions of similarly employed Americans.  20 C.F.R. § 655.0(a).  Thus, the "wages . . . offered and afforded to [H-2A workers] must be compared to the established minimum levels" offered to U.S. workers, "since U.S. workers cannot be expected to accept employment under conditions below the

---

[1] Plaintiffs filed a motion for leave to respond to the two earlier motions to dismiss on December 23, 2016, the same day their response to the third motion to dismiss is due, so that a consolidated response could be filed.  Dkt. 75.  As the Court has not yet had the chance to rule on that request, Plaintiffs are submitting their opposition today to be timely.

1

1  established minimum levels." *Id.* at § 655.0(a)(2).  The H-2A Regulations further provide that "the

2  employer must comply with all applicable . . . State and local laws and regulations."  20 C.F.R. §

3  655.135(e). Simply put, the overarching principle of the INA and H-2A Regulations is to ensure that

4  H-2A workers are paid and treated no worse than domestic workers.  Otherwise, employers would

5  undercut American workers by hiring immigrant laborers, paying them depressed wages and

6  providing substandard working conditions.  Paying H-2A workers less than the minimum wage that

7  must be paid to domestic workers would contravene the entire purpose of the INA.

8          To enforce this principle, the H-2A Regulations require that employers seeking to hire H-2A

9  workers provide the Secretary of Labor with "job orders" that accompany the Application for

10 Temporary Employment Certification for these workers.  *Id.* at § 655.122(c).  These orders "must

11 include each of the minimum benefit, wage, and working condition provisions."  *Id.*  The job order

12 creates an employment contract with an H-2A employee as a matter of law pursuant to the H-2A

13 Regulations.  *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 899-900 (9th Cir. 2013) (an

14 allegation that the job clearance orders were the employment contracts of H-2A workers is sufficient

15 to state a claim for breach of contract).

16          The specific wages that must be paid to H-2A shepherds, such as Plaintiffs Cántaro and Inga

17 and the classes of workers they seek to represent, is laid out in 20 C.F.R. § 655.210-211.[2]  The job

18 orders (*i.e.*, the contract between the employer and the H-2A shepherd) must provide that the

19 "employer . . . pay the worker at least the monthly AEWR[3] . . . the agreed-upon collective bargaining

20 wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect

21

22

23      [2] Prior to their incorporation in the CFR, the substance of these regulations were set forth in

24 the Federal Register.  *TEGL No. 32-10, Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program*, 76

25 Fed. Reg. 47,256, 47,258 (Aug. 4, 2011).  *See also* 20 C.F.R. § 653.501(d)(4) (job orders cannot be placed unless the wage rate offered was not less than the prevailing wage, or the applicable Federal

26 or State minimum wage, whichever is higher)

27      [3] The AEWR is a specially calculated wage based on the Department of Agriculture's Farm

Labor Survey, which approximates what the prevailing wage would be if not for the hiring of foreign

28 workers.  *See* Temporary Agricultural Employment of H–2A Aliens in the United States, 75 Fed. Reg. 6884, 6891-6893 (Feb. 12, 2010).

at the time work is performed, *whichever is highest*, for every month of the job order period or portion thereof." *Id*. at § 655.210(g) (emphasis added). *See also* § 655.211(a) (same). The employer's obligation in setting wages for H-2A shepherds could not be clearer: look at the various wages that could be paid (the AEWR, the federal minimum wage, the state minimum wage, etc.), and pay the highest of all these options.

As stated in their First Amended Complaint, Plaintiffs are shepherds and former shepherds who worked for Defendants in Nevada under the H-2A program, and were therefore entitled to the wages and working conditions outlined in the H-2A Regulations, which became part of a contract between Plaintiffs and their employers. Dkt. 45 at 4. Defendants had a contractual obligation to pay Plaintiffs the Nevada minimum wage, and breached their contracts and violated state law when they failed to do so. *Id*. at 5-18.

### STANDARD OF REVIEW

There is a strong presumption against dismissing an action for failure to state a claim. *Blanck v. Hager*, 360 F. Supp. 2d 1137, 1147 (D. Nev. 2005). "Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Harris v. Amgen, Inc*., 573 F.3d 728, 737 (9th Cir. 2009). Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain" statement that adequately informs the defendant of the plaintiff's cause of action. *Id*. When ruling on a 12(b)(6) motion to dismiss for failure to state a claim, the court must take all allegations of material fact as true and construe the facts in the light most favorable to the non-moving party. *W. Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th Cir. 1985). If there exists any set of facts that entitles the non-moving party to the relief the Court can grant, dismissal is improper. *Blanck*, 360 F. Supp. 2d at 1148. *See also Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989) ("Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

A rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be made in two ways, either as a facial or a factual challenge to the existence of federal jurisdiction. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000). A facial challenge asserts that the pleadings are insufficient to support subject matter jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.

2004).  When a party makes a facial challenge, the court must accept the allegations of the pleadings as true.  *Id*.  A factual challenge asserts that there is no actual existence of jurisdiction, and "relie[s] on extrinsic evidence" outside of the plaintiff's pleadings.  *Id*.  If the challenge is factual, the court is free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary.  *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).  Defendants have not stated whether their jurisdictional challenge is facial or factual, but they have not relied on any arguments or evidence outside of Plaintiffs' First Amended Complaint.  Defendants therefore make a facial challenge, and the Court must accept Plaintiffs' allegations as true.

**ARGUMENT**

**I.    THIS COURT HAS JURISDICTION OVER ALL CLAIMS**

A.    This Court Has Federal Question Jurisdiction Under § 1331

The contract law claims at the heart of this case are premised on substantial federal law questions, namely the proper interpretation and application of the INA and H-2A Regulations to the circumstances of this case, and whether federal law creates a contract between Plaintiffs and Defendants based on the H-2A job orders.  Binding authority holds that federal courts have jurisdiction over contract claims in such circumstances, and Defendants' assertion that "construction of federal law is not an issue" is in error. Dkt. 55 at 6.  *See also* Dkt. 74 at 6.

Federal question jurisdiction applies to "claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  "For a case to 'arise under' federal law, a plaintiff's well-pleaded complaint must establish either (1) that federal law creates the cause of action or (2) that the plaintiff's asserted right to relief depends on the resolution of a substantial question of federal law."  *Peabody Coal Co. v. Navajo Nation*, 373 F.3d 945, 949 (9th Cir. 2004).  *See also Dunlap v. G&L Holding Grp., Inc.*, 381 F.3d 1285, 1290 (11th Cir. 2004) ("In order for a state-law claim to raise substantial questions of federal law, federal law must be an essential element of [the plaintiff's] claim, and the federal right . . . that forms the basis of the claim must be such that the

claim will be supported if the federal law is given one construction or effect and defeated if it is given another . . . . In other words, the state-law claim must really and substantially involve a dispute or controversy respecting the validity, construction or effect of federal law.") (internal quotation marks and alterations omitted).  Plaintiffs' complaint clearly establishes that their contract claims hinge on substantial federal issues: (1) whether, under federal law, the job orders under which Plaintiffs worked for Defendants created a contractual relationship; (2) whether, under federal law, the contract created included a requirement to pay the state minimum wage if it was higher than the alternatives; and (3) whether Defendants properly paid Plaintiffs in accordance with the INA and H-2A Regulations, which turns on the proper construction of those federal laws.  Interpretation of federal law, which dictates the terms of the contract, is the only way to properly adjudicate Plaintiffs' contract claims.  Thus, in order to maintain uniformity in the application of federal law, this Court has federal question jurisdiction over those claims.

Courts have already addressed identical circumstances to those at bar to find that contract claims addressing wages paid under the H-2A immigrant worker regulations raise substantial questions of federal law such that federal question jurisdiction exists.  In *Mitchell v. Osceola Farms Co.*, 408 F. Supp. 2d 1275, 1280 (S.D. Fla. 2005), the district court found that it had federal question jurisdiction over the contract claims made by H-2A workers asserting inadequate pay.  As here, the plaintiffs in *Mitchell* had accepted the terms of their job offers, which incorporated DOL regulations on wage rates, and the defendants violated those terms by paying wages below those required by federal regulations.  *Id*. at 1277.  The plaintiffs "argue[d] that the [c]ourt ha[d] federal question jurisdiction because the breach of contract claim turn[ed] on a substantial question of federal law.  Specifically, the [c]ourt [had to] determine the meaning and purpose of federal immigration statutes and regulations governing the H-2A program in order to determine whether [the] [d]efendant breached its contract with [the] [p]laintiffs."  *Id*. at 1278.  The court agreed, finding that "the federal interest in regulating immigration is unquestionably substantial … [because] 'the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.'"  *Id*. (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976), and citing *Sudomir v. McMahon*, 767 F.2d 1456, 1464 (9th Cir. 1985) ("[F]ederal authority

in the areas of immigration and naturalization is plenary.")); s*ee also Avila-Gonzalez v. Barajas*, No. 2:04CV567-FTM-33DNF, 2006 WL 643297, at *1 (M.D. Fla. Mar. 2, 2006) ("While ordinarily contract claims are adjudicated in the state courts, absent the existence of an express federal cause of action, the Court may exercise jurisdiction over H-2A workers' claims because they turn on interpretation of terms dictated by federal statutes and regulations.").

The Ninth Circuit has similarly held that contract claims hinging on substantial issues of federal law should be heard in federal court. *Cal. ex rel. Lockyer v. Dynegy, Inc*., 375 F.3d 831 (9th Cir.), *amended on denial of reh'g*, 387 F.3d 966 (9th Cir. 2004), involved a complicated statutory scheme for the regulation of California energy prices. The California Attorney General brought contract claims against multiple energy companies alleging that they fraudulently sold energy they were supposed to hold in reserve, leading to the 2000-2001 California blackouts. *Id*. at 836-37. The lawsuit was an attempt to enforce federal tariffs, which are "the equivalent of a federal regulation" and overseen by Federal Energy Regulatory Commission ("FERC"). The Ninth Circuit found federal question jurisdiction: "In the case before us … relief is predicated on a subject matter committed exclusively to federal jurisdiction. The state lawsuit turns, entirely, upon the defendant's compliance with a federal regulation. The tariff defines the companies' contractual obligation with respect to the conduct at issue. Absent a violation of the FERC-filed tariff, no state law liability could survive." *Id*. at 839. So too here, Defendants' contract obligations are defined by the H2-A regulations dictating their wage and hour requirements. Absent applicability of the H-2A regulations, no state law liability would survive.

Likewise, in *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 159 F.3d 1209, 1211 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016), the plaintiff filed state common-law claims, including breach of contract, against the Nasdaq Stock Market, alleging that Nasdaq improperly de-listed and suspended trading of the plaintiff's stock. Although the plaintiff framed the complaint as a state law claim, the defendant's conduct was "exclusively determined by federal law" because the validity of the claim depended on whether Nasdaq had violated the rules adopted by the SEC. *Id*. at 1212. Thus, if Nasdaq had complied with the rules, there was no viable cause of action. *Id*. As in *Dynegy* and the

6

1  case at bar, the state cause of action turned entirely upon the defendant's compliance with a federal

2  regulation.  *See also Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1102 (C.D. Cal. 2012) ("[T]he

3  Court finds that jurisdiction is appropriate under § 1331 because the charitable trust claims implicate

4  significant federal issues.  *Grable & Sons*, 545 U.S. at 312.  A charitable trust claim against the

5  federal government will always require an initial analysis of whether Congress has passed a statute

6  agreeing to assume fiduciary duties as a trustee of the charitable trust.  It is appropriate to provide a

7  federal forum to address these issues.").[4]

8           The cases Defendants cite to argue that inclusion of a federal statute in a contract does not,

9  by itself, create federal jurisdiction are inapposite; they address circumstances where a federal statute

10  was referenced in a contract, but the contract claims did not turn on substantial questions raised by

11  the federal law at issue.  *See* Dkt. 55 at 5-6 and Dkt. 74 at 6-7 (citing *Dunlap v. G&L Holding Grp.,*

12  *Inc.*, 381 F.3d 1285, 1292 (11th Cir. 2004) (while contract at issue contained requirements for

13  compliance with federal baking regulations, no substantial issue of federal law existed because the

14  contract "claims d[id] not require proof of violation or an interpretation" of these regulations); *City*

15  *of Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901, 904-905 (7th Cir. 2004) (contract

16  claim was based on cable company's refusal to pay *any* franchise fees to city, so reference in

17  contract to federal law setting a cap on franchise payments was not sufficiently relevant for claim to

18  be based on federal law); *Lindy v. Lynn*, 501 F.2d 1367, 1369 (3d Cir. 1974) (mortgage contract

19  claim was based solely on state law, and the fact that the mortgage "documents were subject to the

20  regulations of the [Fair Housing Act] [wa]s not significant"); *Sheridan Healthcorp, Inc. v. Aetna*

21

22  _____

23

24       [4] Other courts have similarly found that federal question jurisdiction exists where
    adjudication of state law claims—such as contract claims—depends upon an interpretation of a
    federal law or regulation.  *See, e.g., Mitchell v. Bank of America, N.A.*, No. 6:09-cv-2131-Orl-

25  31GJK, 2010 WL 3340486, at *3 (M.D. Fla. Aug. 25, 2010) (removal from state court on the basis
    of federal question jurisdiction was proper where plaintiff's state law claims "necessarily depends on

26  the resolution of a substantial question of federal law, namely [d]efendants' alleged violation of the
    Fair Debt Collection Practices Act."); *Becnel v. KPMG LLP*, 387 F.Supp.2d 984, 986 (W.D. Ark.

27  2005) (federal question jurisdiction existed over plaintiffs' state law claims because the only way to
    determine whether defendant's investment program was legitimate was to interpret the relevant

28  portions of the United States Code relating to them).

*Health Inc.*, 161 F. Supp. 3d 1238, 1247 (S.D. Fla. 2016) (plaintiff health care provider's contract claim against defendant health insurer involved only what services were covered under the contract, which did "d[id] not involve" and "d[id] not rest upon the interpretation" of ERISA)). Here, however, Plaintiffs' contract claims do not merely reference federal law, but turn on terms dictated by federal statutes and regulations, and therefore the lawfulness of Defendants' conduct is determined by federal law.

In fact, the main case Defendant El Tejon cites for the proposition that claims for breach of contract "arise under" state law held that the district court nonetheless had federal question jurisdiction. Dkt. 55 at 6 (citing *Olson v. Bemis Co.*, 800 F.3d 296 (7th Cir. 2015)). The plaintiff in *Olson* sued his employer and union challenging a settlement the defendants had reached following the plaintiff's on-site work injury. *Id.* at 298. The Seventh Circuit agreed with the district court that although breach of contract claims customarily "arise under" state law, the plaintiff's breach of contract claim arose under federal law because the claim was "inextricably intertwined with consideration of the terms of a labor contract" that was regulated by the Labor Management Relations Act, a statute that preempted state labor law. *Id.* at 300-301 (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985). Likewise here, Plaintiffs' employment contracts are "inextricably intertwined" with federal regulations governing pay for immigrant workers, and so Plaintiff's claims arise under federal law.

Defendants also highlight *Price v. Washington Mutual, N.A.*, No. CV 10-4875 AHM (SHX), 2010 WL 2792124 (C.D. Cal. July 14, 2010)—a two-page unpublished order, and the only case within this Circuit Defendants cite as supporting their argument—for its holding that the breach of contract claim there did not "arise under" the Counterfeit Detection Act. Dkt. 55 at 6. *Price* involved two *pro se* plaintiffs who brought a breach of contract claim against banks attempting to foreclose on their home. *Price*, 2010 WL 2792124 at *1. The plaintiffs cited the Counterfeit Detection Act (regulating the reproduction of U.S. currency) as an attempt to gain federal question jurisdiction, but, as the court properly held, that statute was totally unrelated to the plaintiffs' contract claim. *Id.* at *2. *Price* is inapplicable here, where the terms of the contract explicitly and undeniably turn on application of federal regulations.

1    Because the resolution of Plaintiffs' contract claims requires adjudication of substantial

2    issues pertaining to federal regulations governing immigrant workers—an area preserved specifically

3    and exclusively for federal courts—this Court has federal question jurisdiction over Plaintiffs'

4    contract claims with respect to all Defendants.

5        B.    This Court Has Supplemental Jurisdiction Over the Claims of Defendants Gragirena,
             El Tejon, Estill and Estill Ranches Under § 1367

6

7        Alternatively, this Court has diversity jurisdiction over Plaintiffs' claims against WRA and

8    MPAS based on the Class Action Fairness Act ("CAFA"), and also has supplemental jurisdiction

9    over the same claims against Defendants Gragirena and El Tejon (based on jurisdiction over WRA),

10   as well as against Defendants Estill and Estill Ranches (based on jurisdiction over MPAS).  Neither

11   WRA nor MPAS (the "Association Defendants") dispute that the claims against them meet the

12   jurisdictional requirements of CAFA.  *See* Dkt. 65.  Defendants Gragirena, El Tejon, Estill and Estill

13   Ranches (the "Ranch Defendants") however, contend that Plaintiffs' claims against them cannot be

14   combined with the claims against the "Association Defendants."  Dkt. 55 at 8-9; Dkt 74 at 8-10.

15   Plaintiffs do not argue that the claim against any Ranch Defendant alone exceeds $5 million in

16   value.  Yet the claims against the Ranch Defendants are based on the same case or controversy as the

17   claims against the Association Defendants, and therefore this Court has supplemental jurisdiction

18   over the Ranch Defendants.

19       The Association Defendants meet the CAFA requirements, and so the only issue is whether

20   this Court has supplemental jurisdiction over Plaintiffs' claims against the Ranch Defendants.

21   Section 1367 "confers supplemental jurisdiction over all claims, including those that do not

22   independently satisfy the amount-in-controversy requirement, if the claims are part of the same . . .

23   case or controversy."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).

24   Defendants Gragirena and El Tejon argue that "the causes of action brought . . . against the multiple

25   defendants are separate, distinct causes of action."  *Id*.  Quite the opposite.  Each Plaintiff brings the

26   *exact same* legal claims, based on the same set of facts, against both the Association Defendants and

27   the Ranch Defendants.  *See* Dkt. 45 at ¶¶ 176-233(claims against each set of Defendants in First

28   Amended Complaint are identical).  Because Plaintiffs' claims against the Ranch Defendants arise

9

out of the same case or controversy as the claims against the Association Defendants, this Court has supplemental jurisdiction.  And the presence of multiple defendants does not alter the fact that these claims arise out of the same case or controversy.  *See, e.g.*, *Mendoza v. United States*, 481 F. Supp. 2d 650, 657 (W.D. Tex. 2007), *aff'd sub nom. Mendoza v. Murphy*, 532 F.3d 342 (5th Cir. 2008) ("[T]his Court has original jurisdiction because Plaintiffs filed their First Amended Complaint under the FTCA against the United States of America.  The First Amended Complaint reveals that the claims against the remaining Defendants are so related to the claims against the United States that they form part of the same case or controversy.  Indeed, Plaintiffs have alleged a joint employment relationship, with joint liability, as to WRA and the El Tejon Defendants (Plaintiff Cantaro) and as to MPAS and the Estill Defendants (Plaintiff Inga).  Thus, this Court may exercise supplemental jurisdiction over the remaining Defendants.").

This analysis does not change simply because the Ranch Defendant classes are not the same exact groups as the Association Defendants classes, but are instead smaller groups within the larger Association Defendant classes.  In *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 418 (D.C. Cir. 2006), the plaintiffs brought both a federal FLSA "opt-in" claim and a state-law "opt-out" wage claim, and therefore the federal "opt-in" class overlapped with the state "opt-out" class.  The D.C. Circuit held that the district court had supplemental jurisdiction over the state-claim class because all of the plaintiffs "performed the same type of work for the same employer," and therefore it was "clear that the two claims . . . form part of the same Article III case or controversy."  *Id.* at 424.  The Ninth Circuit has adhered to this principle.  *See Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 761 (9th Cir. 2010), *vacated on other grounds*, 132 S. Ct. 74 (2011) (district court had supplemental jurisdiction over state-law wage claims because it had original jurisdiction over claims of smaller FLSA class).  Thus, because the Court has jurisdiction over the class claims against the Association Defendants, it has supplemental jurisdiction over the class claims against the Ranch Defendants that involve the same type of work, allege the same misconduct, and rely on the same set of facts necessary to prove a violation.

The Court's supplemental jurisdiction is all the more logical when considering the alternative the Ranch Defendants propose.  Were the Court to remand the claims against Ranch Defendants to

state court but retain the claims against the Association Defendants (as it must under CAFA), there would be two parallel cases addressing the exact same conduct, with overlapping classes of plaintiffs, alleging a joint employment relationship, with possible contradictory findings.  Indeed, despite the joint employment relationship alleged between the Ranch Defendants and their corresponding Association Defendants, there could be diverging treatment of the employment relationship between the same plaintiffs and the same joint employer entities in state and federal court.  This is precisely what supplemental jurisdiction is meant to prevent.  *See*, *e.g.*, *Moore v. Dollar Tree Stores Inc.*, 85 F. Supp. 3d 1176, 1194 (E.D. Cal. 2015) ("[T]he Court's exercise of supplemental jurisdiction would best advance economy, convenience, fairness, and comity.  The state and federal claims are so intertwined that it makes little sense to decline supplemental jurisdiction.  To do so would create the danger of multiple suits, courts rushing to judgment, increased litigation costs, and wasted judicial resources.").

## II.   GRAGIRENA AND ESTILL ARE INDIVIDUALLY LIABLE FOR STEALING PLAINTIFFS' WAGES

Defendants Gragirena and Estill argue that Nevada law does not allow for individual liability against them, relying exclusively on *Boucher v. Shaw*, 124 Nev. 1164, 1168, 196 P.3d 959, 961 (2008).  Dkt. 55 at 10-11.  Yet *Boucher* addressed the Nevada Revised Statute, not the Nevada Constitution's Minimum Wage Amendment under which claims are stated against Gragirena and Estill here, and *Boucher*'s approach to interpreting state wage and hour laws has since been overturned.

*Boucher* addressed the limited question of whether individual managers could be held liable under Chapter 608 of the Nevada Revised Statutes.  124 Nev. at 1165.  The defendants there were high-level managers and owners in the defendant company.  *Id*.  Neither the statute nor the legislative history offered guidance as to who qualified as an "employer," and so the Nevada Supreme Court relied upon principles of state corporate law to find that individual management-level employees could not be held liable under Nevada's wage and hour laws.  *Id*. at 1170.  In particular, the Court declined to apply the "economic realities" test used in FLSA employment claims, finding it "an [in]appropriate application of Nevada law."  *Id*. at 1170 n.27.

11

Defendants Gragirena and Estill end their analysis there, ignoring the fact that in 2014, the Nevada Supreme Court explicitly "adopted the [FLSA]'s 'economic realities' test for employment in the minimum wage context." *Terry v. Sapphire Gentlemen's Club*, 130 Nev. Adv. Op. 87, 336 P.3d 951, 953 (2014), *reh'g denied* (Jan. 22, 2015). Under the "economic realities" test, individual officers can be "employers" based on a number of non-dispositive factors, including the power to hire and fire, supervision and control of work schedules and conditions of employment, the power to determine pay, and the responsibility to maintain employment records. *Kenny v. Trade Show Fabrications W., Inc.*, No. 215CV410JCMVCF, 2016 WL 697110, at *2 (D. Nev. Feb. 18, 2016) (citing *Hale v. State of Ariz.*, 993 F.2d 1387, 1394 (9th Cir. 1993)). And while the *Terry* Court was careful to point out that, like *Boucher*, it was interpreting only the Nevada Revised Statutes, it further explained that the Nevada Constitution's Minimum Wage Amendment had its own definition of "employer," and that the "text of the Minimum Wage Amendment supplants that of our statutory minimum wage laws." The Minimum Wage Amendment is therefore subject to the "economic realities" test, as this is the rule of statutory interpretation now mandated by the Nevada Supreme Court.

A court within this district has already addressed this precise issue, and found that individuals can indeed be subject to liability under the Nevada Constitution. In *Becky Kariuki & Dixie Kaiuki v. Shac, LLC, et al.*, No. 214CV1118JCMCWH, 2016 WL 6069927 (D. Nev. Oct. 13, 2016), the plaintiff workers brought suit under the Minimum Wage Amendment against their employer company, as well as the company's owner and the owner's wife, who acted in the capacity of a manager. Applying the "economic realities" test as mandated in *Terry*, Judge Mahan denied summary judgment as to the individual defendants, finding that there remained a factual dispute over whether their roles and responsibilities subjected them to individual liability. And, contrary to Mr. Estill's unsupported argument that an individual cannot be held liable for the wage violations of a limited liability corporation, the corporate form of the company did not affect Judge Mahan's analysis in *Kariuki*, a suit against an LLC, and does not affect the "economic realities" test generally. *See, e.g.*, *Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 252 (5th Cir. 2012) (applying "economic realities" test to individual employer at LLC); *Gray v. Powers*, 673 F.3d 352, 353 (5th

1 | Cir. 2012) (same); *In re Enter. Rent-A-Car Wage & Hour Emp. Prac. Litig.*, 683 F.3d 462, 467 (3d

2 | Cir. 2012) (same).

3 |      In sum, *Boucher* is inapposite because it did not interpret the Minimum Wage Amendment

4 | and applied a rule of statutory interpretation that has since been overturned.  Defendants Gragirena

5 | and Estill may therefore be held liable under the "economic realities" test for violations of the

6 | Minimum Wage Amendment.

7 | **III.   DEFENDANTS MUST PAY THE NEVADA MINIMUM WAGE, NOT THE
8 | FEDERAL AEWR**

9 |      As described above at 2-3, the DOL requires employers to pay H-2A workers the *highest* of

10 | all applicable minimum wage rates, whether set by state or federal law.  20 C.F.R. §§ 655.210(g),

11 | 655.211(a); 76 Fed. Reg. at 47,258; 20 C.F.R. § 653.501(d)(4).  In a blatant misreading of the H-2A

12 | Regulations, Defendant WRA argues that it complied with its obligations under federal law because

13 | it paid its H-2A workers the federal AEWR wage.  Dkt. 65 at 8-9.  However, the Regulations could

14 | not be clearer: the Nevada minimum wage is higher than the AEWR, and so employers must pay

15 | their H-2A workers the Nevada minimum wage, just as they would pay their domestic workers the

16 | Nevada minimum wage.  20 C.F.R. §§ 655.210(g), 655.211(a).

17 |      WRA argues that the AEWR applies because the FLSA exempts agricultural livestock

18 | workers such as shepherds, and therefore the Nevada Minimum Wage must be ignored "by

19 | analogy."  Dkt. 65 at 10.  There is no dispute that an FLSA exemption applies here, which means

20 | that the FLSA rate for these plaintiffs is lower than the AEWR rate.[5]  However, WRA glosses over

21 |

22 |

23 |    [5] While there is no dispute that the FLSA exemption for agricultural workers applies to preclude any FLSA claim here, that does not mean the AEWR controls, and WRA's authority is inapposite.  Dkt. 65 at 9.  WRA cites 80 Fed. Reg. 62958 at 62984.  That portion of the Federal

24 | Register simply addresses what recordkeeping rules will be applied to shepherds in the H2-A program, particularly with respect to tracking days spent on the range as opposed to time worked on

25 | the ranch, or on activities ancillary to herding.  There is no discussion of what pay rate governs. WRA's citation to 80 Fed. Reg. 62988 (actually found at 62987), Dkt. 65 at 9-10, does accurately

26 | note that the FLSA contains an exemption for herders, so that the federal minimum wage was not applicable.  However, the Federal Register said nothing to undercut the applicability of state

27 | minimum wage, and the context of this discussion was the information that would be considered in establishing the AEWR.  Nothing in the Federal Register pages cited by WRA changes the

28 | requirements of 20 C.F.R. § 655.210(g) or the other regulations cited by Plaintiffs.

the fact that it must pay the higher of the AEWR, the FLSA minimum wage, *or* the state minimum wage.  The Nevada Minimum Wage, which does not exempt agricultural employees from its application, is higher than AEWR, and thus Defendants must comply with the H2-A regulations and pay that higher state minimum wage.

To the extent WRA might be arguing that the FLSA's agricultural livestock exemption somehow preempts Nevada's minimum wage laws because Nevada's law "must yield" to federal law, Dkt. 65 at 11, that is categorically incorrect.  Federal H2-A rules specifically direct payment of state minimum wage where it is higher.  20 C.F.R. §§ 655.210(g), 655.211(a), 653.501(d)(4).  And the FLSA explicitly authorizes states to set wages above the federal floor and to disregard exemptions set by the FLSA.  *See* 29 U.S.C. § 218(a) ("No provision of [the FLSA] . . . shall excuse noncompliance with any . . . State law . . . establishing a minimum wage higher than the minimum wage established under this chapter.").  Thus, rather than there being a conflict between federal and state law, federal law explicitly directs application of the state minimum wage under these circumstances.  WRA has an obligation under federal law to pay its H-2A workers the Nevada minimum wage, to which no exemption applies.

Nevada state minimum wage is applicable, because there is no livestock worker exemption under Nevada law (as there is under the FLSA).  *Thomas v. Nevada Yellow Cab Corp.*, 327 P.3d 518, 521 (2014), *reh'g denied* (Sept. 24, 2014) (all applicable exemptions are laid out in Nevada's Minimum Wage Amendment, and no others apply); *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409 (9th Cir. 1990) (FLSA exemptions do not preempt state overtime pay laws that do not have those exemptions).  Because FLSA exemptions do not apply to state minimum wage laws, applying the federal exemption to Nevada's shepherds would violate not only Nevada law but also the H-2A Regulations' requirement that employers comply with all state laws and regulations.  *See* 20 C.F.R. § 655.135(e).

Put in the context of the central purpose behind the INA and the H-2A Regulations, if an American worker came to work as a shepherd for a ranch in Nevada, he would earn the Nevada minimum wage for all hours worked, and no federal law would dictate otherwise.  Federal law requires that immigrant workers be treated in kind.  20 C.F.R. § 655.0(a).

14

**IV.    PLAINTIFFS PROPERLY ALLEGE CONTRACT CLAIMS**

In attempting to dismiss Plaintiff Cántaro's contract claim, WRA argues that there was no contract for it to breach because it was never a party to Plaintiff Cántaro's employment contracts. Dkt. 65 at 14.  Separately, El Tejon and Estill Ranches do not dispute that they entered into employment contracts, but contend that they did not breach those contracts.  Dkt. 55 at 12; Dkt. 74 at 16-17.  Defendants' arguments fail.

A.    WRA is Properly Alleged to Be a Party to Plaintiff Cántaro's Contract

WRA attempts to dismiss Plaintiff Cántaro's contract claim because it claims it was not a party to any contract with Mr. Cántaro.  According to WRA, the only parties to any contract that existed were Mr. Cántaro and El Tejon.  However, contracts do not have to be limited to two parties. Plaintiff Cántaro alleges that he worked for *both* WRA and El Tejon as joint employers.  And, of course, if both WRA and El Tejon are parties to the contract, *both* can liable under the contact.

This precise contractual relationship between the WRA, a ranch, and a shepherd was considered by another court in this Circuit, *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055 (E.D. Wash. 2013). There, considering a motion for summary judgment, the Court found a dispute of fact regarding whether WRA "manifested intent to be bound by the terms of the Sheepherder Agreement" and concluded that "Western Range is party to a work contract with each Plaintiff sheepherder as a matter of law pursuant to the H-2A program." *Id.* at 1072.

Mr. Cántaro alleges facts analogous to the plaintiff in *Ruiz*. He alleges he entered into valid employment contracts with both WRA and El Tejon through entry into a contract similar to the form Sheepherder Employment Agreement attached to the First Amended Complaint as Exhibit B,[6] as well as entry into a contract through the H-2A applications, job orders and accompanying

_____

[6] Mr. Cántaro will refer to that form contract rather than the version attached by El Tejon, which is outside the four corners of the complaint.  Pursuant to Rule 12(d), when faced with documents outside the pleadings attached to a motion to dismiss, a court must either (1) convert the Motion to a motion for summary judgment, or (2) ignore the documents and consider the Motion as a motion to dismiss. Fed. R. Civ. P. 12(d).  Because no discovery has been taken in this case, conversion to a motion for summary judgment at this stage of the proceedings would be premature. The court should therefore ignore unauthenticated attachments to motions to dismiss.

1  regulations similar to the form job order attached to the First Amended Complaint as Exhibit A.

2  Dkt. 45 ¶¶ 25-27, 30-43, 186 & 201; Exhibit A, Dkt. 40-2.

3  Mr. Cántaro further alleges that WRA is a party to his Sheepherder Employment Agreement

4  and is entitled to discovery on that issue.  Dkt. 45 ¶¶ 25-27, 33-35; *see also Ruiz*, 949 F. Supp. 2d at

5  1072.  Mr. Cántaro also alleges that WRA recruited him to be a shepherd, drafted the Sheepherder

6  Employment Agreement, and set additional terms of employment with which Mr. Cántaro had to

7  comply.  Dkt. 45 ¶ 33.  Finally, Mr. Cántaro alleges that WRA, through the Sheepherder

8  Employment Agreement, required "that [he] work at any ranch managed by Defendant WRA and

9  that he agree to be transferred to another WRA ranch at any time – regardless of whether it was his

10  preference to stay on the ranch to which he was originally assigned and regardless of whether the

11  individual WRA ranch on which he worked agreed to the transfer."  Dkt. 45 ¶ 33.  These allegations

12  are sufficient at this stage to establish that WRA was a party to the Sheepherder Employment

13  Agreement.

14  Even in the absence of WRA's intent to be bound by the terms of the Sheepherder

15  Employment Agreement, Mr. Cántaro alleges that WRA was a party to a separate, written work

16  contract with Mr. Cántaro incorporating all required provisions of the H-2A Regulations.  In *Ruiz*,

17  the court found that WRA's job order, also called a clearance order, created an employment contract

18  with a shepherd employee as a matter of law pursuant to the H-2A Regulations.  *Ruiz*, 949 F. Supp.

19  at 1072; *see also Rivera v. Peri & Sons Farms, Inc*., 735 F.3d 892, 899-900 (9th Cir. 2013) (holding

20  that an allegation that the job clearance orders were the employment contracts of H-2A workers is

21  sufficient to state a claim for breach of contract.); *Arriaga v. Fla. Pac. Farms, L.L.C.,* 305 F.3d

22  1228, 1233 n. 5 (11th Cir. 2002) ("[T]he [H-2A] clearance orders ultimately become the work

23  contract between the employers and farmworkers."); *Frederick Cty. Fruit Growers Ass'n*, 968 F.2d

24  1265, 1268 (D.C. Cir. 1992) ("Put simply, '[e]ach [employer's] promise in the job clearance order

25  create[s] a contractual obligation running from that [employer] to each of its workers.'").

26  Plaintiff Cántaro alleges that WRA employed him while in the United States, Dkt. 45 ¶¶ 29-

27  36, and that WRA is a party to the employment contract created "through the H-2A Applications and

28  job orders," Dkt. 45 ¶¶ 25-27, 186.  Plaintiff Cántaro attached a sample clearance order to the First

16

1  Amended Complaint, which emphasizes the order's status as a binding employment contract, stating:

2  "[t]his job order describes the actual terms and conditions of the employment being offered by me

3  and contains all the material terms and conditions of the job." FAC Exhibit A, Dkt. 40-2 at 6.

4  Indeed, WRA signed the clearance order as "employer." *See id.* at 6, 9.  Mr. Cántaro has therefore

5  alleged the existence of a valid employment contract with WRA.

6      B.    Plaintiffs Properly Allege Breach of Employment Contracts

7          Defendants misapprehend the nature of Plaintiffs' contract claims as they attempt to argue

8  that Plaintiffs cannot recover statutory minimum wages through a contract.  That argument is wrong

9  on the law.  *See Tyus v. Wendy's of Las Vegas, Inc.,* No. 2:14-cv-00729-GMN-VCF, 2015 WL

10  5021644, at *4 (D. Nev. Aug. 21, 2015) (stating that "when a statute imposes additional obligations

11  on an underlying contractual relationship, a breach of statutory obligation *is a breach of contract . . .*

12  .") (citing *Brewer v. Premier Golf Props.*, 86 Cal. Rptr. 3d 225, 235 (Cal. Ct. App. 2008) (citations

13  omitted) (emphasis added)).  But the Court need not reach that issue because Plaintiffs here allege

14  that the requirement to pay at least the state minimum wage is incorporated explicitly, not implicitly,

15  as a contract term.  *See, e.g.,* Dkt. 45 ¶ 26.  Certainly, if overtime were explicitly required by statute

16  and by an explicit contract term, no one would argue that the failure to pay overtime was not both a

17  statutory and contractual breach.  Here, the alleged contracts require Defendants to pay at least the

18  Nevada minimum wage under Nevada's Constitution, and the failure to do so leads to both a

19  constitutional and a contractual claim.

20          Although Defendants attempt to obfuscate the law by citing cases outside the H-2A context,

21  "there are federal cases too numerous to count which have held that H-2A workers may pursue state

22  breach of contract claims against employers who fail to comply with clearance orders." *Lopez v.*

23  *Fish,* No. 2:11-cv-113, 2012 WL 2126856, at *2 (E.D. Tenn. May 21, 2012) (collecting authorities);

24  *see supra at* 16-17 (citing cases holding same).  The clearance orders, also called job orders,

25  explicitly require compliance with applicable state minimum wage rules, like Nevada's

26  constitutional minimum wage.  All clearance orders must include an employer assurance that it will

27  "comply with all applicable Federal, State and local laws and regulations." 20 C.F.R. § 655.135(e)

28  (listing "[a]ssurances and obligations of H-2A employers."); FAC Exhibit A, Dkt. 40-2 at 7

("Employer agrees to abide by the regulations at 20 CFR 655.135."); FAC Exhibit C, Dkt. 40-4 at 6

("Employer agrees to abide by assurances at 20 CFR 655.135 and 20 CFR 653.501.").  Those

include state minimum wage laws, as emphasized by regulations in the H-2A shepherd context: "As

a condition of receiving an H-2A labor certification, an employer must comply with all applicable

Federal, State and local employment-related laws and regulations, *including the mandatory State*

*minimum wage rates for the occupation.*" *TEGL No. 32-10, Special Procedures: Labor Certification*

*Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A*

*Program*, 76 Fed. Reg. 47,256, 47,258 (Aug. 4, 2011) (emphasis added) (interpreting 20 C.F.R. §

655.122).[7]  Thus, *every* H-2A shepherd contract includes an explicit promise to pay the state

minimum wage, if applicable.

Plaintiffs' alleged contracts are no different.  Mr. Inga's H-2A certification explicitly states it

is an employment contract between himself and Defendant Estill Ranch, and the certification

provides Mr. Inga with all assurances laid out in 20 C.F.R. § 655.135, including that regulation's

promise to follow all applicable laws, like paying the state minimum wage.  *See* Dkt. 45 ¶¶ 66-7;

FAC Exhibit C, Dkt. 40-4 at 5.  Similarly, WRA's clearance order assured Plaintiff Cántaro that his

employers would comply with state and federal law, including state minimum wage laws.  *See* Dkt.

45 ¶¶ 27; Exhibit A, Dkt. 40-2 at 7 ("Employer *agrees* to abide by the regulations at 20 C.F.R. §

655.135").  Plaintiff Cántaro also alleges he was subject to a separate Sheepherder Employment

Agreement, which states that "[i]n no event shall Employee's compensation be less than the

minimum required by the United States of America" and that the employer "agrees to comply with

all applicable laws of the United States *and the individual states*, including but not limited to

_____

[7] In November 2015, these special procedures were incorporated into the Code of Federal
Regulations, 20 C.F.R. §§ 655.200 *et seq.*, but Plaintiffs were subject to the interpretive guidance for
shepherds in place prior to that date and only published in the Federal Register.  Consistent with the
previously published guidance, the new regulation requires that "[t]he employer must pay the worker
at least the monthly AEWR, as specified in § 655.211, the agreed-upon collective bargaining wage,
or the applicable *minimum wage imposed by Federal or State law* or judicial action, in effect at the
time work is performed, whichever is highest, for every month of the job order period or portion
thereof." 20 C.F.R. § 655.210(g).

compliance with immigration laws." *See* Dkt. 45 ¶¶ 27, 34-36; Exhibit A, Dkt. 40-2 at 7.  Nevada is

an "individual state" that requires payment of the minimum wage to shepherds.  Nev. Const. Art. 15

§ 16.  Meanwhile, the United States, through its immigration laws, requires that all H-2A shepherds

receive at least the state minimum wage.  76 Fed. Reg. at 47,258; *see also* 20 C.F.R. § 655.210(g)

(requiring shepherds be paid *minimum wage imposed by ... State law*") (emphasis added).

In short, Plaintiffs allege that Defendants, through their various contractual assurances,

promised to pay at least the Nevada minimum wage, but did not.  Mr. Cántaro alleges that WRA and

El Tejon violated express contract terms by paying him less than the applicable minimum wage rate

and by failing to provide medical attention or adequate living conditions.  Dkt. 45 ¶¶ 56, 58, 101-

109, 187, 201.  In particular, Mr Cántaro alleges that WRA and El Tejon paid him $1,422.55 per

month for his work in Nevada—substantially less than the applicable Nevada state minimum wage

of $8.25 per hour for work conducted 24 hours per day 7 days per week—and therefore violated the

terms of his employment contracts.  Dkt. 45  ¶¶ 49, 56, 58, 101-109, 187, 201.  Mr. Inga likewise

alleges that Estill Ranches violated these express contract terms by paying him less than the

applicable Nevada minimum wage rate and by failing to provide adequate housing, food or water.

Dkt. 45  ¶¶ 75-79, 101-109, 264-272.  In particular, Mr. Inga alleges that Estill Ranches paid him

$800 per month for his work in Nevada—substantially less than the applicable Nevada state

minimum wage rate of $8.25 per hour for work conducted 24 hours per day 7 days per week—and

therefore violated the terms of his contract.  Dkt. 45  ¶¶ 75-76, 106.

These allegations state a claim for breach of contract.  If Defendants would like to offer

evidence that they did not agree contractually to pay the Nevada minimum wage, they will have that

opportunity at summary judgment and trial.

**V.     ALTERNATIVELY, DEFENDANTS ARE LIABLE IN EQUITY FOR STEALING PLAINTIFFS' WAGES**

WRA argues for dismissal of Plaintiff Cántaro's breach of contract claim by stating that it

has no contract with Plaintiff Cántaro.  Dkt. 66 at 14-15.  WRA simultaneously argues for dismissal

of Mr. Cántaro's unjust enrichment claim in quasi contract by stating that it has a written contract

with Mr. Cántaro.  Dkt. 66 at 17-20.  Both cannot be true simultaneously.

A plaintiff "is free to seek equitable remedies and breach of contract in the alternative." *DFR Apparel Co. v. Triple Seven Promotional Products, Inc.,* No. 2:11-cv-001406-APG, 2014 WL 4891230, at *3 (D. Nev. Sept. 30, 2014).  "[A] party can recover on a quasi-contract when the party will have no right under an enforceable contract, such as when an express contract failed or was rescinded." *Leighton v. City and County of Denver*, 14-cv-02812-PAB-NYW, 2015 WL 5532751, * 8 (D. Colo. Sep. 21, 2015) (quotations and citations omitted).  To the extent this Court determines that Mr. Cántaro's contract with WRA fails in some way, Plaintiff Cántaro may proceed with claims in equity in the alternative.  This, of course, is why the federal rules allow a plaintiff to plead in the alternative.  *See* Fed. R. Civ. P. 8(a)(3).

Meanwhile, El Tejon and Estill Ranches concede the existence of written employment contracts with Mr. Cántaro and Mr. Inga, respectively, and therefore argue that Plaintiffs may not proceed with their claims in equity.  Although the general rule is that "unjust enrichment does not apply where there is an express, written contract," *Crockett & Myers, Ltd. v. Napier, Fitzgeralld & Kirby, LLP*, 440 F. Supp. 2d 1184 (D. Nev. 2006); *see also Leasepartners Corp., Inc. v. Robert L. Brooks Trust,* 113 Nev. 747, 942 P.2d 182, 187 (1997), "a party can recover on a quasi-contract when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract." *Leighton v. City and County of Denver*, 14-cv-02812-PAB-NYW, 2015 WL 5532751, * 8 (D. Colo. Sep. 21, 2015) (internal citations omitted).  Therefore, a party can proceed with unjust enrichment and breach of contract claims that arise out of separate facts or separate violations of a party's rights.  *Custom Teleconnect, Inc. v. International Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1181-81 (D. Nev. 2003); *see also D'Amato v. Lillie*, 401 Fed. Appx. 291 (9th Cir. 2008) (unpublished) (upholding "the unjust enrichment offset to the jury's damages award [because it] did not 'relat[e] to the same matter' as the express Agreements."); *Rhodes v. Designer Distrib. Serv., LLC*, 2012 WL 642434 at 7 (Nev. Sup. Ct., Feb. 24, 2012) (dismissal of quasi contract claim is appropriate only where it covers "the same subject matter as the express contract and [i]s not separate and distinct.")

Here, although El Tejon and Estill Ranches concede the existence of written agreements, they dispute the terms of those employment contracts.  Dkt. 55 at 12-15; Dkt. 74 at 17-19.  Pending

the Court's resolution of those disputes, Plaintiffs may proceed with their equitable claims against the Defendant Ranches in the alternative, as they may cover factual matter separate from that covered by the written agreements.  In particular, Defendants' position appears to be that their promises to follow state minimum wage law somehow fall outside the contracts.  If that were so, Plaintiffs can proceed in equity.  Until it is clear whether these promises are part of or outside of the contract, Plaintiffs should be entitled to proceed with both claims in the alternative.  *See E. H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20, 23 n.3 (9th Cir. 1975) ("[W]hile damages and restitution cannot be requested concurrently in a complaint, a plaintiff may claim these remedies as alternatives, leaving the ultimate election for the court.").

El Tejon also insists that Mr. Cántaro's promissory estoppel claim is inadequate due to failure to plead "*justifiable* and *reasonable* reliance."  Dkt. 55 at 16 (emphasis in original).  "'To establish promissory estoppel … the party asserting the estoppel … must have relied to his detriment on the conduct of the party to be estopped.'"  *Pink v. Busch*, 100 Nev. 684, 689, 691 P.2d 456, 459-60 (1984) (*quoting Cheqer, Inc. v. Painters & Decorators Joint Comm., Inc.*, 98 Nev. 609, 614, 655 P.2d 996, 998-99 (1982)).

Mr. Cántaro properly alleges that he relied to his detriment.  Mr. Cántaro alleges that El Tejon agreed "to comply with all H-2A program regulations—including the H-2A program's requirement that an employer pay the state minimum wage if that is higher than the AEWR."  Dkt. 45 ¶ 26.  Mr. Cántaro relied on this promise in leaving his family and his country to come to the United States to work as a shepherd.  Dkt. 45 ¶¶ 43, 44.  And Mr. Cántaro worked hard while here, "almost never declin[ing] work and [] often engaged by the WRA Defendants to be on duty in his workplace 24 hours a day, seven days a week."  Dkt. 45 ¶ 48; *see also id*. ¶ 49.  Mr. Cántaro alleges that, despite his reliance, he was not paid the wages to which he was entitled.  Dkt. 45  ¶¶ 82-97.  These allegations are sufficient to allow Mr. Cántaro to proceed with his promissory estoppel claim against El Tejon.  Dkt. 45 ¶¶ 204-207.

Meanwhile, Estill Ranches argues that this court ought not analyze Mr. Inga's promissory estoppel claim, citing a lack of specific facts.  Dkt. 74 at 18.  However, Mr. Inga alleged specific facts regarding each of the four elements of a promissory estoppel claim outlined in *Pink*, 691 P.2d

at 459.  Mr. Inga alleges that Estill Ranches and John Estill agreed "to comply with all H-2A program regulations—including the H-2A program's requirement that an employer pay the state minimum wage if that is higher than the AEWR."  Dkt. 45 ¶ 26.  Mr. Inga relied on this promise in leaving his family and his country to come to the United States to work as a shepherd.  Dkt. 45 ¶¶ 59-62.  And Mr. Inga worked hard while here; he "almost never declined work and was often engaged by Defendants to be on duty in his workplace 24 hours a day, seven days a week."  Dkt.45 ¶ 75.  These allegations are sufficient.

## VI. STATUTES OF LIMITATION CANNOT PROTECT DEFENDANTS FROM ALL LIABILITY

WRA requests dismissal of Plaintiff Cántaro's minimum wage claim under the Nevada Constitution based on the two-year statute of limitations described in *Perry v. Terrible Herbst, Inc.*, 132 Nev. Adv. Op. 75 (Oct. 27, 2016).  WRA's argument does not hold water because Plaintiff Cántaro filed this case within two years of his employment with WRA.

However, now that the Nevada Supreme Court has determined that a two-year statute of limitations applies to minimum wage claims under the state constitution, Mr. Inga concedes that he may not proceed with his constitutional claim, though he is, of course, proceeding on his contract and equity claims.  Mr. Inga also concedes that a three-year statute of limitations applies to his claim for failure to pay separated employees wages when due.  Dkt. 74 at 11.  Since this claim is not timely as to Mr. Inga, there is no need to address the Estill Defendants' argument that there is no private cause of action for that claim under NRS 608.020-608.050, although Plaintiffs disagree with Defendants contention on that point.  Dkt. 74 at 12-13.

WRA also seeks to import the two-year statute of limitations described in *Perry* to a wide variety of other claims, arguing that counts three, four and five of the First Amended Complaint are "derived from" the Nevada Constitutional claims.  Dkt. 66 at 22.  These claims, for breach of contract, promissory estoppel, and unjust enrichment and quantum meruit, are not derived from the Nevada Constitution.  These are separate claims with their own applicable statutes of limitation.  Nevada statute provides that contract actions may be commenced within six years of the breach.  Nev. Rev. Stat. Ann. § 11.190(1)(b).  A four-year statute of limitations applies to the promissory

1   estoppel, unjust enrichment and quantum meruit claims, as they are "action[s] upon a contract,

2   obligation or liability not founded upon an instrument in writing." Nev. Rev. Stat. Ann. § 11.190

3   (2)(c); *see also In re Amerco Derivative Litig.* 252 P.3d 681, 703 (Nev. 2011); *KlaCaizner v.*

4   *Countrywide Fin.*, 2015 WL 627927 at 18 (Nev. 2015).

5       These statutes of limitations clearly allow Mr. Cántaro to bring timely claims in contract and

6   equity. Mr. Cántaro alleges that he "worked for the WRA Defendants from 2007 until June 2014,"

7   and spent his final months of work in Nevada. Dkt. 45 ¶¶ 43, 44. Mr. Cántaro filed this case on

8   May 3, 2016. Dkt. 1. Mr. Inga left his job working for the MPAS Defendants in Nevada in or about

9   February 2013 and joined this case on October 3, 2016. Dkt. 45 ¶ 72. Plaintiffs are comfortably

10   within the statute of limitations for their contract and equity claims.

11                                       **CONCLUSION**

12       For the foregoing reasons, this Court should deny Defendants' Motions to Dismiss, Dkts. 55,

13   65 and 74.

14

15   Dated: December 16, 2016                    Respectfully submitted,

16                                               COHEN MILSTEIN SELLERS & TOLL PLLC

17                                                */s/Christine E. Webber*
                                                 CHRISTINE E. WEBBER, ESQ.

18                                               (Admitted Pro Hac Vice)
                                                 cwebber@cohenmilstein.com

19                                               BRIAN CORMAN, ESQ.
                                                 (Admitted Pro Hac Vice)

20                                               bcorman@sohenmilstein.com

21                                               1100 New York Ave., NW, Ste 500
                                                 Washington, DC 20005

22
                                                 THIERMAN BUCK LLP
23                                               MARK R. THIERMAN, ESQ.
                                                 Nevada State Bar No. 8285
24                                               mark@thiermanbuck.com
                                                 JOSHUA D. BUCK, ESQ.
25                                               Nevada State Bar No. 12187
                                                 josh@thiermanbuck.com
26                                               LEAH L. JONES, ESQ.
                                                 Nevada State Bar No. 13161
27                                               leah@thiermanbuck.com
                                                 7287 Lakeside Drive
28                                               Reno, Nevada 89511
                                                 Telephone: (775) 284-1500

Facsimile: (775) 703-5027

TOWARDS JUSTICE
ALEXANDER HOOD, ESQ.
(Admitted Pro Hac Vice)
alex@towardsjustice.org
1535 High Street, Ste. 300
Denver, CO  80218

***Attorneys for Plaintiffs***

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2016, a true and correct copy of the foregoing was served via the United States District Court CM/ECF system on all parties or persons requiring notice.

By:                                                      */s/Christine E. Webber*

                                                           Christine E. Webber