MARK R.  THIERMAN, Nev.  Bar No.  8285
JOSHUA D.  BUCK, Nev.  Bar No.  12187
LEAH L.  JONES, Nev.  Bar No.  13161
Thierman Buck LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027
Email: mark@thiermanbuck.com
josh@thiermanbuck.com
leah@thiermanbuck.com

ALEXANDER HOOD (*pro hac vice*)
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

CHRISTINE E.  WEBBER (*pro hac vice*)
BRIAN CORMAN (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Suite 500
Washington, DC  20005
Tel: 202-408-4600
Fax: 202-408-4699
Email: cwebber@cohenmilstein.com
bcorman@cohenmilstein.com

*Attorneys for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| ABEL CANTARO CASTILLO; ALCIDES INGA RAMOS, RAFAEL DE LA CRUZ, and those similarly situated, <br><br>     Plaintiffs, <br><br> v. <br><br> WESTERN RANGE ASSOCIATION; EL TEJON SHEEP COMPANY; MELCHOR GRAGIRENA; MOUNTAIN PLAINS AGRICULTURAL SERVICE; and ESTILL RANCHES, LLC, <br><br>     Defendants. | Civil Case No.  3:16-cv-00237-MMD-VPC <br> **SECOND AMENDED COMPLAINT** |

**INTRODUCTION**

1.     Plaintiffs Abel Cántaro Castillo and Rafael De La Cruz were paid a shockingly low wage of as little as one or two dollars an hour for their work as shepherds in Nevada.  This is well below the minimum wage of $8.25 per hour that these men should have been paid under Nevada law and the $8.25 minimum hourly wage required by the nonimmigrant temporary visa program under which they were employed.[1]

2.     These Plaintiffs are not alone in suffering either of these violations for the many hours of work they provided to the ranching industry in a single week.  This is because their employers—Defendants here—have a policy of paying all shepherds they employ a low *monthly* salary that has the effect of creating illegally low *hourly* rates of pay, in light of the actual number of hours shepherds engage in compensable work.

3.     This illegal pay policy principally manifests in two ways at issue in this case.  First, Defendants Western Range Association ("WRA") and Mountain Plains Agricultural Service ("MPAS") each have policies of setting the wages of all Nevada shepherds, including Plaintiffs Cántaro and De La Cruz, at a rate of as little as $800 per month, despite the fact that this translates to an effective wage rate of between one and two dollars an hour—much less than the Nevada

---

[1] In dismissing the First Amended Complaint, the Court held that the statute of limitations for Plaintiffs' contract claims for failure to pay minimum wages is the two-year period set out in Nevada's Minimum Wage Amendment, not the six-year period for state contract claims.  Doc. No. 107, at 16-17.  An interlocutory appeal on this issue is not available.  *See Est. of Kennedy v. Bell Helicopter Textron, Inc.*, 283 F.3d 1107, 1111 (9th Cir. 2002).  Because Plaintiff Alcides Inga Ramos ended his employment outside of the two-year statute of limitations, he cannot succeed on his contract claims against Defendants Estill Ranches or MPAS based on failure to pay minimum wage absent reconsideration of this ruling or reversal on appeal.  However, Plaintiff Inga (along with Plaintiffs Cántaro and De La Cruz) has added contract claims for failure to pay costs associated with obtaining H-2A labor certifications—claims that clearly fall under Nevada's six-year limitations period for contract claims.  Thus, Inga remains a proper Plaintiff in the case, and reserves his right to pursue on appeal the argument that the six-year contract claims limitations period also applies to his minimum wage claims and those of the proposed MPAS Class.

2244828.2

minimum of $8.25 per hour.  Defendants El Tejon Sheep Company and Melchor Gragirena adopted and implemented this same illegal pay policy in acting as Mr. Cántaro's joint employers.

4.      Second, Defendants violated the terms of the employment contracts required of employers who are granted permission to employ workers under what is commonly referred to as the "H-2A" visa program.  This program, authorized by 8 U.S.C.§ 1101(a)(15)(H)(ii)(a) and the implementing regulations promulgated at 20 C.F.R. Part 655 Subpart B, requires that Nevada ranchers employing H-2A workers pay those workers and any U.S. workers similarly employed at least $8.25 per hour (Nevada's minimum wage).  Defendants violated this contractual obligation by choosing to pay a significantly lower hourly rate.

5.      Defendants also violated the terms of their employment contracts by failing to reimburse Plaintiffs for the costs associated with obtaining the labor certifications necessary to work legally in the United States.  Defendant WRA and MPAS, on behalf of its member ranches, provide assurances to state and federal agencies that ranches will not deduct certain expenses from shepherds' wages and will reimburse shepherds for various expenses, including costs associated with obtaining labor certifications and other travel expenses.  Defendants, as a matter of policy, fail to make these promised reimbursement, which amounts to a violation of their contractual obligations, as well as 8 U.S.C.§ 1101(a)(15)(H)(ii)(a) and the implementing regulations promulgated at 20 C.F.R. § 655.135.

6.      Plaintiffs, on their own behalf and those similarly situated, seek damages including the difference between the lawful hourly wages Defendants should have paid and what they were actually paid under Defendants' illegal pay policies, as well as for costs associated with obtaining Plaintiffs' H-2A labor certifications.  Plaintiffs also seek statutory and/or liquidated damages and attorneys' fees.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the principal class-action state-law claims against WRA pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for those claims exceeds the sum or value of $5 million, exclusive of interest and costs, and at least one member of the plaintiff class is a citizen of a foreign state or a state different from any defendant.  This Court also

2244828.2

1    has jurisdiction over the principal class-action state-law claims against MPAS pursuant to 28 U.S.C.

2    § 1332(d) because the amount in controversy for those claims also exceeds the sum of $5 million,

3    exclusive of interest and costs, and at least one member of the plaintiff class is a citizen of a foreign

4    state or a state different from any defendant.

5         8.      In particular, WRA employed between at least 98 and 173 Nevada shepherds each

6    year in the 154 weeks between May 3, 2014 (two years before the initial Complaint in this action

7    was filed) and the filing of the Second Amended Complaint on May 15, 2017.[2]  As discussed below,

8    WRA's H-2A job orders specified that the work hours were 24 hours a day and seven days per week.

9    Multiplying the number of Nevada herders WRA employed each year by the number of hours

10   worked, WRA herders worked a total of 3,775,152 hours in the statutory period, entitling them to

11   $31,145,004.00 in wages (3,775,152 hours x $8.25).  Subtracting the pay actually received ($800 per

12   month, then $1,206.31 per month from November 2015 to September 2016, then $1,390 from

13   January 2017 to present),[3] WRA herders claim at least $25,990,220.21 in lost wages.  This damages

14   calculation does not include Plaintiffs' contract claims for failure to pay costs associated with

15   obtaining labor certifications.  *See* infra at ¶ 29.  The calculation also does not include damages for

16   claims by former WRA herders for failure to pay separated employees' wages when due under

17   N.R.S. § 608 et seq.  *See* infra at ¶¶ 223-232.

18

19

20

21
_____

22        [2] According to "Disclosure Data" from the Department of Labor, accessible by clicking on
     the "Disclosure Data" tab available at http://www.foreignlaborcert.doleta.gov/performancedata.cfm,
23   WRA certified 173 herders to work for Nevada ranches in 2014, 153 in 2015, 147 in 2016 and 98 in
     2017.  Because WRA certified many herders, including Mr. Cántaro, to work for California ranches
24   like El Tejon, they show up on the Disclosure Data as California herders, even though they worked
     in Nevada.  The number of herders who worked for WRA in Nevada is therefore likely much higher.
25
          [3] Despite the fact that Mr. Cántaro was paid the higher California AEWR rate of
26   approximately $1,422.55 per month rather than $800 per month, he was certified as a California
     herder.  He was therefore not included in the Labor Department's Disclosure Data as a Nevada
27   herder and his damages are not included in Plaintiffs' calculations.

28

| YEAR[4] | NUMBER OF HERDERS | WEEKS WORKED | TOTAL HOURS WORKED | FULL PAY DUE | PAY RECEIVED | TOTAL LOST WAGES |
|---|---|---|---|---|---|---|
| 2014 | 173 | 21.43 | 622,800 | $5,138,100.00 | $684,395.60 | |
| 2015 | 153 | 52 | 1,336,608 | $11,027,016.00 | $1,468,800.00 | |
| 2016 | 147 | 52 | 1,284,192 | $10,594,584.00 | $2,045,169.97 | |
| 2017 | 98 | 32.29 | 531,552 | $4,385,304.00 | $956,418.22 | |
| TOTAL | | | 3,775,152 | $31,145,004.00 | $5,154,783.79 | $25,990,220.21 |

9.      As for the herders working for MPAS, their statute of limitations was tolled by a previously-filed case and therefore extends beyond the two-year limitations period for this case.  On October 28, 2015, Plaintiff De La Cruz filed a First Amended Complaint in the United States District Court for the District of Colorado on behalf of himself and a class of Nevada MPAS herders, alleging Nevada minimum wage claims identical to those made in the case at bar.  *Llacua, et al. v. W. Range Ass'n et al.*, No. 15-CV-01889-REB-CBS (D. Colo. 2015), Doc. No. 32 at 24 (Oct. 28, 2015).  The statute of limitations was tolled for the MPAS herder class during the pendency of their wage claims in *Llacua*.  *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553-54 (1974) (filing of a class-action complaint tolls the statute of limitations for all members of the putative class until the court decides the suit is not appropriate for class action treatment).  The MPAS herders' Nevada minimum wage class claims were still pending in *Llacua* when Plaintiffs here brought wage claims against MPAS in the First Amended Complaint, and therefore these claims continued to toll when MPAS was brought into this case.  *See Cath. Soc. Servs., Inc. v. I.N.S.*, 232 F.3d 1139, 1149 (9th Cir. 2000) (*American Pipe* tolling applies to a subsequent class claim where "[t]he substantive claims asserted are within the scope of those asserted" in the earlier class action, and where plaintiffs are

---

[4] The yearly DOL Disclosure Data from which the number of herders per year was pulled goes from October of the prior year through September of the next year.  For example, the 2014 data shows the number of herders working from October 1, 2013 until September 30, 2014.  The "weeks worked" shown in the table above reflect these dates and uses the applicable two-year statute of limitations period for Plaintiffs' wage claims.

"not attempting to relitigate an earlier denial of class certification, or to correct a procedural deficiency in an earlier would-be class."). Thus, the time period encompassed by the MPAS herders' wage claims goes back to October 28, 2013—two years from the *Llacua* First Amended Complaint.

10.     MPAS employed between at least 26 and 43 shepherds each year in the 184 weeks between October 28, 2013 and the filing of the Second Amended Complaint.[5]  As discussed below, MPAS' H-2A job orders specified that the work hours were 24 hours a day and seven days per week.

11.     Using the same calculations as those used above for WRA, MPAS herders claim $7,319,415.10 in lost wages.  This damages calculation does not include Plaintiffs' contract claims for failure to pay costs associated with obtaining labor certifications.  *See* infra at ¶ 29.  The calculation also does not include damages for claims by former WRA herders for failure to pay separated employees' wages when due under N.R.S. § 608 et seq.  *See* infra at ¶¶ 261-69.

| YEAR[6] | NUMBER OF HERDERS | WEEKS WORKED | TOTAL HOURS WORKED | FULL PAY DUE | PAY RECEIVED | TOTAL LOST WAGES |
|---|---|---|---|---|---|---|
| 2014 | 43 | 48.14 | 347,784 | $2,869,218.00 | $382,182.22 | |
| 2015 | 33 | 52 | 288,288 | $2,378,376.00 | $316,800.00 | |
| 2016 | 32 | 52 | 279,552 | $2,306,304.00 | $445,207.07 | |
| 2017 | 26 | 32.29 | 141,024 | $1,163,448.00 | $253,743.61 | |
| TOTAL | | | 1,056,648 | $8,717,346.00 | $1,397,930.90 | $7,319,415.10 |

---

[5] MPAS certified 43 Nevada herders in 2014, 33 in 2015, 32 in 2016, and 26 in 2017.  *See* "Disclosure Data," available at http://www.foreignlaborcert.doleta.gov/performancedata.cfm. Because MPAS likely certified many herders to work for California ranches, even though they also worked in Nevada, the number of MPAS class members is likely much higher.

[6] As with the WRA data, the yearly DOL Disclosure Data from which the number of herders per year was pulled goes from October of the prior year through September of the next year.  For example, the 2014 data shows the number of herders working from October 1, 2013 until September 30, 2014.  The "weeks worked" shown in the table above reflect these dates and the applicable statute of limitations period.

2244828.2

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiffs' and the classes' claims to unpaid wages occurred while they were working as shepherds in Nevada.

## PARTIES

13.     Plaintiff Abel Cántaro Castillo is a former shepherd.  He worked as a shepherd in California and Nevada for Defendants Western Range Association, El Tejon Sheep Co. and Melchor Gragirena from around October 2007 until around June 2014.

14.     Plaintiff Rafael De La Cruz is a former shepherd.  He worked as a shepherd in Nevada for Defendant Mountain Plains Agricultural Service from around March 2009 until late 2014.

15.     Plaintiff Alcides Inga Ramos is a former shepherd.  He worked as a shepherd in Nevada for Defendants Mountain Plains Agricultural Service and Estill Ranches from around April 2012 until around February 2013.

16.     Defendant Western Range Association ("WRA") is a California non-profit corporation with its principal place of business at 161 Fifth Avenue South, Suite 100, Twin Falls, Idaho 83301.  WRA transacts business in Nevada by, among other things, recruiting and employing foreign shepherds, such as Mr. Cántaro, who work in Nevada.

17.     Defendant El Tejon Sheep Co. ("El Tejon") is a California corporation with its principal place of business at 5616 Hooper Way, Bakersfield, CA 93308, and is registered to do business in Nevada as a foreign corporation.  Defendant El Tejon transacts business in Nevada by, among other things, employing shepherds such as Mr. Cántaro, who spend a substantial portion of the year grazing sheep on land outside of cities such as Elko, Nevada.

18.     Defendant Melchor Gragirena resides in California and is the owner of El Tejon.  Defendant Gragirena transacts business in Nevada by, among other things, employing shepherds who spend a substantial part of the year grazing sheep on land in Nevada.

19.     Together, Defendants WRA, El Tejon and Mejchor Gragirena will be referred to as "WRA Defendants."

2244828.2

20.     Defendant Mountain Plains Agricultural Service ("MPAS") is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601.  MPAS transacts business in Nevada by, among other things, recruiting and employing foreign shepherds, such as Mr. Inga and Mr. De La Cruz, who work in Nevada.

21.     Defendant Estill Ranches, LLC ("Estill Ranches") is a Nevada Limited Liability Company with its principal place of business in Gerlach, Nevada.  Defendant Estill Ranches transacts business in Nevada by, among other things, employing shepherds such as Mr. Inga, who graze sheep on land in Nevada.

22.     Together, Defendants MPAS and Estill Ranches will be referred to as "MPAS Defendants."[7]

## STATEMENT OF FACTS

### THE H-2A PROGRAM AND THE OBLIGATIONS OF H-2A EMPLOYERS

23.     This is a case about the H-2A temporary agricultural worker program, which is administered jointly by the Departments of Labor ("USDOL") and Homeland Security.  H-2A workers come to the United States on temporary agricultural visas, commonly referred to as H-2A visas.

24.     An agricultural employer in the United States may only employ H-2A workers if the USDOL certifies that: (1) there are insufficient workers available in the United States to perform the work, and (2) the employment of the nonimmigrant temporary aliens will not adversely affect the wages and working conditions of United States workers similarly employed.

25.     Agricultural employers or agricultural associations seeking the admission of H-2A workers must first file a temporary labor certification application with the USDOL.  20 C.F.R. § 655.130.  This application must include a job offer, commonly referred to as a "clearance order" or

_____

[7] Although Mr. Inga worked only for MPAS and Estill Ranches, both MPAS and WRA recruited and employed herders for Estill Ranches, according to the DOL Disclosure Data and documents already produced by Estill Ranches in this litigation.  Thus, Estill Ranches is a joint employer with MPAS for some herders (including Mr. Inga), and with WRA for other herders.

2244828.2

"job order," that complies with applicable regulations.  20 C.F.R. § 655.121(a)(1).  These regulations establish the minimum benefits, wages, and working conditions that the employer must offer to the employee in order to avoid adversely affecting similarly-situated United States workers.  20 C.F.R. §§ 655.120(a)(2), 655.122, 655.135, and 655.210.

26.    In almost all material respects, both groups of Defendants use identically worded job orders when they seek to employ H-2A shepherds.  Examples of such job orders are attached as Exhibits A and C.

27.    The H-2A program regulations also specify that H-2A employers must agree to pay their workers the higher of the Adverse Effect Wage Rate (AEWR), the prevailing wage for work in the geographic area where the work is to be performed, the federal minimum wage, the state minimum wage, the agreed-upon collectively bargained wage rate, or a wage set by judicial order.  Accordingly, if—as is the case here—an hourly minimum wage requirement established by state law requires the payment of a higher wage than a monthly AEWR (in light, for example, of the number of hours that the worker has labored), the H-2A regulations require that the state minimum wage be paid.

28.    The H-2A program regulations require that each foreign worker receive a copy of an employment contract no later than the time that the worker applies for a visa to enter the United States under the H-2A program.  U.S. workers employed by WRA or its member ranches, or by MPAS or its member ranches, must be provided the contract no later than the first day of work.  In the absence of a contract containing all the required terms and conditions of employment, the job order required by the USDOL will be deemed to be the required employment contract or will supplement the contract provided by the employer.  *See* 20 CFR §655.122(q).  That job order includes the promise to comply with governing law, including the Nevada law setting the minimum wage.

29.    The H-2A regulations also specify that participating employers provide assurances that "the employer and its agents have not sought or received payment of any kind from any employee subject to [H-2A] for any activity related to obtaining H-2A labor certification."  20 C.F.R. § 655.135(j).  Employers are prohibited from shifting costs of any kind for any activity

1   related to obtaining the labor certification, such as "application fees[] or recruitment costs." *Id*.

2   Thus, under the plain language of the regulation, recruitment costs, including visa application fees

3   and costs associated with the application, must be borne by the H-2A employer.  And, as the

4   preamble to the February 2010 Final Rule states, government-mandated fees such as visa application

5   fees are integral to the employer's choice to use the H-2A program to bring foreign workers into the

6   country.  Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg.

7   6884, 6925 (Feb. 12, 2010). Such expenses provide no benefit to the employee other than for that

8   particular limited employment situation.  Requiring employers to bear the full cost of their decision

9   to import foreign workers is a necessary step toward preventing the exploitation of foreign workers,

10   with its concomitant adverse effect on U.S. workers. Temporary Agricultural Employment of H-2A

11   Aliens in the United States; Modernizing the Labor Certification Process and Enforcement, 73 Fed.

12   Reg. 8538, 8547 (Feb. 13, 2008).

13        30.    In the contracts they enter into with all H-2A shepherds, including with Plaintiffs and

14   other Class Members, all Defendants explicitly agree to comply with all H-2A program

15   regulations—including the H-2A program's requirement that an employer pay the state minimum

16   wage if that is higher than the AEWR, and to pay all costs associated with obtaining H-2A labor

17   certifications.

18        31.    A requirement to comply with the H-2A rules is a term of the employment agreement

19   WRA Defendants enter into with all H-2A shepherds.  For example, a sample of a form contract,

20   which is similar to the one Plaintiff Cántaro entered into with the WRA Defendants, is attached as

21   Exhibit B.  As this contract states, the H-2A shepherd's employer "agrees to comply with all

22   applicable laws of the United States and the individual states, including but not limited to

23   compliance with all immigration laws." Ex. B at 1.  Further, in the job orders for H-2A shepherds,

24   such as the one included as Exhibit A, WRA Defendants agree "to abide by the regulations at 20

25   C.F.R. [§] 655.135." Ex. A at 7.  In turn, 20 C.F.R. § 655.135(e) requires that during the period of

26   employment covered by the H-2A certification, "the employer must comply with all applicable

27   Federal, State and local laws and regulations …."

28

10

32.     MPAS Defendants make a similar commitment in job orders, which "serve as the work contract for workers employed by Mountain Plains Agricultural Service members," Ex. C at 5, and which accordingly require employers to pay a state minimum wage if that wage is higher than a wage set by DOL and to abide by all assurances contained in 20 C.F.R. § 655.135.

### PLAINTIFF CÁNTARO'S EMPLOYMENT AS AN H-2A SHEPHERD

33.     In 2007, a representative of Defendant WRA in Peru first recruited Mr. Cántaro to be a shepherd in the United States while Mr. Cántaro was living near Huancayo, Peru.

34.     The WRA representative made Mr. Cántaro sign a document in which WRA established many of the conditions under which Mr. Cántaro would work in the United States.

35.     In the United States, Mr. Cántaro was employed by one particular WRA ranch, Defendant El Tejon Sheep Company, which is owned and managed by Defendant Gragirena.

36.     Subject to confirmation through discovery, when Mr. Cántaro arrived at El Tejon ranch, Mr. Cántaro signed another contract, similar to the one included as Exhibit B, which was prepared by Defendant WRA and set additional terms of employment with which Mr. Cántaro had to comply.  One such requirement was that Mr. Cántaro work at any ranch managed by Defendant WRA and that he agree to be transferred to another WRA ranch at any time—regardless of whether it was his preference to stay on the ranch to which he was originally assigned and regardless of whether the individual WRA ranch on which he worked agreed to the transfer.

37.     Defendant El Tejon was also a party to this WRA-prepared contract.  Upon information and belief, based on it being the policy of WRA, Defendant El Tejon signed a contract similar to the one attached here as Exhibit B.  That contract identifies Defendant El Tejon as Mr. Cántaro's employer and obligated Defendant El Tejon to comply with a number of contractual provisions, such as paying Mr. Cantaro's wages, keeping records of his employment and wages, and providing him with tools and equipment to perform his work.  *See* Ex. B.

38.     All shepherds employed by Defendant WRA are subject to the same employment policies as those described above because all WRA shepherds sign the same or substantially similar employment contracts as a condition of working for Defendant WRA.  *See* Ex. B.  The terms of WRA employment contracts are described in *Ruiz v Fernandez*, 949 F. Supp. 2d 1055, 1063-71

(E.D. Wash. 2013), where another court in this Circuit concluded that Defendant WRA was a joint employer of shepherds such as Mr. Cántaro.

39.     WRA self-declares in the certifications required by the H-2A program and provided to the USDOL that it is a joint employer, along with its member ranches, for purposes of the employment of H-2A shepherds and United States workers similarly employed. *See* Ex. A at 1.

40.     Defendants El Tejon and Gragirena also entered into employment agreements with Plaintiff Cántaro.

41.     Defendant Gragirena employed Mr. Cántaro by establishing a reasonable degree of oversight over Mr. Cántaro's work.  For example, for a substantial portion of each year, Defendant Gragirena would often observe and direct how Mr. Cántaro would perform specific tasks as a shepherd, indicating, for example, which sheep Mr. Cántaro should focus on birthing or directing Mr. Cántaro to perform a specific task, such as to repair a fence to prevent sheep from escaping from a specific area or to work with a specific pregnant ewe that Defendant Gragirena predicted would have a complicated pregnancy or would have trouble producing milk.

42.     Defendant Gragirena would also instruct H-2A shepherds, including Mr. Cántaro, how to perform certain tasks at his ranch, and would then have the shepherd repeat the tasks he had performed.  Defendant Gragirena would observe the H-2A shepherds performing these tasks until they had performed them to his satisfaction.

43.     Defendant Gragirena also gave Mr. Cántaro detailed instructions to be followed throughout the course of a workweek.  For example, Defendant Gragirena would tell Mr. Cántaro to graze his sheep on one specific plot of land for a specific period of time and then asked that Mr. Cántaro move to a specific different plot of land.  Similarly, Defendant Gragirena would communicate by phone with Mr. Cántaro and ask him to make sure to move his sheep to a specific meeting point in the mountains near Elko on a specific day, in preparation for the sale of the lambs.

44.     On other occasions, Defendant Gragirena used an intermediary—normally Defendant Gragirena's foreman—to direct that Mr. Cántaro perform specific tasks, such as to move sheep from one location to another in the mountains near Elko, Nevada.

2244828.2

45.     Defendant Gragirena would also bring Mr. Cántaro his checks on the pay days or have an intermediary perform this same function.

46.     Mr. Cántaro worked for the WRA Defendants from 2007 until June 2014, generally returning to Peru for short periods of time every three years but otherwise working as a U.S.-based shepherd.

47.     For all of Mr. Cántaro's time as a shepherd, he generally worked from approximately mid-October until approximately early to mid-April near Bakersfield, California, assisting with lambing and other work as assigned.  Then, from approximately mid-April until approximately late September or early October, Mr. Cántaro grazed his herd alone on public lands near Elko, Nevada.

48.     This case only concerns the time Mr. Cántaro, or others similarly situated, worked in Nevada.

49.     The WRA H-2A job orders specified that the work hours were 24 hours a day and seven days per week; the work hours are among the terms and conditions of employment that must be contained in the contract and job order and disclosed to any shepherd employed by WRA or its member ranches, including Defendant El Tejon Sheep Company and Defendant Gragirena.

50.     Under the terms of the H-2A program, the employer must pay for the work offered in the job order or employment contract, in this instance 24 hours of work a day, seven days per week.

51.     During all of his time as a shepherd in Nevada, Mr. Cántaro almost never declined work and was often engaged by the WRA Defendants to be on duty in his workplace 24 hours a day, seven days a week.

52.     During every week of his employment by the WRA Defendants, including for example, the month of May 2014, Mr. Cántaro worked well over 40 hours per week, and was on duty in his workplace 24 hours per day, seven days per week pursuant to the terms of the job order and Defendants' requirement that he remain near the flock and guard them from predators.  Thus, during each week in the month of May 2014, Mr. Cántaro worked 168 hours, but he was paid only approximately $1422.55 for that entire month.  This monthly wage amounts to $331.93 per week, which works out to only $1.98 per hour.

2244828.2

53.     All or almost all of the other shepherds working with Mr. Cántaro worked according to the same or similar schedule as the one described above.  Mr. Cántaro knows this because he would meet the other shepherds at various times during the year: for example, during the time he was assisting with lambing and during the time when he was preparing the lambs for sale.

54.     Mr. Cántaro began his last work contract with the WRA Defendants in or around late October 2013, after returning from an approximately three-month stay in Peru.  Upon arrival, he again performed his work near Bakersfield, CA from October 2013 until around early April 2014.

55.     The WRA Defendants then transported Mr. Cántaro to public lands near Elko, Nevada, in April 2014.

56.     During this time, Mr. Cántaro developed a severe infection in a tooth that required immediate medical attention.

57.     As a result, Mr. Cántaro repeatedly requested that Defendant Gragirena or his foreman provide him with access to medical attention, but neither complied with the request.

58.     This medical condition was exacerbated by the poor conditions in which Mr. Cántaro was living, where he had insufficient access to water, adequate shelter, and a balanced diet.

59.     In or about June 2014, Mr. Cántaro feared that if he did not obtain medical attention immediately, he could be seriously injured or worse.  He was also concerned that he would shortly be required by Defendant Gragirena to travel to a more isolated region in the mountains near Elko, where medical attention would be even more difficult to obtain.  He therefore left Mr. Gragirena's employ and sought medical attention for his worsening condition.

60.     Mr. Cántaro was not paid any wages for approximately the last ten days of his work with the WRA Defendants.

61.     Under the terms of the H-2A program, Defendants WRA and El Tejon were required to pay for any costs and expenses related to Mr. Cántaro's labor certifications.  Defendants failed to do so.  Specifically, in 2013, Mr. Cántaro paid for his visa application fees, passport fees, and fees for a medical examination that was a condition of employment, as well as multiple trips from Pampas, Peru to Lima, Peru to secure his visa, take the medical examinations, and attend a WRA-

14

directed interview to determine if he had the skills necessary to work as a shepherd.  Defendants never reimbursed Mr. Cántaro for these costs, which amounted to at least $300.

## PLAINTIFF DE LA CRUZ'S EMPLOYMENT AS AN H-2A SHEPHERD

62.    In late 2008 or early 2009, a representative of Defendant MPAS in Peru first recruited Mr. De La Cruz to be a shepherd in the United States.

63.    The MPAS representative made Mr. De La Cruz sign a form contract in which MPAS established many of the conditions under which Mr. De La Cruz would work in the United States, including his monthly salary, the location of his work, and certain requirements he had to meet to continue working as a shepherd for MPAS.

64.    The MPAS representative directed how Mr. De La Cruz should obtain an H-2A visa to work in the United States.  Mr. De La Cruz was required to complete a visa application and take several trips from his home in Concepcion, Peru, to the American consulate in Lima, Peru, in order to complete his visa application.

65.    In the United States, Mr. De La Cruz was employed by one particular MPAS ranch, Double-U-Livestock.

66.    Subject to confirmation through discovery, when Mr. De La Cruz arrived at Double-U-Livestock, Mr. De La Cruz signed another contract, which was prepared by Defendant MPAS, which set additional terms of employment with which Mr. De La Cruz had to comply.

67.    All or almost all shepherds employed by Defendant MPAS are subject to the same employment policies as those described above because all or almost all MPAS shepherds sign the same or substantially similar employment contracts as a condition of working for Defendant MPAS.

68.    MPAS also self-declared in the certifications required by the H-2A program and provided to the USDOL that it was a shepherd employer, along with its member ranches, for purposes of the employment of H-2A shepherds and United States workers similarly employed.  For example, in one job order from the period when Mr. De La Cruz worked for MPAS, which is attached as Exhibit C, the Executive Director of MPAS signed the "employer's certification" that the MPAS-prepared job order complied with the requirements of the H-2A visa program.  *See* Ex. C at 2.

2244828.2

69.     MPAS also prepared a uniform attachment for all of its Nevada H-2A job orders establishing terms of employment for all H-2A shepherds it recruited to work in Nevada.  *See* Ex. C at 3-6.

70.     Mr. De La Cruz worked for MPAS from March 2009 until late 2014.  He believes he worked all of this time in Nevada.

71.     The MPAS H-2A job orders specified that the work hours were 24 hours a day and seven days per week; the work hours are among the terms and conditions of employment that must be contained in the contract and job order and disclosed to any shepherd employed by MPAS or its member ranches.

72.     Under the terms of the H-2A program, the employer must pay for the work offered in the job order or employment contract, in this instance 24 hours of work per day, seven days per week.  *See* Ex. C at 3.

73.     During all of his time as a shepherd, Mr. De La Cruz almost never declined work and was often engaged by Defendant to be on duty in his workplace 24 hours a day, seven days a week.  Mr. De La Cruz was often awakened at night, and would customarily have to get up at least once or twice each night to tend to the sheep.

74.     During every week of his employment by Defendant, including for example, the month of January 2014, Mr. De La Cruz worked well over 40 hours per week, and was on duty in his workplace 24 hours per day, seven days per week pursuant to the terms of the job order and Defendant's requirement that he remain near the flock and guard them from predators.  Thus, during each week in the month of January 2014, Mr. De La Cruz worked 168 hours, but he was paid only approximately $800 for that entire month.  This monthly wage amounts to $184.76 per week, which works out to only $1.09 per hour.

75.     All or almost all of the other shepherds working with Mr. De La Cruz worked according to the same or similar schedule as the one described above.  Mr. De La Cruz knows this because he would meet the other shepherds at various times during the year: for example, back at the ranches just before or after the ranches' lambing season.

16

76.     Under the terms of the H-2A program, Defendant MPAS was required to pay for any costs and expenses related to Mr. De La Cruz's labor certifications.  Defendant failed to do so.  For instance, Mr. De La Cruz paid the cost of travel from his hometown in Concepcion, Peru to Lima, Peru, in order to secure his visa.

## PLAINTIFF INGA'S EMPLOYMENT AS AN H-2A SHEPHERD

77.     In the first few months of 2012, a representative of Defendant MPAS in Peru first recruited Mr. Inga to be a shepherd in the United States while Mr. Inga was living near Huancayo, Peru.

78.     The MPAS representative made Mr. Inga sign a form contract in which MPAS established many of the conditions under which Mr. Inga would work in the United States, including his monthly salary, the location of his work, and certain requirements he had to meet to continue working as a shepherd for MPAS.

79.     In the United States, Mr. Inga was employed by one particular MPAS ranch, Defendant Estill Ranches, which is owned and managed by John Estill.

80.     Subject to confirmation through discovery, when Mr. Inga arrived at Estill Ranches, Mr. Inga signed another contract, which was prepared by Defendant MPAS, and which set additional terms of employment with which Mr. Inga had to comply.

81.     Upon information and belief, Defendant Estill Ranches was also a party to this MPAS-prepared contract.

82.     All or almost all shepherds employed by Defendant MPAS are subject to the same employment policies as those described above because all or almost all MPAS shepherds sign the same or substantially similar employment contracts as a condition of working for Defendant MPAS.

83.     MPAS also self-declared in the certifications required by the H-2A program and provided to the USDOL that it was a shepherd employer, along with its member ranches, for purposes of the employment of H-2A shepherds and United States workers similarly employed.  For example, in one job order from the relevant period when Mr. Inga worked at Estill Ranches, which is attached as Exhibit C, the Executive Director of MPAS signed the "employer's certification" that the

2244828.2

1 MPAS-prepared job order for Estill Ranches complied with the requirements of the H-2A visa
2 program.  *See* Ex. C at 2.

3      84.    MPAS also prepared a uniform attachment for all of its Nevada H-2A job orders
4 establishing terms of employment for all H-2A shepherds it recruited to work in Nevada.  *See* Ex. C
5 at 3-6.

6      85.    Defendant Estill Ranches also employed Mr. Inga.  It did so by establishing a
7 reasonable degree of oversight over Mr. Inga's work.  For example, for a substantial portion of each
8 year, Estill Ranches owner John Estill would observe and direct how Mr. Inga would perform
9 specific tasks as a shepherd, indicating, for example, which sheep Mr. Inga should focus on moving
10 around the range or directing Mr. Inga to perform a specific task, such as to repair a fence.

11      86.    On other occasions and because he did not speak fluent Spanish and Mr. Inga did not
12 speak English, John Estill used an agent—normally one of his foremen—to direct that Mr. Inga
13 perform specific tasks, such as to move sheep from one location to another.

14      87.    John Estill would also bring Mr. Inga his checks on pay days or have an agent
15 perform this same function on his behalf.

16      88.    Mr. Inga worked for MPAS and Estill Ranches from April 2012 until February 2013.
17 He believes he worked all of this time in or near Gerlach, Nevada.

18      89.    The MPAS H-2A job orders specified that the work hours were 24 hours per day and
19 seven days per week; the work hours are among the terms and conditions of employment that must
20 be contained in the contract and job order and disclosed to any shepherd employed by MPAS or its
21 member ranches, including Defendant Estill Ranches.

22      90.    Under the terms of the H-2A program, Defendants MPAS and Estill Ranches were
23 required to pay for any costs and expenses related to Mr. Inga's labor certifications.  Defendants
24 failed to do so.  Specifically, in early 2012, Mr. Inga paid for his visa application fees, as well as
25 multiple trips from Huancayo, Peru to Lima, Peru to secure his visa.  Defendants never reimbursed
26 Mr. Inga for these costs, which amounted to at least $250.

27      91.    Mr. Inga was also living in dangerous and unsanitary conditions when he was
28 working for MPAS and Estill Ranches.  He had insufficient access to water, adequate shelter, and a

2244828.2

balanced diet.  In particular, Mr. Inga lived in a camper with insufficient heating and no place to store any perishable items.  The camper was also insufficiently insulated and had holes through which rodents and wind would pass.  MPAS and Estill Ranches also provided Mr. Inga with insufficient food: he often mainly ate potatoes and sometimes had to share his food with his sheep dogs, as they had insufficient food themselves.

92.     In or around February 2013, Mr. Inga had had enough of the bad conditions.  In part because of the bad conditions and the poor pay, Mr. Inga ended his employment relationship with MPAS and Estill Ranches.

**THE H-2A VISA PROGRAM FOR SHEPHERDS AND DEFENDANTS' WAGE POLICIES**

93.     As described above, most shepherds, including Plaintiffs, work in the United States under the H-2A program, which is administered by the USDOL and the Department of Homeland Security.

94.     The USDOL has implemented special rules regulating H-2A workers in the sheepherding industry.  As part of these special rules, the USDOL, among other things, sets a wage floor which must be paid to the workers admitted under the labor certification, or it will not approve H-2A visa applications.

95.     As is relevant here, the USDOL-established wage floor for shepherds requires the payment of the *highest* of (i) the Adverse Effect Wage Rate (AEWR) determined for every state where the work will be performed; (ii) the federal minimum wage; (iii) the state minimum wage for the state where the work is performed; or, (iv) an agreed-upon collectively bargained wage.  All employers under the H-2A program are required to both promise to pay and to actually pay the higher of the above specified pay rates.  *See* 20 C.F.R. § 655.120 and 655.210.

96.     The Nevada state minimum wage for the work performed by the shepherds in Nevada is $8.25.

97.     Under the terms of the H-2A program and the contract provisions applicable to the shepherds, a higher state minimum wage law necessarily supersedes any lower wage floor specified by the USDOL.

19

98.     As noted above, Defendants WRA and MPAS each have a policy and practice of only paying the AEWR established by the USDOL, regardless of whether a higher wage is required under state law, the H-2A program, or federal law.

99.     Defendants El Tejon and Mr. Gragirena adopted and implemented this same policy and practice of paying per month, based on the AEWR established by the USDOL, albeit paying the California AEWR even for the months that Plaintiffs worked in Nevada, rather than paying the higher hourly wage required by state law.

100.    In light of this policy, the wage offered and normally paid by the WRA Defendants varies only based on the state in which a ranch is located.  For example, if the ranch on which a shepherd works is based in California (as is the case with Mr. Cántaro in some instances), the wage Defendants pay is the AEWR for California.  On the other hand, if the ranch is located in Nevada, Defendant WRA has a policy of paying the Nevada AEWR, which has been as low as $800 per month.

101.    The MPAS Defendants adhere to the same policy. The wage offered to all H-2A shepherds in Nevada is the monthly minimum of as low as $800 per month.

102.    The existence of these policies is evident from a review of the USDOL's Fiscal Year 2014 through 2017 "Disclosure Data," which is a data set that provides information about each H-2A Visa Application submitted to the USDOL by Defendants.

103.    The data for Fiscal Years 2014 through 2017 cover the period from October 1, 2013 to the present.  This is the most recent and comprehensive data available on H-2A certifications.

104.    The Disclosure Data is accessible by clicking on the "Disclosure Data" tab available at http://www.foreignlaborcert.doleta.gov/performancedata.cfm.  To access the Fiscal Year 2014 through 2017 data, download a Microsoft Excel file available for H-2A workers for Fiscal Year 2014, 2015, 2016 or 2017 under this tab.

105.    The 2014 through 2017 data reveal that the minimum wage offered to all WRA shepherds and all MPAS shepherds in Nevada is uniformly $800 per month initially, then $1,206.31

2244828.2

per month from November 2015 to September 2016, then $1,390 from January 2017 to present.[8] The wage offered to all California WRA shepherds is uniformly the AEWR set by the USDOL for that state for the relevant period of time (*i.e.*, $1,422.55, $1,600.34, or $1,777.98 per month).

106.   Mr. Cántaro was offered approximately the AEWR established by the USDOL for California.

107.   Mr. Cántaro was paid approximately $1422.55 per month—or slightly more than this sum—for every month that he worked as a shepherd for the WRA Defendants.  (Plaintiff will have to determine the exact amount he was paid through discovery as his employment records are in the possession of the WRA Defendants.).

108.   Mr. De La Cruz was offered approximately the AEWR established by the USDOL for Nevada.

109.   Mr. De La Cruz was paid approximately $800 per month for every month that he worked as a shepherd for MPAS.  (Mr. De La Cruz will have to determine the exact amount he was paid through discovery as his employment records are in the possession of MPAS.)

110.   Finally, in addition to Defendants MPAS and WRA adhering to the policy described in ¶¶ 93-109 for all the shepherds each has employed in Nevada, Defendants El Tejon and Gragirena have adopted and implemented this same policy for all shepherds employed by Defendant Gragirena's ranch who worked in Nevada, paying them the California AWER both for months when they worked in California and for months when they worked in Nevada, where state law mandated higher pay.

**NEVADA MINIMUM WAGE**

111.   As noted above, Plaintiffs worked in Nevada for Defendants.

---

[8] One can view the underlying Disclosure Data by matching the ETA case number included with each record in the Disclosure Data and reviewing the individual H-2A applications associated with these numbers.  These H-2A records are viewable at https://icert.doleta.gov/, where one can perform a search by ETA case number.  A review of numerous individual H-2A Applications at this website confirms that Defendants have a policy of uniformly paying the same monthly minimum wage to shepherds.

2244828.2

112.    Plaintiffs Cántaro and De La Cruz were paid illegally low wages for their work in Nevada.  Even though Mr. Cántaro was paid approximately $1,422.55 per month (or slightly more than this sum), he should have been paid much more than this amount based on the number of compensable hours he worked.  Even though Mr. De La Cruz was paid approximately $800 per month, he should have been paid much more than this amount based on the number of compensable hours worked.

113.    The Nevada minimum wage is established in Section 16 of the Nevada Constitution. This is an hourly minimum wage that applies regardless of the industry in which the employee is working.  *See Thomas v. Nevada Yellow Cab Corp.*, 327 P.3d 518 (Nev. 2014).

114.    At present, the hourly minimum wage for all employees in Nevada is $7.25 per hour for workers who are covered by an employer's medical insurance and $8.25 per hour for workers who do not have insurance coverage.

115.    Upon information and belief, foreign shepherds, including Plaintiffs Cántaro and De La Cruz, employed by either the WRA Defendants or MPAS, have not been covered by medical insurance meeting the requirements of Section 16 of the Nevada Constitution.

116.    All foreign shepherds, including Plaintiffs, are accordingly entitled to an hourly wage of at least $8.25 per hour for each hour of work completed in Nevada.

117.    In order for the wage of $1,422.55 per month to be a lawful payment, Mr. Cántaro would have had to have worked fewer than 40 hours per week and, in order for $800 per month to be a lawful payment, Mr. De La Cruz would have had to have worked well under 40 hours in a week. But both Plaintiffs worked much more than 40 hours a week: they were engaged by the WRA Defendants and MPAS respectively to work 24 hours a day, seven days per week under the terms of the job orders.

118.    Plaintiffs' work was standard operating procedure for a shepherd.  Nevada shepherds were engaged to work 24 hours a day, seven days per week.

119.    All shepherds are accordingly always working in excess of 40 hours per week and are being underpaid for the hourly minimum value of their labor as established in the Nevada Constitution.

2244828.2

## RULE 23 CLASS ALLEGATIONS

### WRA Nevada Classes

120.     Plaintiff Cántaro asserts Counts I, III, IV, V and IX against Defendant WRA as a Class Action pursuant to Federal Rule of Civil Procedure 23.

121.     He brings these claims on behalf of the "WRA Nevada Class," which, pending any modifications necessitated by discovery, is defined as follows:

> All persons whom WRA employed as shepherds through the H-2A program, who worked in Nevada during the applicable statute of limitations.

122.     Plaintiff Cántaro defines the "WRA Former Employee Sub-Class" as follows:

> All persons whom WRA employed as shepherds through the H-2A program, who worked in Nevada during the applicable statute of limitations and who are no longer employed by WRA.

123.     The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Cántaro does not know the exact size of the classes since that information is within the control of WRA.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendant WRA employed hundreds of shepherds in Nevada between 2014 and 2017.  WRA employed hundreds more herders in the years encompassing Plaintiffs' contract claims, which have a six-year statute of limitations.

124.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including, (a) whether WRA was obligated to pay shepherds working in Nevada at least the Nevada minimum wage instead of paying the monthly wage established by the USDOL; (b) whether WRA fulfilled its obligation to pay the Nevada minimum wage; (c) whether any health insurance was offered by WRA to putative Class Members which qualified for the lower, $7.25/hour minimum wage; (d) whether WRA was a joint employer of the H-2A shepherds; (e) whether WRA paid Plaintiffs for all compensable hours; (f) whether WRA paid all wages when due following termination of employment of shepherds in Nevada; (g) whether WRA was obligated to pay Nevada shepherds for any expenses associated with obtaining visas and permits to work for Defendants in the United States; and (h) whether WRA fulfilled its contractual obligation to pay these expenses.

2244828.2

125.    The claims asserted by Mr. Cántaro are typical of the claims of all of the potential Class Members.  All potential Class Members who worked within the statute of limitations period for the wage claims allege they were paid less than the applicable Nevada minimum wage by Defendants, that WRA was their joint employer, and that they worked 168 hours per week (24 hours/day, seven days/week).  All potential Class Members who worked within the statute of limitations period for the contract claims allege that WRA violated its employment contracts by failing to reimburse Plaintiffs for the costs associated with obtaining the labor certifications necessary to work for WRA in the United States.

126.    Mr. Cántaro suffered from the same illegally low wage as the class.  Mr. Cántaro also suffered the same injury as the class for failure to reimburse visa-related expenses.

127.    Mr. Cántaro will fairly and adequately protect and represent the interests of the class.

128.    Mr. Cántaro is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions who will adequately represent the class.

129.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

130.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendant WRA.

131.    Mr. Cántaro is unaware of any members of the putative class who are interested in presenting their claims in a separate action, though he is aware of a separate class action based on Nevada law against another Defendant: MPAS.  *See Llacua et al v.  W. Range Ass'n et al.*, 1:15-cv-01889-REB-CBS (D. Colo. 2015).  This other case contains no Nevada-based wage claims against WRA.  Plaintiffs' understanding is that the claims in that case for failure to pay the Nevada minimum wage and for failure to reimburse labor certification-related expenses have been dismissed.

2244828.2

132.    Mr. Cántaro is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

133.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

134.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

135.    The contours of the classes will be easily defined by reference to Defendants' records and government records.

**El Tejon Classes**

136.    Plaintiff Cántaro asserts Counts II, VI, VII, VIII, and X as a Class Action pursuant to Federal Rule of Civil Procedure 23.

137.    In particular, he asserts Counts II and X against Defendants Gragirena and El Tejon, and he asserts Counts VI-VIII against only Defendant El Tejon.

138.    Pending any modifications necessitated by discovery, Plaintiff defines the "El Tejon Class" as follows:

> All persons whom Defendants El Tejon and Gragirena employed through the H2A program as shepherds during the applicable statute of limitations.

139.    Pending any modifications necessitated by discovery, Plaintiff defines the "El Tejon Former Employee Sub-Class" as follows:

> All persons whom Defendants El Tejon and Gragirena employed through the H2A program as shepherds during the applicable statute of limitations who are no longer employed by Defendants El Tejon and Gragirena.

140.    The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Cántaro does not know the exact size of the classes, since that information is within the control of the Defendants.  However, according to publicly available

2244828.2

data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendants El Tejon and Gragirena employed approximately 48 herders during the two-year statutory period for Plaintiffs' wage claims.  El Tejon employed many more herders during the six-year statutory period for Plaintiffs' contract claims.

141.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including (a) whether Defendants El Tejon and Gragierena were obligated to pay Nevada shepherds at least the Nevada minimum wage instead a of paying the monthly wage floor established by the USDOL; (b) whether Defendants El Tejon and Gragierena fulfilled their obligation to pay the Nevada minimum wage; (c) whether any health insurance was offered by Defendants El Tejon and Gragierena to putative Class Members which qualified for the lower, $7.25/hour minimum wage; (d) whether Defendants El Tejon and Gragierena were joint employers, with WRA, of the H-2A shepherds; (e) whether Defendants El Tejon and Gragierena paid plaintiffs for all compensable hours; (f) whether Defendants El Tejon and Gargierena are jointly and severally liable for WRA's violations; (g) whether El Tejon was obligated to pay Nevada shepherds for any expenses associated with obtaining visas and permits to work for Defendants in the United States; and (h) whether El Tejon fulfilled its contractual obligation to pay these expenses.

142.    The claims asserted by Mr. Cántaro are typical of the claims of all of the potential Class Members.  All potential Class Members who worked within the statute of limitations period for the wage claims allege they were paid less than the applicable Nevada minimum wage by Defendants, that El Tejon and Melchor Gragirena were their joint employers, and that they worked 168 hours per week (24 hours/day, seven days/week).  All potential Class Members who worked within the statute of limitations period for the contract claims allege that El Tejon violated its employment contracts by failing to reimburse Plaintiffs for the costs associated with obtaining the labor certifications necessary to work for El Tejon in the United States.

143.    Mr. Cántaro suffered from the same illegally low wage as the class.  Mr. Cántaro also suffered the same injury as the class for failure to reimburse visa-related expenses.

144.    Mr. Cántaro will fairly and adequately protect and represent the interests of the class.

2244828.2

145.    Mr. Cántaro is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

146.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

147.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants El Tejon and Gragirena.

148.    Mr. Cántaro is unaware of any members of the putative class who are interested in presenting their claims in a separate action, though he is aware of a separate class action based on Nevada law against another Defendant: MPAS.  *See Llacua et al v.  W. Range Ass'n et al.*, 1:15-cv-01889-REB-CBS (D. Colo. 2015).  This other case contains no Nevada-based wage claims against the WRA or El Tejon Defendants.

149.    Mr. Cántaro is unaware of any pending litigation commenced by members of the class concerning the instant controversies.

150.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

151.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

152.    The contours of the class will be easily defined by reference to Defendants' records and government records.

2244828.2

**MPAS Nevada Classes**

153.     Plaintiff De La Cruz asserts Counts XI and XV against Defendant MPAS as a Class Action pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs De La Cruz and Inga both assert Counts XII to XIV against Defendant MPAS as a Class Action pursuant to Federal Rule of Civil Procedure 23.[9]

154.     Plaintiffs De La Cruz and Inga bring these claims on behalf of the "MPAS Nevada Class," which, pending any modifications necessitated by discovery, is defined as follows:

> All persons whom MPAS employed as shepherds through the H-2A program, who worked in Nevada at any time during the applicable statute of limitations.[10]

155.     Plaintiffs define the "MPAS Former Employee Sub-Class" as follows:

> All persons whom MPAS employed as shepherds through the H-2A program, who worked in Nevada during the applicable statute of limitations and who are no longer employed by the MPAS.

156.     The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiffs do not know the exact size of the classes since that information is within the control of MPAS.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendant MPAS employed over 100 Nevada shepherds during the statutory period for Plaintiff De La Cruz's wage claims.  The statute of limitations for Mr. De La Cruz's and Mr. Inga's contract claims for failure to reimburse Plaintiffs'

---

[9] As noted above, Plaintiff Inga understands the Court has ruled that a two-year statute of limitations applies to contract claims tied to the Nevada Minimum Wage Amendment claims. However, Plaintiff Inga raises timely contract claims against MPAS for failure to reimburse labor certification-related expenses.  *See supra* at ¶ 1 n.1.  Mr. De La Cruz's claims encompass those contract claims as well as claims against MPAS for failure to pay minimum wages.

[10] As discussed above, *see supra* at ¶ 9, Plaintiffs assert that the statute of limitations is tolled for this Class based on *American Pipe*, 414 U.S. 538 (1974), and the Nevada minimum wage claim brought against MPAS in *Llacua*, No. 15-cv-01889-REB-CBS (D. Colo. 2015).  For the MPAS Class' wage claims, the limitations period goes back to October 28, 2013; for the contract claims for failure to pay labor certification expenses, which were also made in *Llacua* against MPAS, the period goes back to October 28, 2009.

1   labor certification costs go back another four years, and therefore the size of the putative class for

2   those claims is much higher.

3     157. There are questions of law or fact common to the classes that predominate over any

4   individual issues that might exist—including, (a) whether MPAS was obligated to pay shepherds

5   working in Nevada at least Nevada minimum wage instead of paying the monthly wage established

6   by the USDOL; (b) whether MPAS fulfilled its obligation to pay the Nevada minimum wage; (c)

7   whether any health insurance was offered by MPAS to putative Class Members which qualified for

8   the lower, $7.25/hour minimum wage; (d) whether MPAS was a joint employer of the H-2A

9   shepherds; (e) whether MPAS paid Plaintiffs for all compensable hours; (f) whether the MPAS paid

10  all wages when due following termination of employment of shepherds in Nevada; (g) whether

11  MPAS was obligated to pay Nevada shepherds for any expenses associated with obtaining visas and

12  permits to work for Defendants in the United States; and (h) whether MPAS fulfilled its contractual

13  obligation to pay these expenses.

14    158. The claims asserted by Mr. De La Cruz and Mr. Inga are typical of the claims of all of

15  the potential Class Members.  All potential Class Members who worked within the statute of

16  limitations period for the wage claims allege they were paid less than the applicable Nevada

17  minimum wage by Defendants, that MPAS was their joint employer, and that they worked 168 hours

18  per week (24 hours/day, seven days/week).  All potential Class Members who worked within the

19  statute of limitations period for the contract claims allege that MPAS violated its employment

20  contracts by failing to reimburse Plaintiffs for the costs associated with obtaining the labor

21  certifications necessary to work for MPAS in the United States.[11]

22    159. Mr. De La Cruz suffered from the same illegally low wage as the class.  Mr. Inga and

23  Mr. De La Cruz suffered the same injury as the class for failure to reimburse visa-related expenses.

24

25  _____

26   [11] Mr. Inga represents the class of herders bringing contract claims under the six-year statute
27  of limitations.  Mr. De La Cruz represents the class of herders bringing contract claims, but also the
    wage claims under the two-year statute of limitations.

28

2244828.2

160.    Mr. Inga and Mr. De La Cruz will fairly and adequately protect and represent the interests of the class.

161.    Mr. Inga and Mr. De La Cruz are represented by counsel experienced in litigation on behalf of low-wage workers and in class actions who will adequately represent the class.

162.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

163.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendant MPAS.

164.    Mr. Inga and Mr. De La Cruz are aware of a separate class action based on Nevada law against Mountain Plains Agricultural Service.  *See Llacua et al v.  W. Range Ass'n et al.*, 1:15-cv-01889-REB-CBS (D.  Colo.  2015).  Plaintiffs' understanding is that the claims in that case for failure to pay the Nevada minimum wage and for failure to reimburse labor certification-related expenses have been dismissed.

165.    Mr. Inga and Mr. De La Cruz are unaware of any other pending litigation commenced by members of the Class concerning the instant controversies.

166.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

167.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

168.    The contours of the class will be easily defined by reference to Defendants' records and government records.

2244828.2

**Estill Ranches Class**

169.    Plaintiff Inga asserts Counts XVI to XVIII as a Class Action pursuant to Federal Rule of Civil Procedure 23.

170.    In particular, he asserts these Counts against Defendant Estill Ranches.

171.    Pending any modifications necessitated by discovery, Plaintiff Inga defines the "Estill Ranches Class" as follows:

> All persons whom Defendant Estill Ranches employed through the
> H2A program as shepherds in Nevada at any time during the
> applicable statute of limitations.

172.    The members of the putative classes are so numerous that joinder of all potential Class Members is impracticable.  Plaintiff Inga does not know the exact size of the classes, since that information is within the control of the Defendants.  However, according to publicly available data from the USDOL (namely, the aforementioned "Disclosure Data"), Defendant Estill Ranches employed at least 50 shepherds during the statutory period for Mr. Inga's contract claims for failure to pay for labor certification-related expenses.

173.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist—including (a) whether Estill Ranches was obligated to pay Nevada shepherds for any expenses associated with obtaining visas and permits to work for Defendants in the United States; (b) whether Estill Ranches fulfilled its contractual obligation to pay these expenses; (c) whether Estill Ranches was a joint employer, with MPAS, of the H-2A shepherds; (d) whether Estill Ranches repaid Plaintiffs for their out-of-pocket expenses related to obtaining their H-2A labor certifications; and (e) whether Estill Ranches is jointly and severally liable for MPAS's violations.

174.    The claims asserted by Mr. Inga are typical of the claims of all of the potential Class Members because all potential Class Members allege that the Estill Ranches failed to reimburse them for the costs of obtaining labor certifications necessary to work for Estill Ranches.

175.    Mr. Inga suffered the same injury for failure to reimburse visa-related expenses as the class.

2244828.2

176.    Mr. Inga will fairly and adequately protect and represent the interests of the class.

177.    Mr. Inga is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

178.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.  It is also superior because the putative Class Members lack the resources and language ability to locate and retain competent counsel.

179.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendant Estill Ranches.

180.    Mr. Inga is unaware of any members of the putative class who are interested in presenting these claims in a separate action, though—as noted above—he is aware of a separate class action based on Nevada law against MPAS.  *See Llacua et al v W. Range Ass'n et al.*, 1:15-cv-01889-REB-CBS (D. Colo. 2015).

181.    Mr. Inga is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

182.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Nevada, and shepherds operate exclusively in the western United States.

183.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

184.    The contours of the class will be easily defined by reference to Defendants' records and government records.

2244828.2

## COUNT ONE

**Failure to Pay Minimum Wages in Violation of the Nevada Constitution**
**(On Behalf of Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)**

185.    Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.  As noted above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of the WRA Nevada Class pursuant to Fed. R. Civ. P. 23.

186.    WRA employed Plaintiff Cántaro and other members of the WRA Nevada Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

187.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage, and attorneys' fees, pursuant to Nev. Const. art. 15, § 16, for the relevant time period alleged herein.

188.    Although not necessary to obtain fees under the Nevada Constitution, Plaintiff Cántaro sent a written demand for wages at least five days prior to bringing this claim and is entitled to attorneys' fees and costs if he prevails in this action.

## COUNT TWO

**Failure to Pay Minimum Wages in Violation of the Nevada Constitution**
**(On Behalf of Plaintiff Cántaro and the El Tejon Class Against Defendants El Tejon and Gragirena)**

189.    Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.  As noted above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of the El Tejon Class pursuant to Fed. R. Civ. P. 23.

190.    Defendants El Tejon and Gragirena employed Plaintiff Cántaro and members of the El Tejon Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

191.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage and attorneys' fees pursuant to Nev. Const. art. 15, § 16, for the for the relevant time period alleged herein.

2244828.2

192.     Although not necessary to obtain fees under the Nevada Constitution, Plaintiff Cántaro sent a written demand for wages at least five days prior to bringing this claim and is entitled to attorneys' fees and costs if he prevails in this action.

**COUNT THREE**

**Breach of Contract or Quasi-Contract**
**(Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)**

193.     Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

194.     As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

195.     Plaintiff and the WRA Nevada Class entered into contracts with WRA that explicitly incorporated the requirements of 20 C.F.R. §§ 655.122, 655.210 and 655.135 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiff and members of the WRA Nevada Class entered into contracts with WRA, which were drafted by WRA, and which included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 655.135.

196.     These contracts provide that each worker employed by WRA will be paid the higher of the monthly AEWR, the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof.  WRA failed to pay the required wage when they failed to pay the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state law, the above cited regulations, and the employment contract.  These contracts also provide that employers are not permitted to shift costs for any activity related to obtaining an H-2A labor certification, including visa application fees and any related costs.  Any of these costs borne by workers must then be reimbursed by the employer.  Defendant WRA failed to reimburse its herders for these costs.

197.     As a result of the breach of contract, the Plaintiff and the WRA Nevada Class suffered damages for the relevant time period alleged herein.

34

## COUNT FOUR

### Promissory Estoppel
### (Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)

198.     Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

199.     As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

200.     In the alternative to a contract claim, Plaintiff Cántaro and the WRA Nevada Class are entitled to relief in promissory estoppel.  WRA promised the Plaintiff and members of the Nevada Class that it would adhere to 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 655.135.

201.     Plaintiff Cántaro and the WRA Nevada Class relied on this promise to their detriment by traveling to WRA member ranches to work as shepherds, where the WRA and its members illegally failed to pay wages as promised.  The Class Members also relied on this promise to their detriment by paying their own visa application fees and recruitment costs, which WRA failed to pay. Plaintiff Cántaro and the WRA Nevada Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein, and for all costs borne by Class Members to obtain the labor certifications needed to work for WRA and its member ranches.

## COUNT FIVE

### Unjust Enrichment and Quantum Meruit
### (Plaintiff Cántaro and the WRA Nevada Class Against Defendant WRA)

202.     Plaintiff Cántaro incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

203.     As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

204.     In the alternative to a contract claim, Plaintiff Cántaro and the WRA Nevada Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on the WRA when the Plaintiff and the WRA Nevada Class performed work as specified by the WRA for

2244828.2

1    which the WRA failed to pay the required compensation in violation of 20 C.F.R. § 655.122, 20

2    C.F.R. § 655.210 and 20 C.F.R. § 655.135.

3          205.    That benefit was appreciated by the WRA as it had the advantage of the Plaintiff's

4    and Class Members' labor without paying for that labor as required; it is unjust for the WRA to be

5    permitted to benefit from the illegally obtained labor; and WRA engaged in unfair competition with

6    other Nevada businesses that abide by Nevada's wage and hour laws and contract laws.

7          206.    Plaintiff Cántaro and the WRA Nevada Class reasonably expected to be paid all

8    wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210, and those wages were

9    not paid according to that expectation.  Plaintiff and the WRA Class likewise reasonably expected to

10   be reimbursed for all application fees and recruitment costs associated with obtaining their H-2A

11   labor certifications due under 20 C.F.R. § 655.135, and those costs were not reimbursed according to

12   that expectation.

13         207.    As a result, Plaintiff Cántaro and the WRA Nevada Class are entitled to the full value

14   of the services provided, and the WRA should be disgorged of the illegally withheld wages and

15   reimbursement costs for the relevant time period alleged herein.

16                                          **COUNT SIX**

17                           **Breach of Contract or Quasi Contract**
18            **(Plaintiff Cántaro and the El Tejon Class Against Defendant El Tejon)**

19         208.    Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully

20   re-written herein.

21         209.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on

22   behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

23         210.    Plaintiff and the El Tejon Class entered into contracts with Defendant El Tejon that

24   explicitly incorporated the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 through the

25   H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those

26   similarly situated.  In the alternative, Plaintiff and the El Tejon Class entered into contracts with

27

28

2244828.2

1  Defendant El Tejon that included as implied terms of the contracts the requirements of 20 C.F.R. §

2  655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 655.135.

3        211.    These contracts provide that each worker employed by Defendant El Tejon will be

4  paid the higher of the monthly AEWR (adverse effect wage rate), the agreed-upon collective

5  bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial

6  action, in effect at the time work is performed, whichever is highest, for every month of the job order

7  period or portion thereof.  Defendant El Tejon failed to pay the required wage when it failed to pay

8  the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour

9  worked, a violation of Nevada state law and of the above cited regulations.  These contracts also

10  provide that employers are not permitted to shift costs for any activity related to obtaining an H-2A

11  labor certification, including visa application fees and any related costs.  Any of these costs borne by

12  workers must then be reimbursed by the employer.  Defendant El Tejon failed to reimburse its

13  herders for these costs.

14        212.    As a result of the breach of contract, the Plaintiff and the El Tejon Class suffered

15  damages for the relevant time period alleged herein.

16  **COUNT SEVEN**

17  **Promissory Estoppel**
**(Plaintiff Cántaro and the El Tejon Class Against Defendant El Tejon)**

18

19        213.    Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully

20  re-written herein.

21        214.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on

22  behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

23        215.    In the alternative to a contract claim, Plaintiff Cántaro and the El Tejon Class are

24  entitled to relief in promissory estoppel.  Defendant El Tejon promised Plaintiff Cántaro and the El

25  Tejon Class that it would adhere to 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. §

26  655.135.

27        216.    Plaintiff Cántaro and the El Tejon Class relied on this promise to their detriment by

28  traveling to the ranch operated by Defendant El Tejon to work as shepherds, where Defendant El

37

Tejon illegally failed to pay wages as promised, and by paying for their own visa application fees and recruitment costs, which Defendant El Tejon failed to pay. Plaintiff Cántaro and the El Tejon Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein, and for all costs borne by Class Members to obtain labor certifications needed to work for El Tejon.

## COUNT EIGHT

### Unjust Enrichment and Quantum Meruit
### (Plaintiff Cántaro and the El Tejon Class Against Defendant El Tejon)

217.    Plaintiff Cántaro incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

218.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

219.    In the alternative to a contract claim, Plaintiff Cántaro and the El Tejon Class are also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on Defendant El Tejon when the Plaintiff and the El Tejon Class performed work as specified by Defendant El Tejon for which Defendant El Tejon failed to pay the required compensation in violation of 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 655.135.

220.    That benefit was appreciated by Defendant El Tejon as it had the advantage of the Plaintiff's and Class Members' labor without paying for that labor as required; it is unjust for the Defendant El Tejon to be permitted to benefit from the illegally obtained labor; and Defendant El Tejon engaged in unfair competition with other Nevada businesses that abide by Nevada's wage and hour laws and contract laws.

221.    Plaintiff Cántaro and the El Tejon Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 and those wages were not. Plaintiffs likewise reasonably expected to be reimbursed for all application fees and recruitment costs associated with obtaining their H-2A labor certifications due under 20 C.F.R. § 655.135, and those costs were not reimbursed according to that expectation.

2244828.2

222.    As a result, Plaintiff Cántaro and the El Tejon Class are entitled to the full value of the services provided and Defendant El Tejon should be disgorged of the illegally withheld wages and reimbursement costs for the relevant time period alleged herein.

### COUNT NINE

**Failure to Pay Separated Employees Wages When Due**
**(On Behalf of Plaintiff Cántaro and the WRA Former Employee Sub-Class Against Defendant WRA)**

223.    Plaintiff Cántaro incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

224.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

225.    Mr. Cántaro and many other members of the WRA Former Employee Sub-Class are no longer employed by WRA, whether due to resignation or termination.

226.    N.R.S.  § 608.140 provides that an employee has a private right of action for unpaid wages.

227.    N.R.S.  § 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

228.    N.R.S.  § 608.040(1)(a-b), in relevant part, impose a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

229.    N.R.S.  § 608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

2244828.2

230.    By failing to pay Plaintiff and all members of the WRA Former Employee Sub-Class for all hours worked in violation of state law, Defendant WRA has failed to timely remit all wages due and owing to Plaintiff and all members of the Sub-Class.

231.    Despite demand, Defendant willfully refuses and continues to refuse to pay Plaintiff and all WRA Former Employee Sub-Class Members who are former employees their full wages due and owing to them.

232.    Wherefore, Plaintiff demands thirty (30) days wages under N.R.S.  608.140 and 608.040, and an additional thirty (30) days wages under N.R.S.  608.140 and 608.050, for all members of the WRA Former Employee Sub-Class, together with attorneys' fees, costs, and interest as provided by law.

## COUNT TEN

### Failure to Pay Separated Employees Wages When Due
**(On Behalf of Plaintiff Cántaro and the El Tejon Former Employee Class Against Defendant El Tejon and Gragirena)**

233.    Plaintiff Cántaro incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

234.    As set forth above, Plaintiff Cántaro asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

235.    Mr. Cántaro and many other Class Members are no longer employed by El Tejon and Gragirena, whether due to resignation or termination.

236.    N.R.S.  608.140 provides that an employee has a private right of action for unpaid wages.

237.    N.R.S.  608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

238.    N.R.S.  608.040(1)(a-b), in relevant part, imposes a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee

40

who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

239.   N.R.S.  608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

240.   By failing to pay Plaintiff and all members of the El Tejon Class who are former employees for all hours worked in violation of state law, Defendants El Tejon and Gragirena have failed to timely remit all wages due and owing to Plaintiff and all members of the El Tejon Class who are former employees.

241.   Despite demand, Defendants willfully refuse and continue to refuse to pay Plaintiff and all El Tejon Class Members who are former employees their full wages due and owing to them.

242.   Wherefore, Plaintiff demands thirty (30) days wages under N.R.S.  608.140 and 608.040, and an additional thirty (30) days wages under N.R.S.  608.140 and 608.050, for all members of the El Tejon Class who are former employees, together with attorneys' fees, costs, and interest as provided by law.

## COUNT ELEVEN

### Failure to Pay Minimum Wages in Violation of the Nevada Constitution
### (On Behalf of Plaintiff De La Cruz and the MPAS Nevada Class Against Defendant MPAS)

243.   Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.  As noted above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of the MPAS Nevada Class pursuant to Fed. R. Civ. P. 23.

244.   MPAS employed Plaintiff De La Cruz and other members of the MPAS Nevada Class in Nevada during the relevant statute of limitations and paid him less than the Nevada minimum wage.

2244828.2

245.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage, and attorneys' fees, pursuant to Nev. Const. art. 15, § 16, for the relevant time period alleged herein.

### COUNT TWELVE

### Promissory Estoppel
### (Plaintiffs De La Cruz and Inga and the MPAS Nevada Class Against Defendant MPAS)

246.    Plaintiffs incorporate by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

247.    As set forth above, Plaintiffs De La Cruz and Inga assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

248.    In the alternative to a contract claim, Plaintiffs De La Cruz and Inga and the MPAS Nevada Class are entitled to relief in promissory estoppel.  MPAS promised Plaintiffs and members of the MPAS Nevada Class that it would adhere to 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 655.135.

249.    Plaintiffs Inga and De La Cruz and the MPAS Nevada Class relied on this promise to their detriment by traveling to MPAS member ranches to work as shepherds, where MPAS and its members illegally failed to pay wages as promised.  The Class Members also relied on this promise to their detriment by paying their own visa application fees and recruitment costs, which MPAS failed to pay.  Plaintiffs De La Cruz and Inga and the MPAS Nevada Class are entitled to damages, including all wages owed but not paid for the relevant time period alleged herein, and for all costs borne by Class Members to obtain the labor certifications needed to work for MPAS and its members.

### COUNT THIRTEEN

### Unjust Enrichment and Quantum Meruit
### (Plaintiffs De La Cruz and Inga and the MPAS Nevada Class Against Defendant MPAS)

250.    Plaintiffs incorporate by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

2244828.2

251.    As set forth above, Plaintiffs De La Cruz and Inga assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

252.    In the alternative to a contract claim, Plaintiffs De La Cruz and Inga and the MPAS Nevada Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on MPAS when Plaintiffs and the MPAS Nevada Class performed work as specified by MPAS for which MPAS failed to pay the required compensation in violation of 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 655.135.

253.    That benefit was appreciated by MPAS as it had the advantage of Plaintiffs' and Class Members' labor without paying for that labor as required; it is unjust for MPAS to be permitted to benefit from the illegally obtained labor; and MPAS engaged in unfair competition with other Nevada businesses that abide by Nevada's wage and hour laws and contract laws.

254.    Plaintiff De La Cruz and the MPAS Nevada Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210, and those wages were not paid according to that expectation.  Plaintiffs De La Cruz and Inga and the MPAS Nevada Class likewise reasonably expected to be reimbursed for all application fees and recruitment costs associated with obtaining their H-2A labor certifications due under 20 C.F.R. § 655.135, and those costs were not reimbursed according to that expectation.

255.    As a result, Plaintiffs De La Cruz and Inga and the MPAS Nevada Class are entitled to the full value of the services provided, and MPAS should be disgorged of the illegally withheld wages and reimbursement costs for the relevant time period alleged herein.

## COUNT FOURTEEN

### Breach of Contract of Quasi-Contract
### (Plaintiffs De La Cruz and Inga and the MPAS Nevada Class Against Defendant MPAS)

256.    Plaintiffs incorporate by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

257.    As set forth above, Plaintiffs De La Cruz and Inga assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

43

258.     Plaintiffs and the MPAS Nevada Class entered into contracts with MPAS that explicitly incorporated the requirements of 20 C.F.R. §§ 655.122, 655.210 and 655.135 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiffs and members of the MPAS Nevada Class entered into contracts with MPAS, which were drafted by MPAS, and which included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122, 20 C.F.R. § 655.210 and 20 C.F.R. § 135.

259.     These contracts provide that each worker employed by MPAS will be paid the higher of the monthly AEWR, the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof.  MPAS failed to pay the required wage when they failed to pay the minimum wage required by Article 15, section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state law, the above cited regulations, and the employment contract.  These contracts also provide that employers are not permitted to shift costs for any activity related to obtaining an H-2A labor certification, including visa application fees and any related costs.  Any of these costs borne by workers must then be reimbursed by the employer.  Defendant MPAS failed to reimburse its herders for these costs.

260.     As a result of the breach of contract, Plaintiffs and the MPAS Nevada Class suffered damages for the relevant time period alleged herein.

## COUNT FIFTEEN

**Failure to Pay Separated Employees Wages When Due**
**(On Behalf of Plaintiff De La Cruz and the MPAS Former Employee Sub-Class Against Defendant MPAS)**

261.     Plaintiff De La Cruz incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

262.     As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

263.     Mr. De La Cruz and members of the MPAS Former Employee Sub- Class are no longer employed by MPAS, whether due to resignation or termination.

44

264.     N.R.S. § 608.140 provides that an employee has a private right of action for unpaid wages.

265.     N.R.S. § 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

266.     N.R.S. § 608.040(1)(a-b), in relevant part, impose a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

267.     N.R.S. § 608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

268.     By failing to pay Plaintiff and all members of the MPAS Former Employee Sub-Class who are former employees for all hours worked in violation of state law, Defendant MPAS has failed to timely remit all wages due and owing to Plaintiff and all members of the Sub-Class.

269.     Wherefore, Plaintiff demands thirty (30) days wages under N.R.S. 608.140 and 608.040, and an additional thirty (30) days wages under N.R.S. 608.140 and 608.050, for all members of the MPAS Former Employee Sub-Class, together with attorneys' fees, costs, and interest as provided by law.

## COUNT SIXTEEN

### Breach of Contract or Quasi Contract
### (Plaintiff Inga and the Estill Ranches Class Against Defendant Estill Ranches)

270.     Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

2244828.2

271.   As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

272.   Plaintiff and the Estill Ranches Class entered into contracts with Defendant Estill Ranches that explicitly incorporated the requirements of 20 C.F.R. § 135 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated.  In the alternative, Plaintiff and the Estill Ranches Class entered into contracts with Defendant Estill Ranches that included as implied terms of the contracts the requirements of 20 C.F.R. § 135.

273.   These contracts provide that employers are not permitted to shift costs for any activity related to obtaining an H-2A labor certification, including visa application fees and any related costs. Any of these costs borne by workers must then be reimbursed by the employer.  Defendant Estill Ranches failed to reimburse its herders for these costs.

274.   As a result of the breach of contract, Plaintiff Inga and the Estill Ranches Class suffered damages for the relevant time period alleged herein.

## COUNT SEVENTEEN

### Promissory Estoppel
### (Plaintiff Inga and the Estill Ranches Class Against Defendant Estill Ranches)

275.   Plaintiff incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

276.   As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

277.   In the alternative to a contract claim, Plaintiff Inga and the Estill Ranches Class are entitled to relief in promissory estoppel.  Defendant Estill Ranches promised Plaintiff Inga and the Estill Ranches Class that it would adhere to 20 C.F.R. § 655.135.

278.   Plaintiff Inga and the Estill Ranches Class relied on this promise to their detriment by paying for their own application fees and recruitment costs, which Estill Ranches failed to pay. Plaintiff Inga and the Estill Ranches Class are entitled to damages, including all costs borne by Class Members associated with obtaining labor certifications needed to work for Estill Ranches.

2244828.2

## COUNT EIGHTEEN

### Unjust Enrichment and Quantum Meruit
### (Plaintiff Inga and the Estill Ranches Class Against Defendant Estill Ranches)

279.    Plaintiff Inga incorporates by reference paragraphs 1 to 184 of this Complaint as if fully re-written herein.

280.    As set forth above, Plaintiff Inga asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

281.    In the alternative to a contract claim, Plaintiff Inga and the Estill Ranches Class are also entitled to relief in unjust enrichment and quantum meruit.  A benefit was conferred on Defendant Estill Ranches when Plaintiff and the Estill Ranches Class performed work as specified by Defendant Estill Ranches for which Defendant Estill Ranches failed to pay the required costs in violation of 20 C.F.R. § 655.135.

282.    That benefit was appreciated by Defendant Estill Ranches as it had the advantage of the Plaintiff's and Class Members' labor without paying for that labor as required; it is unjust for the Defendant Estill Ranches to be permitted to benefit from the illegally obtained labor; and Defendant Estill Ranches engaged in unfair competition with other Nevada businesses that abide by Nevada's contract laws.

283.    Plaintiff Inga and the Estill Ranches Class reasonably expected to be reimbursed for all application fees and recruitment costs associated with obtaining their H-2A labor certifications, and those costs were not reimbursed according to that expectation.

284.    As a result, Plaintiff Inga and the Estill Ranches Class are entitled to the full value of the services provided and Defendant Estill Ranches should be disgorged of the illegally withheld reimbursement costs for the relevant time period alleged herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully requests that judgment be entered in their favor and in favor of those similarly situated and that this Court:

1.    Declare Defendants in violation of each of the counts set forth above;

2244828.2

2.  Certify and maintain this action as a class action, with Plaintiff Cántaro as designated class representative for the WRA and El Tejon Classes, with Plaintiff De La Cruz as designated class representative for the MPAS Class, and with Plaintiff Inga as designated class representative for the MPAS and Estill Ranches Classes, and with their counsel appointed as class counsel;

3.  Award damages for Defendants' failure to pay the Nevada minimum wage, as required by contract, by state law, and the principles of unjust enrichment, quantum meruit, and promissory estoppel, and to pay wages in a timely fashion upon conclusion of employment;

4.  Award pre-judgment, post-judgment, and statutory interest, as permitted by law;

5.  Award attorneys' fees;

6.  Award costs;

7.  Order equitable relief, including a judicial determination of the rights and responsibilities of the parties;

8.  Award such other and further relief as the Court may deem just and proper; and

9.  Grant Plaintiffs a jury trial.

Dated: May 15, 2017                        Respectfully submitted,

/s/  Christine E. Webber
Christine E.  Webber (*pro hac vice*)
Brian Corman (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Suite 500
Washington, DC  20005
Tel: 202-408-4600
Fax: 202-408-4699
Email: cwebber@cohenmilstein.com
bcorman@cohenmilstein.com

Joshua D.  Buck, Nev.  Bar No.  12187
Thierman Buck LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel.  (775) 284-1500
Fax.  (775) 703-5027
Email: josh@thiermanbuck.com

2244828.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Alexander Hood (*pro hac vice*)
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

*Attorneys for the Plaintiffs*

2244828.2

**PROOF OF SERVICE**

I, Heijin McIntire, declare:

I am employed in Washington D.C. by the law office of Cohen Milstein Sellers & Toll, P.L.L.C. located at 1100 New York Avenue, N.W., Suite 500, Washington, D.C. 20005.  I am over the age of 18 and not a party to this action.

On this day, May 15, 2017, I served the foregoing Second Amended Complaint by causing the above named document to be served via the electronic service through the Court's ECF program to all parties who have appeared in this case.

/s/  Heijin C. McIntire

2244828.2